BENNO & ASSOCIATES P.C.
Ameer Benno, Esq.
30 Wall Street, 8th Floor
New York, NY 10005
Tel.: (212) 227-9300

Corey Lee, Esq.
C.T. Lee & Associates
225 Broadway, Suite 3005
New York, NY 10007
Tel.: (212) 566-5509

P. Jenny Marashi, Esq.
Law Office of Poupa Jenny Marashi
930 Grand Concourse #1E
Bronx, NY 10451
Tel.: (917) 703-7142

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YING LI, | Case No.: |
| Plaintiff, | |
| vs. | FIRST AMENDED COMPLAINT |
| THE CITY OF NEW YORK, DET. MATTHEW DEGNAN, LT. THOMAS CONFORTI, DET. DAVID MOSER, LT. JOHN PERDOCH, DET. JOHN PHELAN, P.O. YATYU YAM, SGT. GUISELLA RODRIGUEZ, LT. ARTHUR HALL, DET. MICHAEL HEFFERNAN, SGT. TIMOTHY CAI, DET. DOUGLAS LEE, DET. DENNIS CHAN, SGT "FNU" MANFREDI ("FIRST NAME UNKNOWN"), ADA P. LEIGH BISHOP, DR. KRISTEN LANDI, "JOHN DOES 1-15" (NAMES FICTITIOUS AND PRESENTLY UNKNOWN), DR. FERNANDA KUPFERMAN, AND FLUSHING HOSPITAL MEDICAL CENTER, | DEMAND FOR JURY TRIAL |
| Defendants | |

1

2

Plaintiffs, by and through their undersigned attorneys, allege as follows:

FIRST AMENDED COMPLAINT - 1

## NATURE OF THE ACTION

1.      Plaintiff brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of her civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.   Plaintiff also asserts claims under New York law.

## JURISDICTION

2.      The Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C §§ 1331, 1343(a), (3), and (4).

3.      This Court may also exercise supplemental jurisdiction over the plaintiff's state law claims that arise from the same facts and circumstances under 28 USC § 1367.

## JURY TRIAL DEMANDED

4.      Plaintiff demands trial by jury of all issues properly triable thereby

## VENUE

5.      Venue is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

6.      Plaintiff YING LI is a United States citizen and a citizen of the City and State of New York.

7.      That at all times herein mentioned, defendant CITY OF NEW YORK (hereinafter "CITY") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

8.      That at all times herein mentioned, defendant CITY operated, controlled and maintained a police force known as the New York Police Department ("hereinafter "NYPD").

FIRST AMENDED COMPLAINT - 2

9.      Defendant City was also, at all times relevant herein, authorized to act through the Queens County District Attorney's office in regard to investigation, evaluation and prosecution of alleged criminal conduct within the County of Queens and City of New York.

10.     The Queens County District Attorney's office was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County of Queens and City of New York.

11.     Although not a named party, Queens County District Attorney Richard Brown was at all times relevant herein the District Attorney of the County of Queens, responsible for, and the chief architect of, the policies, practices and customs of the Queens County District Attorney's Office, as well as responsible for the hiring, screening, training, retention, supervision, monitoring, auditing, discipline, counseling and control of the assistant district attorneys who worked in his office.

12.     Defendant City was also, at all times relevant herein, authorized to act through the Office of Chief Medical Examiner of the City of New York ("OCME").

13.     OCME was at all times relevant herein a municipal entity, existing as a division within the City of New York Department of Health and Mental Hygiene, created and authorized under the laws of the State of New York to investigate in regard to investigations into cases of persons who die within New York City from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner.

14.     Bodies of deceased persons are brought to OCME because the law requires that the Chief Medical Examiner investigate deaths of persons dying from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a

FIRST AMENDED COMPLAINT - 3

correctional facility, or in any suspicious or unusual manner. The medical examiner is responsible for determining the cause and manner of death.

15.     That at all times herein mentioned, defendant DET. MATTHEW DEGNAN (hereinafter, "DEGNAN") was and is an NYPD officer employed by defendant CITY.

16.     That at all times herein mentioned, defendant DEGNAN was acting within the course and scope of his employment with defendant CITY.

17.     That at all times herein mentioned, defendant DEGNAN was acting under color of state law.

18.     Defendant DEGNAN is sued herein in both his individual and official capacities.

19.     That at all times herein mentioned, defendant LT. THOMAS CONFORTI (hereinafter, "CONFORTI") was and is an NYPD officer employed by defendant CITY.

20.     That at all times herein mentioned, defendant CONFORTI was acting within the course and scope of his employment with defendant CITY.

21.     That at all times herein mentioned, defendant CONFORTI was acting under color of state law.

22.     Defendant CONFORTI is sued herein in both his individual and official capacities.

23.     That at all times herein mentioned, defendant DET. DAVID MOSER (hereinafter, "MOSER") was and is an NYPD officer employed by defendant CITY.

24.     That at all times herein mentioned, defendant MOSER was acting within the course and scope of his employment with defendant CITY.

25.     That at all times herein mentioned, defendant MOSER was acting under color of state law.

FIRST AMENDED COMPLAINT - 4

26.     Defendant MOSER is sued herein in both his individual and official capacities.

27.     That at all times herein mentioned, defendant LT. JOHN PERDOCH (hereinafter, "PERDOCH") was and is an NYPD officer employed by defendant CITY.

28.     That at all times herein mentioned, defendant PERDOCH was acting within the course and scope of his employment with defendant CITY.

29.     That at all times herein mentioned, defendant PERDOCH was acting under color of state law.

30.     Defendant PERDOCH is sued herein in both his individual and official capacities.

31.     That at all times herein mentioned, defendant DET. JOHN PHELAN (hereinafter, "PHELAN") was and is an NYPD officer employed by defendant CITY.

32.     That at all times herein mentioned, defendant PHELAN was acting within the course and scope of his employment with defendant CITY.

33.     That at all times herein mentioned, defendant PHELAN was acting under color of state law.

34.     Defendant PHELAN is sued herein in both his individual and official capacities.

35.     That at all times herein mentioned, defendant P.O. YATYU YAM (hereinafter, "YAM") was and is an NYPD officer employed by defendant CITY.

36.     That at all times herein mentioned, defendant YAM was acting within the course and scope of his employment with defendant CITY.

37.     That at all times herein mentioned, defendant YAM was acting under color of state law.

38.     Defendant YAM is sued herein in both his individual and official capacities.

FIRST AMENDED COMPLAINT - 5

39.     That at all times herein mentioned, defendant SGT. GUISELLA RODRIGUEZ (hereinafter, "RODRIGUEZ") was and is an NYPD officer employed by defendant CITY.

40.     That at all times herein mentioned, defendant RODRIGUEZ was acting within the course and scope of her employment with defendant CITY.

41.     That at all times herein mentioned, defendant RODRIGUEZ was acting under color of state law.

42.     Defendant RODRIGUEZ is sued herein in both her individual and official capacities.

43.     That at all times herein mentioned, defendant LT. ARTHUR HALL (hereinafter, "HALL") was and is an NYPD officer employed by defendant CITY.

44.     That at all times herein mentioned, defendant HALL was acting within the course and scope of his employment with defendant CITY.

45.     That at all times herein mentioned, defendant HALL was acting under color of state law.

46.     Defendant HALL is sued herein in both his individual and official capacities.

47.     That at all times herein mentioned, defendant DET. MICHAEL HEFFERNAN (hereinafter, "HEFFERNAN") was and is an NYPD officer employed by defendant CITY.

48.     That at all times herein mentioned, defendant HEFFERNAN was acting within the course and scope of his employment with defendant CITY.

49.     That at all times herein mentioned, defendant HEFFERNAN was acting under color of state law.

50.     Defendant HEFFERNAN is sued herein in both his individual and official capacities.

FIRST AMENDED COMPLAINT - 6

51.     That at all times herein mentioned, defendant SGT. TIMOTHY CAI (hereinafter, "CAI") was and is an NYPD officer employed by defendant CITY.

52.     That at all times herein mentioned, defendant CAI was acting within the course and scope of his employment with defendant CITY.

53.     That at all times herein mentioned, defendant CAI was acting under color of state law.

54.     Defendant CAI is sued herein in both his individual and official capacities.

55.     That at all times herein mentioned, defendant DET. DOUGLAS LEE (hereinafter, "LEE") was and is an NYPD officer employed by defendant CITY.

56.     That at all times herein mentioned, defendant LEE was acting within the course and scope of his employment with defendant CITY.

57.     That at all times herein mentioned, defendant LEE was acting under color of state law.

58.     Defendant LEE is sued herein in both his individual and official capacities.

59.     That at all times herein mentioned, defendant DET. DENNIS CHAN (hereinafter, "CHAN") was and is an NYPD officer employed by defendant CITY.

60.     That at all times herein mentioned, defendant CHAN was acting within the course and scope of his employment with defendant CITY.

61.     That at all times herein mentioned, defendant CHAN was acting under color of state law.

62.     Defendant CHAN is sued herein in both his individual and official capacities.

FIRST AMENDED COMPLAINT - 7

63.     That at all times herein mentioned, defendant SGT. "FNU" MANFREDI ("First Name Unknown") (hereinafter, "MANFREDI") was and is an NYPD officer employed by defendant CITY.

64.     That at all times herein mentioned, defendant MANFREDI was acting within the course and scope of his employment with defendant CITY.

65.     That at all times herein mentioned, defendant MANFREDI was acting under color of state law.

66.     Defendant MANFREDI is sued herein in both his individual and official capacities.

67.     That at all times relevant herein, defendant Assistant District Attorney P. LEIGH BISHOP ("BISHOP") was an officer, employee, and/or agent of the Queens County District Attorney's Office.

68.     That at all times relevant herein, defendant BISHOP was duly appointed and acting as an officer, servant, employee, and/or agent of the Queens County District Attorney's Office.

69.     That at all times relevant herein, defendant BISHOP was acting within the scope and course of her employment with the Queens County District Attorney's Office, and under color of state law, and otherwise performed and engaged in conduct incidental to the performance of her lawful pursuit of his duties as an officer, servant, employee, and/or agent of the Queens County District Attorney's Office.

70.     That defendant BISHOP is sued in both her individual and official capacities.

71.     That at all times herein mentioned, defendant DR. KRISTEN LANDI (hereinafter, "LANDI") was and is an OCME physician employed by defendant CITY.

FIRST AMENDED COMPLAINT - 8

72.     That at all times herein mentioned, defendant LANDI was acting within the course and scope of her employment with defendant CITY.

73.     That at all times herein mentioned, defendant LANDI was acting under color of state law.

74.     Defendant LANDI is sued herein in both her individual and official capacities.

75.     That at all times herein mentioned, defendants "JOHN DOES 1 through 15" were and are law enforcement and/or OCME personnel employed by defendant CITY.

76.     That at all times herein mentioned, defendants JOHN DOES 1 through 15 were acting within the course and scope of their employment with defendant CITY.

77.     That at all times herein mentioned, defendants JOHN DOES 1 through 15 were acting under color of state law.

78.     The names "JOHN DOES 1 through 15" are fictitious, as these defendants' true names, genders, and identities are presently unknown.

79.     These defendants are intended to be the law enforcement and/or OCME personnel involved in the detention, arrest, imprisonment, and prosecution of plaintiff.

80.     That defendants JOHN DOES 1 through 15 are sued herein in both their individual and official capacities.

81.     That at all times herein mentioned, defendant CITY was under an obligation to use reasonable care in the hiring, training, retention, and supervision of its employees, including, without limitation, all defendants set forth above.

82.     That at all times herein mentioned, defendants CITY, DEGNAN,  CONFORTI, MOSER, PERDOCH, PHELAN, YAM, RODRIGUEZ, HALL, HEFFERNAN, CAI, LEE, CHAN, MANFREDI, Assistant District Attorney BISHOP, Dr. LANDI, and "JOHN DOES 1-

FIRST AMENDED COMPLAINT - 9

1   15" (names fictitious and presently unknown) shall be collectively referred to as the "CITY

2   DEFENDANTS."

3        83.     That at all times herein mentioned, defendants DEGNAN,   CONFORTI,

4   MOSER, PERDOCH, PHELAN, YAM, RODRIGUEZ, HALL, HEFFERNAN, CAI, LEE,

5   CHAN, MANFREDI, and "JOHN DOES 1-15" (names fictitious and presently unknown) may

6   also be collectively referred to as the "OFFICER DEFENDANTS" or "DEFENDANT

7   OFFICERS."

8        84.     That at all times herein mentioned, FLUSHING HOSPITAL MEDICAL

9   CENTER ("FHMC") was a private medical hospital located at 4500 Parsons Boulevard in

10   Flushing, Queens, New York.  Defendant FHMC is also liable for the damages suffered by

11   plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of

12   respondeat superior.

13        85.     That at all times herein mentioned, defendant DR. FERNANDA KUPFERMAN

14   (hereinafter, "KUPFERMAN") was and is a physician employed by defendant FHMC.

15        86.     At all relevant times herein, the individual defendants acted jointly and in

16   concert with each other.

17        87.     Each individual defendant s had the duty and the opportunity to protect plaintiff

18   from the unlawful actions of the other individual defendants, but each individual defendant

19   failed and refused to perform such duty, thereby proximately causing plaintiff's injuries.

20   **<u>STATEMENT OF FACTS</u>**

21        88.     The facts stated in this complaint are based, inter alia, on the personal knowledge

22   of plaintiff regarding events in which he was directly involved and upon information and belief.

23   The sources of "information and belief" factual statements are primarily documents from the

FIRST AMENDED COMPLAINT - 10

1    underlying criminal prosecution and related public documents which are currently available to

2    plaintiff. Those sources are incomplete, particularly, without limitation, as to numerous

3    documents and court exhibits. This complaint is drawn without the benefit of full discovery

4    proceedings.

5         89.     Plaintiff repeats and realleges each and every allegation set forth above as though

6    fully set forth at length herein.

7         90.     Plaintiff Ying Li was 22 years old at the time of the incident that resulted in this

8    action. Plaintiff's husband Hang Bin was 24 years old at the time of the incident that resulted in

9    this action.

10        91.     Plaintiff and her husband were elementary school classmates in Fujian Province

11    in China. They met each other again, by chance, in the United States. They both came to the

12    US a few years prior. He took a leave from his job to take care of his wife and daughter in

13    accordance to the tradition of *zuo yuezi*, or "sitting the month", which is a Chinese custom,

14    where for at least the first month to 100 days of the baby's life, the mother and baby are to be

15    diligently cared for by family members.

16        92.     Baby Annie was born on August 13, 2007, five weeks premature. She spent her

17    first few days in the NICU. By report, her mother had been in poor health, and Annie was born

18    with head molding, tachypnea and grunting (pulmonary distress and retraction noted). Her labs

19    showed high WBC (suggesting infection), and low RBC and Hct. The diagnosis was possible

20    sepsis, and she was treated with antibiotics. After a few days on antibiotics, her WBC count

21    became normal, and she was released, although her RBC count was still low.

FIRST AMENDED COMPLAINT - 11

93.    Hang Bin was honored and happy to have the opportunity to take care of his wife and daughter for the first 100 days of her life.  Annie had a lovely disposition.  She was calm and joyful. Hang Bin and plaintiff were grateful and kind to one another.

94.    On October 22, plaintiff and Hang Bin felt that Annie had a slight bit of a fever, otherwise she seemed well.  As first time parents, they were anxious about their daughter, and called their parents in China several times to report how their daughter was doing and to ask them for advice. Their friend, Li Dong came over. By the end of the evening it seemed as if her slight fever had waned.

95.    At approximately 1:00 am on October 23, while Annie woke up to feed, she suddenly went limp.  After Annie collapsed, plaintiff and her husband immediately notified 911. Li Dong and their neighbor Helen Zhou assisted them in speaking with 911, and getting the baby to the ambulance.

96.    Annie suffered from a preexisting and congenital heart disease and inherited from her father's family, a genetic disorder called Osteogenesis Imperfecta ("OI"), which is also known as "brittle bone disease."  OI caused Annie to suffer easy bruising and bone fractures. Annie's mother's family history also included a number of sudden infant deaths, including her brother who died at two months, as well as a sister with hip fractures and bow legs,  that leaves her extremely physically impaired and wheelchair bound.

97.    The cause of Annie's collapse was natural causes likely due to a remote heart attack with calcified heart muscles , and/or other collagen and tissue related issues.

98.    When Annie arrived at the Emergency Room, Annie was in an unresponsive condition, without heartbeat or pulse.  Annie was revived and placed on life support.  Annie's Glasgow Coma Scale was 3, the lowest possible score. She had no bruising. Her fontanelle was

FIRST AMENDED COMPLAINT - 12

not bulging, indicating her brain was not swollen, and it was unlikely she had any substantial intracranial hemorrhaging. The initial and primary diagnosis was cardiorespiratory arrest with possible sepsis.   The medical report confirms there were no external signs of trauma (no bruising or swelling).  This was initially considered a Sudden Infant Death Syndrome ("SIDS") case.

99.    On October 23, an ophthalmology report at 11:55 a.m. showed extensive retinal hemorrhages in both eyes "caused by prolonged CPR vs Head Trauma." A note indicates that SBS "usually produces less confluent areas of hemorrhaging."

100.    On October 23, at 1:37 a CT Scan of Annie's head showed a non-displaced right parietal skull fracture, a recent subdural hemorrhage and diffuse lack of oxygen to the brain. The fracture was not accompanied by significant soft tissue welling, suggesting it was an old fracture.  There was also an indication of an ear or sinus infection.

101.    Upon information and belief, on October 23, 2007 at approximately 5:00pm defendant PHELAN and his NYPD Child Abuse Squad received a call regarding suspected child abuse.  He went to the Hospital with other members of the NYPD, and defendant YAM who was an Officer at the 109th Precinct, and who spoke Mandarin.

102.    Defendant PHELAN and his partner arrived at Flushing Hospital at approximately 6:30 pm.

103.     Defendant PHELAN and his partner spoke with staff there, looked at medical charts, and met plaintiff and her husband through hospital staff there.

104.    Plaintiff and her husband were then taken to defendant PHELAN's office at the Queens Child Abuse Squad, with interpreter defendant YAM.

FIRST AMENDED COMPLAINT - 13

105.    At arrival several other Officers and sergeants were there including defendant MANFREDI. During the interrogation and while the Li's were with Officers, there was a back and forth within 109th Precinct regarding who would take the case.  They waited for the 109th Precinct's defendant HEFFERNAN to arrive.  Finally at approximately 10:00 pm it was decided that Child Abuse Squad would take the case.

106.    At approximately 10:30 pm defendant PHELAN and DEGNAN interrogated Ying Li for about an hour while defendant YAM interpreted.   After one hour of interrogation, at approximately 11pm, defendant DEGNAN and defendant YAM interrogated Hang Bin.

107.    Upon information and belief, at approximately 12:00 am on October 24, 2007, it was decided the 109th precinct should take the case, and the case was transferred.

108.    The 109th precinct detectives, Defendant DEGNAN and HEFFERNAN took the Li's to their apartment.  Defendants DEGNAN and HEFFERNAN then drove the Li's to Flushing Hospital, where Defendants DEGNAN and HEFFERNAN engaged in lengthy communications with the Flushing Hospital Staff, including defendant KUPFERMAN.

109.    The case was transferred back again to the Child Abuse Squad later that morning, and the Li's were again taken to the Child Abuse Squad.  At 2:00 pm, over 19 hours after they had been asked by the Police to leave their dying child, after 48 hours of fluorescent lights and questions and interpreters, the Li's were finally driven to Flushing Hospital, with defendant PHELAN.  Upon information and belief, upon their arrival at Flushing Hospital, it was decided that the case would be transferred back over to the 109th Precinct.

110.    Later that day on October 24, 2007, defendant PHELAN went to Li's house. Hang Bin signed a consent for defendant PHELAN to search his home.  While there, Defendant

FIRST AMENDED COMPLAINT - 14

1    DEGNAN received a call that the 109th precinct would get a warrant to search the home. Later,

2    detectives from the 109th Precinct went to search the home.

3         111.    Defendant PHELAN did not interview any people other than medical personnel

4    and Ying Li.

5         112.    Defendant CHAN served as interpreter from the afternoon of October 24th, 2007

6    until the morning hours of October 25th.  Among other things, he interpreted for defendants

7    HEFFERNAN and MOSER, from the 109th precinct, while they separately interrogated Hang

8    Bin Li and Ying Li, several times.

9         113.    These interrogations of plaintiff and Hang Bin Li included Officers from the

10   Queens Homicide Squad (a separate squad from the 109th Precinct homicide division, and the

11   Child Abuse Squad).  These officers, whose identities are not presently known, are included in

12   defendants "John Does 1-15."

13        114.    For almost 24 full hours, as their daughter lay dying at the hospital, the Lis, who

14   were not permitted to see their daughter, were subjected to multiple interrogations and searches

15   of their home by three separate squads (each with their own interrogation techniques), forensic

16   interrogations by several medical personnel at Flushing Hospital, and were treated with

17   suspicion and unconcealed and unrestrained racism.

18        115.     Throughout this terrible ordeal, defendants – both Officers and medical

19   personnel alike, including defendant KUPFERMAN – repeatedly screamed at plaintiff and

20   Hang Bin that they killed their daughter, and that unless the Lis told them about which one of

21   them caused the injury to Annie, the doctors could not help Annie.

22        116.    Defendants also repeatedly promised plaintiff and Hang Bin that they could

23   return to their dying child if they admitted complicity in the baby's injury.

FIRST AMENDED COMPLAINT - 15

117.    After suffering this torture and hearing the authorities insist, over and over against the weight of all modern science, that the Lis must have caused the injury, and in desperation to have his daughter provided with medical care which defendants had said would be withheld unless he or plaintiff told them something more about the cause of Annie's injuries, Hang Bin stated that maybe, possibly, he had inadvertently lightly bumped Annie's head against a table while trying to resuscitate her.

118.    Ying Li, however, was positive that she did not harm her daughter, that she never saw Hang Bin do anything but love and treasure Annie. She maintained her innocence throughout.

119.    Upon information and belief, Defendants MOSER, CHAN, and HEFFERNAN drove the Li's to their apt, where, for a third time, they asked permission to come into the home and take pictures of the apartment, and asked them to replay what had happened, with the light bump. Plaintiff and Hang Bin complied once again.

120.    Upon information and belief, on October 25th at approximately 11:30 am defendant KUPFERMAN conducted a "forensic interview" of plaintiff, and defendant KUPFERMAN details in the medical records that after three times asking her a question plaintiff changed her story from what was previously stated.

121.    Upon information and belief, throughout the medical records, whole paragraphs demonstrate that the FHMC and its staff were more concerned about their investigatory role as detectives, and less interested, if at all, in sound medical diagnosis.  Lengthy pages were dedicated to Ying Li and her husband's demeanor, interaction with medical staff and law enforcement, and opining upon their possible motives.

FIRST AMENDED COMPLAINT - 16

122.    No past history or prenatal history evaluation was done.  No family history of unexpected deaths, or of genetic diseases or disorders were completed.  No Vitamin D or OI testing was done.  Despite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease, defendant FHMC and its staff, including defendant KUPFERMAN made no efforts to seek a diagnosis other than SBS.   Defendant FHMC and KUPFERMAN also promised plaintiff that they could better treat her dying child if she admitted her or her husband's complicity in the baby's injury.

123.    Baby Annie was confirmed brain dead on October 26th at 7:35 p.m.

124.    Upon information and belief, on October 26, 2007, in the evening hours, plaintiff and her husband were once again taken to the 109th precinct, where defendant CHAN, who at the time was employed at the Homicide Burueau of the Queen's County District Attorney's Office, and defendant HEFFERNAN and defendant DEGNAN again questioned plaintiff and her husband separately, and again produced another hand written statement from Hang Bin Li regarding the events that occurred on October 22, 2007 to October 23, 2007.  Plaintiff and her husband were kept until the morning hours of October 27, 2007.

125.     Annie was removed from life support on October 28th at 2:40 p.m.

126.    Upon information and belief, on October 29, 2007 Defendants MOSER, DEGNAN, HEFFERNAN and CAI interrogated Hang Bin Li again at the 109th Precinct.

127.    Plaintiff, who had committed no wrongdoing, steadfastly denied wrongdoing throughout the numerous interrogations conducted by the Defendants.

128.    An autopsy and subsequent forensic testing were performed by the OCME, in conjunction with the NYPD.

FIRST AMENDED COMPLAINT - 17

129.     Upon information and belief, on October 29th Officer DEGNAN was present while autopsy was performed by defendant LANDI at the ME's office.

130.     Upon information and belief, on November 3, defendants HEFFERNAN and MOSER interrogated a witness named Li Dong in Chester, New York.

131.     Defendants unlawfully ordered plaintiff to remain in and about her home from approximately October 26, 2007 up to the date of her arrest five months later on March 11, 2008.

132.     During this period when the Li's asked Defendant Officers and other City employees (ACS) about the whereabouts of their daughter's body, as this was extremely important to them, both as parents and in accordance with Chinese culture, they were told that it was none of their business.

133.     On March 11, 2008 at approximately 12:00 p.m., defendants, without probable cause or legal justification, without an interpreter, and, upon information and belief, without an arrest warrant, arrested and imprisoned plaintiff for the death of baby Annie.

134.     According to defendants, Annie had died of "Shaken Baby Syndrome" ("SBS").

135.     Not only did defendants lack evidence that Annie had, in fact, died from SBS, but in fact, forensically, there was no clinical or diagnostic medical evidence to support a finding of SBS.

136.     Annie's brain and neck had no evidence of traumatic axonal injury by Beta Amyloid Precursor Protein ("BAPP"), a specific immunohistochemistry marker for SBS.  Solid science invalidated any hypothesis of SBS with respect to baby Annie.

137.     Moreover, despite being aware of and being presented with evidence that baby Annie's injuries could have been caused by OI or other natural causes, defendants, deliberately

FIRST AMENDED COMPLAINT - 18

and/or with deliberate indifference, refused to consider OI and other natural causes as the cause of Annie's physical injuries and failed to take any steps to rule out OI as the cause of baby Annie's injuries.

138.    Further, there was no evidence, and no reasonable basis to believe, that plaintiff had at any time engaged in any conduct which would have caused or contributed to Annie's injuries and death.

139.    Indeed, nearly fifteen years before plaintiff's arrest for the death of her daughter, the New York State Court of Appeals, in <u>People v. Wong</u>, 81 N.Y.2d 600 (1993), held that if there is more than one person who was present and physically able to have inflicted the shaking injuries at the time the child was injured, no charges for the act can be brought against anyone without a confession or other proof excluding all but the perpetrator.

140.    Despite that the alleged shaking took place while at least three people, other than Annie, were present and physically able hypothetically to have inflicted the shaking injuries, and despite the absence of a confession or any other proof excluding all but plaintiff as the perpetrator, plaintiff was nevertheless unlawfully arrested and imprisoned for her daughter's death.

141.    The <u>Wong</u> Court also held that a defendant's mere presence in an apartment at the time of the crime is insufficient to support a finding of criminal liability.  Criminal liability for such a defendant's failure to seek medical help for the baby after a baby is violently shaken "requires, at the very least, a showing both that the … defendant was personally aware that the shaking had occurred, and that such abusive conduct created a risk that the infant would die without prompt medical treatment."

FIRST AMENDED COMPLAINT - 19

142.     Defendants could make no such showing here, nor did the facts confronting defendants ever give rise to a reasonable inference that plaintiff was criminally liable as either for shaking Annie or as a "passive defendant."

143.     Defendants knowingly relayed false allegations against plaintiff that they had devised to the Queens County District Attorney's Office, including that on or about October 22, 2007, between 8:00 a.m. and 8:00 p.m., inside 43-18 Union Street, in the County of Queens, City and State of New York, plaintiff watched her husband repeatedly violently shake Annie which caused Annie to suffer brain damage and, ultimately, death.

144.     The Queens County District Attorney's Office used the information provided by defendants to draft a criminal court complaint against plaintiff.

145.     Defendant DEGNAN signed the criminal court complaint, thereby swearing to the veracity of its allegations, under penalty of perjury, despite his knowing that there was no truth to those allegations whatsoever, that the allegations against plaintiff were false and completely fabricated, that there was never any legal basis to have detained or arrested plaintiff, and that there was no legal basis to prosecute her.

146.     Plaintiff was thereafter arraigned on a criminal court complaint under Queens County Docket Number 2008QN013983, which, based on the fabricated information that defendants had provided to the District Attorney's Office, charged plaintiff with Manslaughter in the First Degree and Endangering the Welfare of a Child.

147.     There was no probable cause that plaintiff had committed any of these crimes or any other offense.

148.     All defendants agreed, cooperated, participated, and conspired with their co-defendants herein to assist in and effectuate plaintiff's unlawful detention, arrest, imprisonment,

FIRST AMENDED COMPLAINT - 20

1    and malicious prosecution for crimes they knew that she did not commit, and in so doing

2    deprived plaintiff of her rights, privileges and immunities secured by the Constitution of the

3    United States, including, but not limited to, her rights under the Fourth and Fourteenth

4    Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to

5    due process of law.

6        149.    Defendant LANDI willfully participated jointly with members of the NYPD and

7    the Queens County D.A.'s Office in in having plaintiff detained, arrested, imprisoned, and

8    prosecuted without justification, privilege, or probable cause.

9        150.    Moreover, defendant LANDI swore under oath in the criminal complaint against

10   plaintiff that had baby Annie received medical attention sooner, she may have been saved.  This

11   was false, misleading, and perjurious, and entirely unsupported and unsupportable by any

12   medical science or clinical or forensic evidence.

13       151.    Defendant LANDI, testified as an expert witnesses against plaintiff of her own

14   free will and volition and opined that Annie's death was due to SBS, also encouraged,

15   importuned, and continued plaintiff's prosecution for these crimes despite the complete absence

16   of probable cause that any crime had taken place or that plaintiff was the perpetrator.

17       152.    Upon information and belief, defendant LANDI made her determination largely

18   based on the evidence presented to her by defendant KUPFERMAN and Defendant City.

19   Defendant LANDI ignored signs of rib anterior flaring, and any kind of thorough eye exam for

20   eyes, or bones.

21       153.    Defendant LANDI overstepped her role in her capacity as an employee of

22   OCME by making statements as to the Li's guilt.

FIRST AMENDED COMPLAINT - 21

154.     Defendant LANDI also testified falsely and maliciously against plaintiff, including knowingly incorrect testimony about many medical elements, and deliberately withheld material and exculpatory facts in her testimony.

155.     In addition, defendant LANDI played an active role in the prosecution of Ying Li. She provided advice and encouragement, that went well beyond her role, and into ancillary and forensic aspects of motive, culpability, and the veracity of Ying Li.

156.     LANDI several times noted to investigators, and testified both in the Grand Jury and at Hang Bin's criminal trial that the Lis did not come to pick up their daughter's body or care to bury her.  Yet, defendant LANDI knew that the Medical Examiner's Office had not even contacted the Li's who had been anxiously waiting and readily available and extremely cooperative and courteous with the myriad of investigators, even during the most dire of circumstances.  They waited and cried for months for word on where their daughter was so they could give her a proper burial, which they believed, according to Chinese custom, would bring her daughter peace.

157.     Defendant KUPFERMAN acted under color of law in that she was granted by members of the NYPD and the Queens County D.A.'s Office, including co-defendants herein, a status according to which defendant KUPFERMAN acted as a deputy of the NYPD and the Queens County D.A.'s Office.

158.     Defendant KUPFERMAN acted under color of law in that she was granted by members of the NYPD and the Queens County D.A.'s Office, including co-defendants herein, a status according to which defendant KUPFERMAN acted as a deputy of the NYPD and the Queens County D.A.'s Office.

FIRST AMENDED COMPLAINT - 22

159.     Defendant KUPFERMAN conducted "forensic interviews" with plaintiff and her husband, Hang Bin Li, and worked in concert with members of CITY DEFENDANTS to obtain the arrest and prosecution of plaintiff. Defendant KUPFERMAN, of her own free will and volition, testified against plaintiff wrongly, maliciously, as to many medical elements.

160.     For example, defendant KUPFERMAN testified to the forensic interrogation she conducted with Ying Li on October 25th, at 11:30 a.m., stating that Ying changed her answer after speaking to her husband.  She testified to the existence of the triad symptoms, deliberately testifying falsely under oath that "If you read any book, it is a classical case of shaken baby syndrome."  Defendant KUPFERMAN knew that these statements were false and misleading and contrary to all valid and reliable medical evidence.  The triad symptoms, even to advocates of SBS, is a myth.

161.     In addition, defendant KUPFERMAN played an active role in the prosecution of Ying Li. She provided advice and encouragement that went well beyond her role, and into ancillary and forensic aspects of determining motive, culpability, and the veracity of Ying Li.

162.     Defendant KUPFERMAN acted under color of law in that she willfully participated jointly with members of the NYPD and the Queens County D.A.'s Office in having plaintiff detained, arrested, imprisoned, and prosecuted without justification, privilege, or probable cause.

163.     Defendant FHMC, by and through its agents, servants and/or employees, including defendant KUPFERMAN, willfully participated in joint activity with defendant CITY, its agents, servants and/or employees in having plaintiff detained, arrested, imprisoned, and prosecuted without justification, privilege, or probable cause.

FIRST AMENDED COMPLAINT - 23

164.    Upon information and belief, defendant FHMC diagnosed the cause of baby Annie's dead as SBS based largely on the findings of defendant KUPFERMAN.  Defendant KUPFERMAN had final decision making authority which defendant FHMC relied upon.  No higher authority was sought to confirm that Annie's death was due to SBS.

165.    At all relevant times, defendant FHMC trained, directed, encouraged, and knowingly permitted its physicians to conduct and/or participate in investigations into possible child abuse cases, including all alleged SBS cases, with knowledge and/or reckless disregard of the fact that such investigations often, if not always, extended far beyond medical investigations necessary to diagnose and treat injury, and ventured into areas fundamentally outside of professional medical practice, including into conducting fact investigations and interrogations into ancillary and forensic aspects of motive, culpability, and the veracity of individuals, with an aim toward compiling facts to assist in establishing criminal guilt.

166.    At all relevant times, defendant FHMC also trained, directed, encouraged, and knowingly permitted its physicians to collaborate, and to provide to law enforcement all of their investigatory "findings," whether or not medical in nature, in all child abuse and SBS cases, and to encourage and push for criminal arrest, prosecution, and conviction of persons who were and are the subject of such investigations, including in the criminal case of plaintiff.

167.    At all relevant times, defendant FHMC knowingly and/or with deliberate indifference failed and/or refused to provide any training, or sufficient and adequate training, to its staff, agents, and representatives, including without limitation its medical staff (and including defendant KUPFERMAN), in advancements in the field of child abuse detection, diagnosis, and investigation, or in the state of medicine with respect to SBS, and instead allowed its employees, agents, and representatives to assemble "multidisciplinary teams" to

FIRST AMENDED COMPLAINT - 24

1   carry on, untrained and unguided, and to pursue in a disorganized and unsupervised manner,

2   witch hunts and ramshackle "investigations" premised on discredited junk science.

3       168.    Defendant OFFICERS and BISHOP, failed to properly investigate the case.

4       169.    Defendant OFFICERS and BISHOP  failed to examine the medical reports, and

5   ask relevant questions as to history, even failing to obtain any medical history prior to Annie's

6   admittance to FHMC.

7       170.    Defendant OFFICERS and BISHOP encouraged and, in effect, deputized Drs.

8   LANDI and KUPFERMAN to forensically and factually investigate the case against Ying and

9   Hang Bin, and delegated to LANDI and KUPFERMAN such critical investigatory functions

10  despite knowing that defendants LANDI and KUPFERMAN were unqualified and incompetent

11  to conduct such investigations, and that such investigatory roles fell far outside defendant

12  LANDI and KUPFERMAN'S professional purviews as physicians and called for fact-finding

13  and judgment making that, fundamentally, were not medical in nature and that they were not

14  qualified to undertake and to make.

15      171.    Defendants LANDI and KUPFERMAN willingly agreed to serve in such an

16  investigatory capacity despite, and did so enthusiastically and with a commitment to see the Lis

17  arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any

18  crime whatsoever.

19      172.    Defendant OFFICERS abdicated their duty to investigate the facts of this matter

20  and instead deferred entirely to the determinations and conclusions reached by defendants

21  KUPFERMAN and LANDI.

22      173.    Defendants all disregarded plainly exculpatory evidence.  Defendant OFFICERS

23  failed to analyze the weight of all the evidence as well as the sufficiency of any incriminating

FIRST AMENDED COMPLAINT - 25

1     evidence in determining whether they had probable cause to arrest plaintiff. While the

2     circumstances dictated that any reasonable person would have made further inquiry with respect

3     to whether an offense had been committed and, if so, to plaintiff's role vis-à-vis that offense,

4     defendant OFFICERS uniformly refused and/or failed to do so.

5           174.    Defendant OFFICERS and BISHOP ignored evidence, such absence of a

6     "triggering event", and absence of witnesses, among other things.

7           175.    Defendant OFFICERS and BISHOP deliberately ignored and/or concealed

8     evidence, including medical evidence, such as the absence of any visible external marks and the

9     lack of any external signs of trauma, that contradicted the prosecution's theory against plaintiff

10     (that she knew her baby was shaken but and did not seek medical attention) and blatantly

11     ignored and suppressed medical evidence, including reports that stated that no surgical

12     intervention would have changed the outcome.

13           176.    Defendants made these false allegations against plaintiff with actual malice, and

14     out of spite and ill will, and with retributive purpose.

15           177.    Defendants engaged in the above-described conduct intentionally and/or with

16     deliberate indifference to plaintiff's constitutional and civil rights.

17           178.    The OFFICER defendants failed to obtain or disclose evidence inconsistent with

18     plaintiff's guilt, did not document or inform the district attorney's office of exculpatory

19     evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral

20     statements of witnesses. Officers sought to strengthen their case against plaintiff in order to

21     avoid acquittal, leading them to falsify and omit information in their reports and representations

22     to the district attorney's office.

FIRST AMENDED COMPLAINT - 26

179.     As plaintiff did not commit or aid/abet in the commission of any of the offenses with which she was charged, she pleaded not guilty to all counts, and bail was set at $250,000.

180.     Unable to make bail, plaintiff was incarcerated at Rikers Island from March 11, 2008 through March 26, 2012 - a period of approximately 4 years and 16 days.

181.     Upon information and belief, during that time, defendants provided false and misleading, incomplete, deceitful, and knowingly inaccurate testimony before the grand jury, designed to misrepresent the facts and to assist in and secure an indictment against plaintiff for the death of her infant daughter Annie.

182.     Upon information and belief, defendants failed to obtain or disclose evidence inconsistent with plaintiffs' guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements by plaintiff and other witnesses.  Defendants sought to strengthen their case against plaintiffs in order to avoid acquittal, leading them to falsify and omit information in their reports and representations to the district attorney's office.

183.     Upon information and belief, defendants thereafter deliberately failed to set forth facts before the grand jury which would have negated probable cause.

184.     All of the foregoing caused a grand jury to return an indictment against plaintiff charging her with one count of Manslaughter in the Second Degree and one count of Endangering the Welfare of a Child.

185.     Hang Bin Li was indicted for one count of Murder in the Second Degree, two counts of Manslaughter in the Second Degree, and one count of Endangering the Welfare of a Child.

FIRST AMENDED COMPLAINT - 27

186.     Despite repeated requests, plaintiff was never told where her daughter's body was, hence, she was not permitted to bury Annie, nor was she told where Annie was buried. She was told it was "none of her business."

187.     While incarcerated at Rikers Island, plaintiff was pregnant and was not afforded the usual and customary medical services.  In fact, she was taken to a psychiatric ward, rather than to an OBGYN.

188.     On October 30, 2008, plaintiff gave birth to an infant girl, A.L., at the Elmhurst Hospital.

189.     Plaintiff was handcuffed by one hand and one foot at all times when she was in the hospital, and was handcuffed during the entire delivery of her daughter.

190.     Plaintiff's baby daughter, A.L., was taken from her just two and a half days after delivery.  Plaintiff was not permitted to breastfeed or bond with A.L.  The newborn infant remained alone in the hospital for five days after her birth, and was then placed in foster care. Plaintiff had no idea where her daughter A.L. would be taken, or what arrangements would be made for her.

191.     Plaintiff and Hang Bin Li's heartbreaking and tragic story made waves in the Chinese-American community.  They found many supporters who rallied and lobbied and demanded investigation on their behalf.

192.     Plaintiff was required on several occasions to appear in court to defend against the false criminal charge that had been lodged against her.

193.     All defendants acted in concert to lodge these false allegations against plaintiff and initiate a prosecution against her for offenses they knew he did not commit.

FIRST AMENDED COMPLAINT - 28

194.    Defendants made these false allegations against plaintiff with actual malice, and out of spite and ill will, and with retributive purpose.

195.    Defendants engaged in the above-described conduct intentionally and/or with deliberate indifference to plaintiff's constitutional and civil rights.

196.    Upon information and belief, defendants arrested and imprisoned plaintiff despite knowing that there was no legal justification for doing so in order to pressure plaintiff to testify against her husband, who had also been arrested and indicted on the same charges as plaintiff as a result of Annie's death, or to put pressure on plaintiff's husband to plead guilty.

197.    On or about March 23, 2012, plaintiff's bail was reduced on from $250,000 to $10,000 and she was able to make her bail, and was released on March 26, 2012.  In May of 2012 Judge Gregory Lasak ordered further DNA testing done on Hang Bin Li and Ying Li, after the OI gene had been detected in Hang Bin Li. The prosecutors did not follow the orders.

198.    Even though Hang Bin was charged with second-degree murder, the D.A.'s Office knew that its case against him was extremely weak, and they offered to allow him to plead guilty to the misdemeanor of Endangering the Welfare of a Child in exchange for a sentence of time served.  Hang Bin refused to plead.

199.    On January 3, 2013 the Trial of Hang Bin began. The prosecution marched their eight doctor expert witnesses, one emergency medical technician, and five detectives to testify against Mr. Li.  Oddly, also coming to the trial was friend of defendant BISHOP, Katie Holmes, who created a media circus.

200.    On February 1, 2013, plaintiff's husband, Hang Bin Li, ultimately was convicted of reckless manslaughter.

FIRST AMENDED COMPLAINT - 29

201.     Contemporaneously with the commencement of Hang Bin's trial, all charges against plaintiff were dismissed.  According to the Prosecution, it was apparent from medical evidence that the plaintiff was innocent.

202.     While plaintiff certainly was innocent, that was something that defendants had known from the outset.  The truth was that since defendants had all participated in having plaintiff arrested and prosecuted for the purpose of pressuring Hang Bin to plead guilty, and since Hang Bin had refused and was now standing trial, they had no further use for plaintiff.

203.     Plaintiff still has not been able to gain custody of her daughter Angela, because of the false and malicious charges against her stemming from Annie's death.

204.     As a result of the foregoing, plaintiff sustained, inter alia, deprivation of her constitutional rights, loss of enjoyment of life, loss of liberty, loss of basic, fundamental human contact, loss of natural contact with significant others, loss of natural contact with her family, loss of the natural family role she played within her family as wife, mother, daughter, granddaughter, and sister; physical injuries; personal injuries; emotional injuries, loss of income, loss of employment seniority; loss of employment and business experience; loss of benefits; loss of retirement pensions and savings; loss of economic opportunity; pain and suffering; severe mental anguish, emotional distress, fear and lack of privacy, all necessitating psychiatric or therapeutic counseling; inadequate medical care; humiliation, indignities and embarrassment; degradation; injury to reputation; permanent loss of natural psychological development; restrictions on or total deprivations of all personal freedoms; liberties and entitlements, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, hobbies, religious fulfillment, personal fulfillment, sexual activity, family relations, marital relations, reading, movies, travel, driving, enjoyment, and

FIRST AMENDED COMPLAINT - 30

1    expression. Furthermore, as a direct result of his unjust conviction and imprisonment, many of

2    the effects of these disabilities and impairments continue to plague claimant to this day, and will

3    continue to plague her for the rest of her life.

4        205.    The amount of damages sought in this action exceeds the jurisdictional limits of

5    all lower Courts that might otherwise have jurisdiction.

6                        **FIRST CLAIM AGAINST ALL DEFENDANTS**

7             **(False Arrest/Imprisonment Claim Under 42 U.S.C. § 1983)**

8        206.    Plaintiff repeats and realleges each and every allegation set forth above as though

9    fully set forth at length herein.

10       207.    Defendants, while acting in concert and within the scope of their employment

11   and authority, and without a warrant, seized plaintiff, forcibly put plaintiff into handcuffs,

12   placed plaintiff under arrest without any reasonable cause to believe that plaintiff had

13   committed, was committing, or was about to commit any offense, and caused plaintiff to be

14   imprisoned and incarcerated at various facilities, and thereby deprived plaintiff of her rights,

15   liberties, and freedoms under color of state law, including plaintiff's right to be free from

16   unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United

17   States Constitution.

18       208.    Defendants,   including   defendants   LANDI,   OFFICERS,   BISHOP   and

19   KUPFERMAN, made definite misrepresentations of fact, including that the medical evidence

20   conclusively showed that plaintiff was guilty of the charges against her, and defendants had

21   reason to believe that plaintiff would rely on those misrepresentations. Plaintiff relied on these

22   misrepresentation to her detriment.

FIRST AMENDED COMPLAINT - 31

209.     Accordingly, defendants, by fraud, misrepresentation, and deception, induced plaintiff from filing a timely action.  Defendants' misconduct caused the plaintiff to delay in bringing suit and/or wrongfully deceived or misled plaintiff in order to conceal the existence of a cause of action.

210.     Defendant FHMC is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat superior.</u>

### SECOND CLAIM AGAINST ALL DEFENDANTS

**(Malicious Prosecution Claim Under 42 U.S.C. § 1983)**

211.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

212.     Defendants, acting in concert and within the scope of their employment and authority, caused plaintiff to be prosecuted with malice and without probable cause – a prosecution that terminated in plaintiff's favor – in violation of plaintiff's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

213.     Defendant FHMC is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat superior.</u>

### THIRD CLAIM AGAINST ALL DEFENDANTS

**(Malicious Abuse of Process Claim Under 42 U.S.C. § 1983)**

214.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

FIRST AMENDED COMPLAINT - 32

215.     Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process.  Such collateral objectives included, but were not limited to, using plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification, or probable cause.

216.     The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and that by virtue of the aforementioned acts, plaintiff was deprived of his rights, privileges and immunities secured by the Constitution of the United States, including his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable or unlawful searches and seizures and to due process of law.

217.     Defendant FHMC is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat superior.</u>

### <u>FOURTH CLAIM AGAINST ALL DEFENDANTS</u>

### **(Failure-to-Intervene Claim Under 42 U.S.C. § 1983)**

218.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

219.     Each individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other

FIRST AMENDED COMPLAINT - 33

1  police officers, but failed to intervene to prevent the unlawful conduct, despite having had a

2  realistic opportunity to do so, in violation of plaintiff's right under the First, Fourth, and

3  Fourteenth Amendments to the United States Constitution.

4      220.    Defendant FHMC is also liable for the damages suffered by plaintiff as a result

5  of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat</u>

6  <u>superior</u>.

7              **FIFTH CLAIM AGAINST ALL DEFENDANTS**

8                **(Conspiracy under 42 U.S.C. § 1983)**

9      221.    Plaintiff repeats and re-alleges each and every allegation set forth above as

10  though fully set forth at length herein.

11      222.    Defendants agreed, cooperated, participated, and conspired to assist in and

12  effectuate plaintiff's unlawful detention, arrest, imprisonment, and malicious prosecution for

13  crimes she did not commit, and in so doing deprived plaintiff of her rights, privileges and

14  immunities secured by the Constitution of the United States, including, but not limited to, her

15  rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from

16  unreasonable searches and seizures and to due process of law.

17      223.    Defendant FHMC is also liable for the damages suffered by plaintiff as a result

18  of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat</u>

19  <u>superior</u>.

20              **SIXTH CLAIM AGAINST ALL DEFENDANTS**

21        **(Unreasonably Prolonged Detention Claim under 42 U.S.C. § 1983)**

22      224.    Plaintiff repeats and re-alleges each and every allegation set forth above as

23  though fully set forth at length herein.

FIRST AMENDED COMPLAINT - 34

225.    Upon information and belief, defendants' above-described conduct, including but not limited to defendants' mishandling of exculpatory and/or impeaching evidence and their concealment, suppression, and/or failure to turn said evidence over to the prosecution or the defense, and their intimidation, threats, coercion, and deceit of witnesses, engaged in under color of state law, violated rights, privileges and immunities secured to plaintiff by the Constitution of the United States of America including, inter alia, plaintiff's Fourth and Fourteenth Amendment right to be free from continued detention after it was or should have been known that plaintiff was entitled to release, as articulated in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007).

226.    Plaintiff had a right to be free from continued detention stemming from defendants' intimidation and coercion of witnesses, and their mishandling, concealment, and/or suppression of the exculpatory and/or impeaching material described above, and defendants violated that right.

227.    That said Constitutional right arises both from plaintiff's Fourth Amendment right to be free of unreasonable searches and seizures and plaintiff's Fourteenth Amendment right to substantive due process.

228.    Defendants conduct in this regard was so egregious and outrageous as to shock the conscience.

229.    Defendant FHMC is also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of respondeat superior.

## SEVENTH CLAIM AGAINST ALL DEFENDANTS

### (Violation of Due Process Under 42 U.S.C. § 1983)

FIRST AMENDED COMPLAINT - 35

230.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

231.    By the conduct and actions described above, defendants while engaged in under the color of state law, conspired to interfere with and violate rights secured to plaintiff by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, plaintiff's Fourth and Fourteenth Amendment rights.

232.    Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain a conviction against plaintiff at all costs.

233.    This included a course of conduct and pattern of behavior whereby defendants, inter alia, created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had abused her daughter, Annie, intentionally and maliciously concealed material exculpatory evidence, suborned perjurious testimony, developed and cultivated witnesses to testify falsely, and unduly and improperly influenced the statements and testimony of witnesses through deceit and other means.

234.    Additionally, plaintiff's more than four years in pretrial detention occasioned and encouraged by defendants, without legitimate reason, and for purposes, of, inter alia, using plaintiff's confinement as a bargaining chip to pressure her husband to plead guilty, violated plaintiff's Sixth Amendment right to a speedy trial without due process of law.

235.    Insofar as defendants LANDI, KUPFERMAN, and FHMC are concerned, any determination on any of their parts that Annie had been injured and died as a result of SBS

FIRST AMENDED COMPLAINT - 36

1  would have been such a substantial departure from accepted professional judgment, practice, or

2  standards as to demonstrate that they actually did not base their decision on such a judgment.

3     236.   Additionally, the extreme indignities, humiliation, and abuses that plaintiff was

4  forced to endure while a prisoner for more than four years, including, without limitation, not

5  being permitted to know where her daughter's body was buried, not being afforded the usual and

6  customary medical services and being denied OBGYN care, being forced to give birth to her

7  second daughter while handcuffed and shackled, not being permitted to breastfeed or bond with

8  her infant daughter after childbirth, and having her daughter permanently taken from her just

9  two and a half days after delivery, and other, similar outrages, both individually and collectively

10 state a violation of plaintiff's substantive due process rights.

11    237.   That such conduct by defendants deprived plaintiff of liberty and dignity and

12 constituted both a substantive and procedural due process violation under the Fourteenth

13 Amendment.

14    238.   Defendants' conduct precipitated and caused the sequence of events that

15 ultimately resulted in the deprivation of plaintiff's liberty and dignity.

16    239.   Defendants' conduct in this regard was so egregious and outrageous as to shock

17 the conscience.

18    240.   Defendant FHMC is also liable for the damages suffered by plaintiff as a result

19 of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat</u>

20 <u>superior.</u>

21          **<u>EIGHTH CLAIM AGAINST DEFENDANT CITY</u>**

22          **(Municipal Liability "Monell" Claim under 42 U.S.C. § 1983)**

FIRST AMENDED COMPLAINT - 37

241.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

242.     The individual defendants, singly and collectively, while acting within the scope of their employment and authority and under color of state law, engaged in conduct that constituted customs, policies, practices, procedures, rules, or usages of the NYPD and their specific precinct(s) and/or OCME forbidden by the Constitution of the United States.

243.     The foregoing customs, policies, practices, procedures, rules, and usages include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury.   This also includes, without limitation:

   a.   Routinely concluding that Shaken Baby Syndrome is responsible for many infant fatalities despite the absence of evidence necessary to make such a finding;

   b.   Routinely concluding that Shaken Baby Syndrome is responsible for many infant fatalities despite the fact that such medical determinations of SBS are highly dubious, and that the weight of medical authority considers SBS determinations to be no more than guesswork.  See, e.g., Del Prete v. Thompson, 10 F. Supp. 3d 907, 957 n.10 (N.D. Ill. 2014) (noting that "a claim of shaken baby syndrome is more an article of faith than a proposition of science"); New York v. Bailey, No. 2001-0490 (N.Y. Monroe Cnty. Ct. Dec. 16, 2014) ("[A] significant and legitimate debate in the medical community has developed in the past 13 years, over whether young children can be fatally injured by means of shaking[.]"); Ex parte Henderson, 384 S.W.3d 833, 833-34 (Tex. Crim. App. 2012) ("[T]here is no way to determine with a reasonable degree of medical certainty whether [the

child's] injuries resulted from an intentional act of abuse or an accidental fall.");

State v. Edmunds, 746 N.W.2d 590, 598-99 (Wis. Ct. App. 2008) (declaring the "emergence of a legitimate and significant dispute within the medical community as to the cause" of injuries historically attributed to SBS/AHT). United States Supreme Court justices have viewed convictions based on a diagnosis of SBS/AHT with suspicion. See Cavazos v. Smith, 132 S. Ct. 2, 14-27 (2011) (Ginsburg, J., dissenting) ("What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against Smith[.]").

    c. Ignoring evidence calling into question or directly or indirectly repudiating the determination that SBS played a part in an infant's death; and

    d. Failing to perform basic tests that could rule out whether SBS was a factor in a given infant's death;

    e. Encouraging and directing, through policy and/or practice, its law enforcement officers to abdicate their investigatory role and duty to non-law enforcement entities and persons, including to hospitals' "multidisciplinary teams" and to physicians who have no experience, training, or competence in conducting fact-based investigations outside of medical inquiries for purposes of diagnosis and treatment;

    f. Encouraging and directing, through policy and/or practice, its law enforcement officers to defer entirely to the fact determinations and conclusions reached by said hospitals, multidisciplinary teams, and physicians under all circumstances, even when that means disregarding plainly exculpatory evidence, and in so doing, encouraging and directing, through policy and/or practice, its law enforcement

FIRST AMENDED COMPLAINT - 39

officers to refuse to make further inquiry as to whether an offense had been committed, and to fail to analyze the weight of all the evidence as well as the sufficiency of any incriminating evidence in determining whether they have probable cause to make an arrest.

244.   Defendant CITY has recklessly and with deliberate indifference failed to provide adequate training and standards and policies and practices for its police officers in SBS related cases where, in the context of an investigation, the only evidence they have in solving the crime is less than reliable and trustworthy, and the basis of disputed science which is further picked over and chosen in whatever manner necessary for the sole purpose of obtaining a conviction. Such thus leads to recklessly and deliberately indifferent investigations which consciously avoids testing evidence and gathering other evidence, without compromising the law enforcement mission, and leading to the arrest and prosecution of individuals who are innocent of any wrongdoing in an SBS related crime or crimes of which the individual is accused, arrested, and prosecuted.

245.   The abuse to which plaintiff was subjected was consistent with an institutionalized practice of the NYPD and/or OCME, which was known to and ratified by defendant CITY.

246.   Despite knowledge of these institutionalized practices, defendant CITY has at no time taken any effective action to prevent NYPD and/or OCME personnel from continuing to engage in this type of misconduct.

247.   Defendant CITY had prior notice of the vicious propensities of defendants, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority.

FIRST AMENDED COMPLAINT - 40

248.    The failure of defendant CITY to properly train defendants included the failure to instruct them in applicable provisions of the State Penal Law of the State of New York, federal and state constitutional limitations, and the proper and prudent use of force.

249.    Defendant CITY authorized, tolerated as institutionalized practices, and ratified the misconduct detailed above by, among other things:

    a.  Failing to properly discipline, train, restrict, and control employees, including defendants, known to be irresponsible in their dealings with citizens of the community;

    b.  Failing to take adequate precautions in the training, hiring, promotion, and retention of police personnel, including specifically defendants herein;

    c.  Failing to forward to the offices of the District Attorneys evidence of criminal acts committed by police personnel;

    d.  Failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public.

    e.  That the failure to supervise and/or train by defendant CITY of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

FIRST AMENDED COMPLAINT - 41

250.    The NYPD and OCME have inadequately screened, hired, retained, trained, and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come in contact.

251.    The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's safety, well-being, and constitutional rights.

252.    The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff.

253.    The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by plaintiff.

## NINTH CLAIM AGAINST DEFENDANT FHMC

### ("Monell"-Type Claim under 42 U.S.C. § 1983)

254.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

255.    The employees, agents, and representatives of FHMC, singly and collectively, while acting within the scope of their employment and authority and under color of state law, engaged in conduct that constituted customs, policies, practices, procedures, rules, or usages of FMHC forbidden by the Constitution of the United States.

256.    The Defendant FHMC has recklessly and with deliberate indifference failed to provide adequate training and standards and policies and practices for its personnel in SBS related cases.   The Hospital and Staff, rather than perform differential diagnosis, or properly investigate a child's medical records, rushes to the diagnose SBS.

257.    Defendant FHMC encouraged directed, through policy or practice, its employees, agents, and representatives, including defendant KUPFERMAN, to forensically and factually

FIRST AMENDED COMPLAINT - 42

1   investigate SBS cases for non-medical purposes, in order to reach non-medical conclusions, and

2   with knowledge that law enforcement will rely on these investigative conclusions in directing

3   the course of an arrest and prosecution.

4       258.   Defendant FMHC knowingly or with deliberate indifference perpetuates such

5   policies and practices despite awareness that its agents, employees, and representatives  are

6   unqualified and incompetent to conduct such investigations, and that such investigatory roles

7   fall far outside those individuals' professional purviews and calls for fact-finding and judgment

8   making that, fundamentally, are not medical in nature and that FMHC's employees, agents, and

9   representatives are not qualified to undertake and to make.

10      259.   At all relevant times, defendant FMHC perpetuated this policy and practice in

11   order to see those accused of SBS arrested, prosecuted, and convicted, despite the lack of any

12   evidence connecting them with any crime whatsoever.

13      260.   Defendant FHMC failed to train its staff and keep up with the education and

14   advancement in the field of Child Abuse Diagnosis and Investigation, including SBS.

15      261.   Defendant FHMC's failure to train has led to an obvious emphasis by the

16   hospital staff on investigating and prosecuting child abuse cases rather than treating and

17   diagnosing childhood illness.

18      262.   The abuse to which plaintiff was subjected was consistent with an

19   institutionalized practice of the FHMC, which was known to and ratified by defendant FHMC.

20      263.   Despite knowledge of these institutionalized practices, defendant FHMC has at

21   no time taken any effective action to prevent FHMC personnel from continuing to engage in

22   this type of misconduct.

FIRST AMENDED COMPLAINT - 43

264.     Defendant FHMC had prior notice of the tendencies and propensities of its employees, agents, and representatives, including defendant KUPFERMAN, to jump to conclusions, to diagnose SBS without reliable and credible supporting medical evidence, and to conduct non-medical interrogations and investigations into, among other things, the motives, credibility and veracity of individuals suspected of child abuse, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority, despite knowing that these employees, agents, and representatives were providing the results of their investigations to law enforcement and that law enforcement was relying on them to effectuate arrests and prosecutions of individuals.

265.     That the failure to supervise and/or train by defendant FHMC of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, inter alia, plaintiff's Fourth and Fourteenth Amendment rights.

266.     Defendant FHMC has inadequately screened, hired, retained, trained, and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom FHMC come in contact.

267.     The foregoing customs, policies, practices, procedures, rules, and usages constituted deliberate indifference to plaintiff's safety, well-being, and constitutional rights.

268.     The foregoing customs, policies, practices, procedures, rules, or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff.

269.     The foregoing customs, policies, practices, procedures, rules, or usages were the moving force behind the constitutional violations suffered by plaintiff.

FIRST AMENDED COMPLAINT - 44

## <u>TENTH CLAIM AGAINST ALL DEFENDANTS</u>

### (Violation Of Plaintiff's Rights Under The New York State Constitution)

270.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth at length herein.

271.     Defendants, acting in concert and within the scope of their employment and authority, violated plaintiff's right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

272.     Defendants, acting in concert and within the scope of their employment and authority, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain an unjust conviction against her.

273.     Upon information and belief, this included a course of conduct and pattern of behavior whereby defendants, <u>inter alia</u>, created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had committed one or more offenses, intentionally and maliciously concealed material exculpatory evidence, and unduly influenced the statements and testimony of witnesses by means of threats, coercion, violence, or deceit.

274.     That by virtue of the aforementioned acts, defendants deprived plaintiff of her liberty and property without due process of law, in contravention of Article I, § 6 of the New York State Constitution.

275.     Defendants CITY and FHMC are also liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants, and/or employees under the doctrine of <u>respondeat</u> <u>superior</u>.

FIRST AMENDED COMPLAINT - 45

1

2                                    **PRAYER FOR RELIEF**

3   **WHEREFORE**, plaintiff demands the following relief jointly and severally against all the

4   defendants:

5       a.   Compensatory damages in an amount to be determined at trial;

6       b.   Punitive damages in an amount to be determined at trial;

7       c.   Attorney's fees pursuant to 42 U.S.C. § 1988;

8       d.   An award of plaintiff's costs of suit;

9       e.   Pre-judgment and post-judgment interest;

10      f.   Such other relief as this Court deems just and proper.


            Dated this 19th day of November, 2015


            _____
            Ameer Benno, Esq. [AB-1130]

            BENNO & ASSOCIATES P.C.
            30 Wall Street, 8th Floor
            New York, NY 10005
            Tel.: (212) 227-9300

            Corey Lee, Esq.
            C.T. Lee & Associates
            225 Broadway, Suite 3005
            New York, NY 10007
            Tel.: (212) 566-5509

            P. Jenny Marashi, Esq.
            Law Office of Poupa Jenny Marashi
            930 Grand Concourse #1E
            Bronx, NY 10451
            Tel.: (917) 703-7142

            Attorneys for Plaintiff


FIRST AMENDED COMPLAINT - 46