UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

YING LI,

                              Plaintiff,

            - against -

THE CITY OF NEW YORK, DET.
MATTHEW DEGNAN, LT. THOMAS
CONFORTI, DET. DAVID MOSER, LT.
JOHN PERDOCH, DET. JOHN PHELAN,
P.O. YATYU YAM, SGT. GUISELLA
RODRIGUEZ, LT. ARTHUR HALL, DET.
MICHAEL HEFFERNAN, SGT. TIMOTHY
CAI, DET. DOUGLAS LEE, DET. DENNIS
CHAN, SGT "FNU" MANFREDI ("FIRST
NAME UNKNOWN"), ADA P. LEIGH
BISHOP, DR. KRISTEN LANDI, "JOHN
DOES 1-15" (NAMES FICTITIOUS AND
PRESENTLY UNKNOWN), DR.
FERNANDA KUPFERMAN, AND
FLUSHING HOSPITAL MEDICAL CENTER

                              Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-1599 (PKC)

PAMELA K. CHEN, United States District Judge:

On March 26, 2015, Plaintiff Ying Li commenced this action against Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York law. (*See* Dkt. 1.) Plaintiff's ten-count Amended Complaint alleges numerous theories of liability against Defendants. (*See* Dkt. 36, Amended Complaint ("Am. Compl.").) In general, Plaintiff alleges that she was wrongfully accused of being responsible for the death of her infant daughter. (*Id.*) The Amended Complaint makes claims against two groups of defendants: (i) the first group is composed of the City of New York (the "City") and various City employees (collectively, the "City Defendants"), including twelve named New York City Police Department ("NYPD") officers who allegedly

investigated Plaintiff (the "Officer Defendants")[1]; Dr. Kristen Landi ("Dr. Landi"), a physician employed by the City; Queens County Assistant District Attorney P. Leigh Bishop ("ADA Bishop"); and fifteen "John Doe" defendants; and (ii) the second group is composed of Flushing Hospital Medical Center ("Flushing Hospital" or "FHMC") and one of its employees, Dr. Fernanda Kupferman ("Dr. Kupferman") (collectively, the "Medical Center Defendants").

Plaintiff asserts the following ten counts, of which eight are against all Defendants: Count 1 (false arrest and imprisonment), Count 2 (malicious prosecution), Count 3 (malicious abuse of process), Count 4 (failure to intervene), Count 5 (conspiracy), Count 6 (unreasonably prolonged detention), Count 7 (violation of due process), Count 8 (*Monell* liability against the City), Count 9 (*Monell*-type liability against Flushing Hospital), and Count 10 (violation of the New York State Constitution).  Except for Count 10, all of Plaintiff's claims are alleged as federal claims pursuant to Section 1983.

Presently before the Court are two separate motions to dismiss filed by the two groups of Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").  For the reasons set forth below, both the City Defendants' and Medical Center Defendants' motions are GRANTED IN PART and DENIED IN PART.  Furthermore, all claims against the following Defendants are dismissed in their entirety: ADA Bishop, Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

---

[1] The twelve individual NYPD Officer Defendants are Det. Matthew Degnan ("Det. Degnan"), Lt. Thomas Conforti ("Lt. Conforti"), Det. David Moser ("Det. Moser"), Lt. John Perdoch ("Lt. Perdoch"), Det. John Phelan ("Det. Phelan"), P.O. Yatyu Yam ("P.O. Yam"), Det. Sgt. Guisella Rodriguez ("Sgt. Rodriguez"), Lt. Arthur Hall ("Lt. Hall"), Det. Michael Heffernan ("Det. Heffernan"), Sgt. Timothy Cai ("Sgt. Cai"), Det. Douglas Lee ("Det. Lee"), Det. Dennis Chan ("Det. Chan"), Sgt. "FNU" Manfredi ("First Name Unknown") ("Sgt. Manfredi").

Of these individual Officer Defendants, Dets. Moser, Phelan, Heffernan, and Sgt. Manfredi are not represented.  (Dkt. 69.)

# BACKGROUND

## I.     THE FACTS[2]

Early in the morning of October 23, 2007, Annie, the 8-1/2-week-old daughter of Plaintiff and her husband Hang Bin Li, suddenly went limp while being fed.  (Am. Compl. ¶¶ 92, 95.)  The Lis called 911 and took Annie to the emergency room at Flushing Hospital.  (Am. Compl. ¶¶ 95, 98, 108.)  Annie was unresponsive when she arrived at the emergency room, where she was revived and placed on life support.  (Am. Compl. ¶ 98.)[3]

Suspecting child abuse, Flushing Hospital called Det. Phelan and the NYPD Child Abuse Squad that day.  (Am. Compl. ¶ 101.)  Det. Phelan went to the hospital, spoke with the hospital staff, looked at medical charts, and met with the Lis.  (Am. Compl. ¶¶ 101–103.)  P.O. Yam, an officer who spoke Mandarin, accompanied Det. Phelan.  (Am. Compl. ¶ 101.)  The Lis were taken to Det. Phelan's office at the Queens Child Abuse Squad.  (Am. Compl. ¶ 104.)  When they arrived at the 109th precinct, other officers and sergeants, including Defendant Manfredi, were present.  (Am. Compl. ¶ 105.)  Det. Heffernan also came to the Precinct that night.  (Am. Compl. ¶ 105.)  Dets. Phelan and Degnan interrogated Plaintiff, alone, for about an hour while P.O. Yam interpreted.  (Am. Compl. ¶ 106.)  They then interrogated Hang Bin Li.  (Am. Compl. ¶ 106.)  Afterwards, Dets. Degnan and Heffernan drove the Lis back to Flushing Hospital.  (Am. Compl. ¶ 108.)  At the hospital, Dets. Degnan and Heffernan had extended conversations with the hospital staff, including Dr. Kupferman.  (Am. Compl. ¶ 108.)

---

[2] The Court takes the allegations in the Amended Complaint as true, as it must on a motion to dismiss under FRCP 12.  *See EEOC v. Port Auth. of New York & New Jersey,* 768 F.3d 247, 253 (2d Cir. 2014) ("[W]e accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

[3] A medical report from that day indicated that Annie had no external signs of trauma. (Am. Compl. ¶ 98.)

The next day, October 24, 2007, Det. Phelan went to the Lis' house, and Plaintiff's husband gave written consent for Det. Phelan to search the home. (Am. Compl. ¶ 110.) Later, detectives from the 109th Precinct went to search the Lis' home after getting a warrant. (Am. Compl. ¶ 110.) Subsequently, the Lis were interviewed again by numerous people, including Dets. Heffernan and Moser, officers from the Queens Homicide Squad, and medical personnel at Flushing Hospital, including Dr. Kupferman.[4] (Am. Compl. ¶¶ 112–15.) Det. Chan served as an interpreter from the afternoon of October 24, 2007, until the morning hours of October 25, 2007. (Am. Compl. ¶ 112.) During these interviews, according to Plaintiff, Dets. Heffernan and Moser and Dr. Kupferman repeatedly screamed at the Lis that they had killed their daughter and that unless the Lis told them which one of them had hurt Annie, the doctors could not help her. (Am. Compl. ¶ 115.) They also promised the Lis that they could see Annie if they admitted to hurting her. (Am. Compl. ¶ 116.) After being repeatedly told this, Hang Bin Li stated that he might have inadvertently bumped Annie's head lightly against a table while trying to resuscitate her. (Am. Compl. ¶ 117.)

On October 25, 2007, Dr. Kupferman conducted a "forensic interview" of Plaintiff. (Am. Compl. ¶ 120.) A day later, Annie was confirmed brain dead, and was diagnosed with "Shaken Baby Syndrome" ("SBS").[5] (Am. Compl. ¶¶ 123, 134.) That evening, the Lis were again taken

---

[4] The Amended Complaint does not indicate where these interviews occurred. (Am. Compl. ¶¶ 112-15.)

[5] SBS is "a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e. bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures." *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 261 (E.D.N.Y. 2011) (citing, *inter alia*, Shaken Baby Syndrome, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/article/000004.htm). However, some courts have acknowledged that there is an "emergence of a legitimate and significant dispute within the medical community as to the cause of [ ] injuries" that used to be attributed to SBS. *See State v.*

to the 109th precinct, and Dets. Degnan, Heffernan, and Chan questioned the Lis separately until the next morning.  (Am. Compl. ¶ 124.)  Hang Bin Li also gave a written statement regarding the events that had occurred on October 22 and 23.  (*Id.*)  Annie was removed from life support on October 28.  (Am. Compl. ¶ 125.)  On October 29, Dets. Moser, Degnan, Heffernan, and Sgt. Cai questioned Hang Bin Li at the 109th precinct.  (Am. Compl. ¶ 126.)  Throughout the multiple investigations and interviews, Plaintiff denied any wrongdoing.  (Am. Compl. ¶ 127.) Unidentified Defendants ordered Plaintiff to remain in and about her home from approximately October 26, 2007 up to her arrest five months later.  (Am. Compl. ¶ 131.)

On March 11, 2008, Plaintiff and her husband were arrested for Annie's death based on the conclusion that Annie had died of SBS.  (Am. Compl. ¶¶ 133–34.)  Plaintiff was charged with two counts of Manslaughter in the First Degree, and one count of Endangering the Welfare of a Child.  (Am. Compl. ¶¶ 146.)  The grand jury indicted Plaintiff on various charges, including Manslaughter in the Second Degree.  (Am. Compl. ¶ 181, 184, Ex. C.)  Plaintiff pled not guilty to all charges.  (Am. Compl. ¶ 179.)  Plaintiff's husband was also indicted for one count of Murder in the Second Degree, two counts of Manslaughter in the Second Degree, and one count of Endangering the Welfare of a Child.  (Am. Compl. ¶ 185.)  Unable to make bail, Plaintiff was held at the Riker's Island correctional facility for about four years without a trial. (*See* Am. Compl. ¶¶ 180, 234.)  On March 26, 2012, Plaintiff was released after her bail was reduced.  (Am. Compl. ¶ 197.) On January 2, 2013, ADA Bishop moved to dismiss the criminal charges against Plaintiff.  (Dkt. 63–6, Ex. F.)  Hang Bin Li's trial began the next day.  (Am.

---

*Edmunds*, 746 N.W.2d 590, 599 (Wis. Ct. app. 2008); *see also Cavazos v. Smith*, 565 U.S. 1 (2011) (Ginsburg, J., dissenting) ("What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against [petitioner].")

Compl. ¶ 199.) On February 1, 2013, he was convicted of reckless manslaughter. (Am. Compl. ¶ 200.)

## II. PROCEDURAL HISTORY

Plaintiff filed this action on March 26, 2015. (Dkt. 1.) On November 19, 2015, she filed the Amended Complaint. (Dkt. 36.) On March 7, 2016, Defendants moved to dismiss the Amended Complaint pursuant to FRCP 12(b)(6). (Dkt. 53, 58.)

## DISCUSSION[6]

## I. COURT'S CONSIDERATION OF MATERIAL EXTRANEOUS TO THE AMENDED COMPLAINT

Plaintiff and Defendants both seek to have the Court consider certain information and documents outside of the Amended Complaint. Both parties have attached to their moving papers the Queens County criminal court complaint ("criminal complaint") against Plaintiff (Dkt. 60, Ex. B; Dkt. 63, Ex. B) and the transcript of the court conference at which ADA Bishop moved to dismiss the criminal charges against Plaintiff (Dkt. 60, Ex. C; Dkt. 63, Ex. F). The

---

[6] As an initial matter, the Court cautions Plaintiff's counsels that their scatter-shot, kitchen-sink approach to this litigation thus far has done a great disservice to her client's case. Plaintiff's 275-paragraph Amended Complaint indiscriminately asserts eight of her ten claims against every single Defendant, even though, as discussed herein, these claims clearly should not have been brought against many of these Defendants, and many of these Defendants should not have been named at all. Despite the Court's repeated suggestions at the pre-motion conference that Plaintiff's counsel focus on developing meritorious claims and arguments, and consider pruning this action of non-viable claims, Plaintiff not only persisted with all of her claims, but doubled down on her helter-skelter approach by responding to Defendants' motions to dismiss with two separate Memoranda of Law ("MOL"s) with internal editing notes left for the Court to read, place-holders for citations, and multiple grammatical errors. (*See, e.g.*, Dkt. 61 at 22 n.36; *id.* at 41; Dkt. 66 at 29). "Not only does the 'kitchen sink' approach to briefing cause distraction and confusion, it also 'consumes space that should be devoted to developing the arguments with some promise.'" *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 512 (7th Cir. 2011) (citation omitted). Indeed, here, the Court has had to struggle to tease out of Plaintiff's MOLs legally coherent and supported positions. While the Court has done so in order to comply with its duty *at this stage* to view the complaint in the light most favorable to Plaintiff¸ it will not be so forgiving as this case progresses.

City Defendants also submitted the grand jury minutes (Dkt. 65, Ex. A) with their Reply brief. Plaintiff also has submitted a copy of the manslaughter indictment returned by the grand jury against her (Dkt. 63, Ex. C) and two press releases from the Queens District Attorney's Office, dated March 12, 2008, and September 11, 2015 (Dkt. 63, Exs. D, E). The March 12, 2008 press release discusses the District Attorney's charging of Plaintiff and her husband. (*See* Ex. D, Dkt. 63–4, at ECF 2.)[7] The September 11, 2015 press release notes that the Queens District Attorney and the New York City Chief Medical Examiner were to host the 2015 New York City Abusive Head Trauma / Shaken Baby Syndrome Conference. (*See* Ex. E, Dkt. 63–5 at ECF 2.)

In determining the adequacy of a claim under Rule 12(b)(6), courts are generally limited to the facts alleged in the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and facts that may be judicially noticed. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 292 F.3d 147, 153 (2d Cir. 2002)); *see also Williams v. Kellogg Co.*, 628 F. App'x. 59, 60 (2d Cir. 2016) (summary order) (noting that the court may consider matters of which judicial notice may be taken in deciding a Rule 12(b)(6) motion). However, even if the complaint does not expressly cite a document, the complaint is deemed to include that document if it is "integral" to the complaint. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)); *Sira*, 380 F.3d at 67 (document not expressly cited in the complaint was "incorporated into the pleading because [it] was integral to [plaintiff's] ability to pursue" his cause of action); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which

---

[7] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

renders the document integral to the complaint." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–153 (2d Cir. 2002)); Fed. R. Evid. 201 (a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

By repeatedly referring to the criminal complaint, the Amended Complaint incorporates it by reference.[8]  As for Plaintiff's other exhibits, *i.e.*, the indictment, the transcript of the criminal court conference, and the two press releases, the Court takes judicial notice of them, but for the limited purpose of establishing their existence and legal effect, and determining the statements that they contain without considering the truth of those statements.  *See, e.g., Bejaoui v. City of New York*, No. 13–cv–5667, 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 31, 2015) (recognizing disagreement among district courts in the Second Circuit as to whether incident reports, arrest reports, and police complaints may be judicially noticed, but still taking notice of the plaintiff's State court indictment and criminal court order to establish their existence and legal effect); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Assn'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))); *see, e.g., Garcia–Garcia v. City of New York*, No. 12–cv–1302, 2013 WL 3832730 (S.D.N.Y. July 22, 2013) (taking judicial notice of criminal complaints and

_____

[8] The Amended Complaint repeatedly refers to the criminal complaint in alleging Plaintiff's fabrication of evidence and malicious prosecution claims. (*See, e.g.,* Am. Compl. ¶ 145 ("Defendant DEGNAN signed the criminal court complaint . . . despite his knowing that there was no truth to those allegations . . . ."); Am. Compl. ¶ 146 (alleging that the criminal court complaint was based on fabricated information provided to the District Attorney's Office); Am. Compl. ¶ 150 (alleging that Dr. Landi made a false statement in the criminal complaint)). Plaintiff also alleges that Dr. Landi made a false statement in the criminal complaint that Annie may have been saved had Plaintiff sought medical care for Annie sooner.  (Am. Compl. ¶ 150.)

indictments for the limited fact that plaintiff was arrested and charged with certain crimes).[9] Here, the criminal court records and the press releases relate to Plaintiff's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped.[10]  (Am. Compl. ¶¶ 201, 212.)

The Court, however, declines to take judicial notice of the grand jury minutes in *People v. Hang Bin Li and Ying Li*, Indictment No. 603/08 (Dkt. 65, Ex. A), which the City Defendants have attached to their Reply brief, because the City seeks to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given.  *See St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 156 (E.D.N.Y. 2010) ("[T]he court may, *at its discretion*, consider matters of which judicial notice may be taken . . . ." (emphasis added) (citation omitted)).

## II.    LEGAL STANDARD

Under Rule 12(b)(6) of the FRCP, a defendant may move for dismissal on the ground that the complaint "fail[s] to state a claim upon which relief can be granted."  To withstand a Rule

---

[9] *See also McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies" (citing *In re Zyprexa Products Liablity Litigation*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008))); *Mitchell v. Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005) ("The press release [from the New York Attorney General] may be considered on this motion to dismiss because . . . this Court may take judicial notice of it as a matter of public record[.]"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements they contained—but . . . not for the truth of the matters asserted.").

[10] Moreover, Plaintiff's counsel has also represented to the Court that she has used one of the press releases in order to identify the named Defendants (*see* 1/7/2016 Pre-Motion Conference Transcript), and the Court therefore may consider at least one of the press releases to be "integral" to the Complaint.  *See Sira*, 380 F.3d at 67.  The Court, however, will not consider the new factual assertions Plaintiff makes in her opposition papers.  *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 285 (S.D.N.Y. 2015) (citing, *inter alia*, *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b).")).

12(b)(6) motion, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal.* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). In ruling on a 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, that "'tenet is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 668). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 555 U.S. at 557). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570.

## III. PLAINTIFF'S SECTION 1983 CLAIMS

Plaintiff has brought this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the

Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)); *see Flynn v. James*, 513 F. App'x 37, 39 (2d Cir. 2013).

### A. Liability of Medical Center Defendants as Private Actors

Plaintiff asserts her federal claims not only against the City Defendants but also against the Medical Center Defendants, who ordinarily would be considered non-State actors. *See White v. St. Joseph's Hosp.*, 369 Fed. App'x 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals . . . are generally not proper § 1983 defendants because they do not act under color of state law." (citing *Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)); *see also Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) (finding that a hospital was not a State actor to the extent it acted in its capacity as a private provider of medical care). As a general matter, liability under Section 1983 is proper only with respect to individuals acting under "color of state law," *i.e.*, State actors, or individuals acting in concert with a State actor. *See* 42 U.S.C. § 1983; *Jones v. City of New York*, No. 12–cv–9144, 2013 WL 4028183, at *6 n.3 (S.D.N.Y. Aug. 8, 2013) ("Section 1983 addresses only those injuries caused by state actors or those acting under color of state law." (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For a private entity to be held liable under Section 1983, a plaintiff must establish that the private entity acted as a "willful participant in joint activity with the State or its agents." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation and quotation marks omitted).

Although the Medical Center Defendants argue that they are not State actors and therefore not subject to liability under Section 1983, they also note that this issue may be more appropriate to be decided on summary judgment. (*See* Dkt. 55 at 19 n.3.) Because the Medical

11

Center Defendants essentially defer arguing the issue, the Court reserves consideration of the issue for summary judgment. For purposes of ruling on Defendants' motions to dismiss, the Court assumes without deciding that the Medical Center Defendants are State actors who acted "under color of state law."

**B.** **City Defendants' Request to Dismiss the Individual Officer Defendants for Lack of Personal Involvement**

The City Defendants point out—and rightfully so—that Plaintiff has failed to allege any personal involvement by many of the named Officer Defendants. (Dkt. 59 at 6.) "An individual defendant is not liable under § 1983 absent personal involvement." *Morris v. Eversley*, 282 F. Supp. 2d 196, 202 (S.D.N.Y. 2003) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim. *See, e.g., Wright v. Orleans Cnty.*, No. 14–cv–0622A, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief." (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11–civ–1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Plaintiffs' method of group pleading is incoherent or illogical" and "[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two

physician groups as "Peer Review Defendants" throughout complaint did not satisfy [FRCP] 9(a)).

1. Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, and Sgt. Manfredi

The Amended Complaint fails to allege facts from which it can be reasonably inferred that Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, and Det. Lee had any involvement in Plaintiff's Queens County criminal proceedings. Though the lengthy Amended Complaint devotes six paragraphs to each of these Defendants (*see* Am. Compl. ¶¶ 19–22, 82–83 (for Lt. Conforti); Am. Compl. ¶¶ 27–30, 81–82 (for Det. Perdoch); Am. Compl. ¶¶39–42, 82–83 (for Sgt. Rodriguez); Am. Compl. ¶¶ 43–46, 82–83 (for Lt. Hall); Am. Compl. ¶¶ 55–58, 82–83 (for Det. Lee)), these paragraphs simply recite the same conclusory, formulaic, and non-substantive allegations as to each of these Defendants, asserting that they were "acting within the course and scope of their employment" and "under color of state law," that they are being sued in their individual and official capacities, and that they should be referred to as "CITY DEFENDANTS" or "OFFICER DEFENDANTS." In short, Plaintiff does not allege that any of these five officers had even a minimal role in arresting, investigating, or prosecuting her. For Sgt. Manfredi, Plaintiff alleges nothing more than that he was present at the 109th Precinct when the Lis arrived with Det. Phelan. (*See* Am. Compl. ¶¶ 104–105.)[11]

Based on Plaintiff's counsel's representation at the pre-motion conference, it appears that Plaintiff named some of these individual Defendants because they were listed as having supervisory roles in the Queens County District Attorney's press release (dated March 12, 2008).

---

[11] Though Plaintiff alleges a claim of failure to intervene in her arrest and prosecution, the allegation that Sgt. Manfredi simply was present at the precinct when the Lis were brought there by Det. Phelan is still not enough to plausibly allege that Sgt. Manfredi was aware of the circumstances relating to Plaintiff's arrest or detention, such that he had a duty to intervene.

(*See* Ex. D, Dkt. 63–4 at ECF 3.) Even though the Court takes judicial notice of the press release, as noted, it does not take judicial notice of the press release for the truth of its contents, *i.e.*, that the identified officers were, in fact, supervisors at the time of Plaintiff's arrest and prosecution. *See Roth*, 489 F.3d at 509. Furthermore, the mere listing of these officers as supervisors in a press release is insufficient to create an inference of personal involvement absent further allegations, especially because "a defendant [may not] be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98–cv–6722, 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000); *Colon*, 58 F.3d at 873–74 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim.").

## 2. P.O. Yam, Sgt. Cai, and Det. Chan

With respect to P.O. Yam, Sgt. Cai, and Det. Chan, the allegations in the Amended Complaint are also insufficient to show personal involvement in unlawful conduct that supports any of Plaintiff's claims. Based on the Amended Complaint, the participation of these officers was limited to serving as translators during the investigations of Plaintiff's criminal case. [12] (*See* Am. Compl. ¶¶ 35–38, 101, 104, 106 (for P.O. Yam); Am. Compl. ¶¶ 51–54, 126 (for Sgt. Cai); Am. Compl. ¶¶ 59–62, 112, 119 (for Det. Chan); Am. Compl. ¶ 82–83 (for all Defendants).) While these translating officers are alleged to have been present during the interviews of the Lis by the other City Defendants, there are no other allegations from which to infer that these three officers were involved, in any way, in the conduct that gives rise to Plaintiff's Section 1983 claims, *e.g.*, arresting Plaintiff without probable cause, initiating criminal process against her,

---

[12] Plaintiff alleges that P.O. Yam interpreted on October 23, 2007 (Am. Compl. ¶¶ 101-06), that Sgt. Cai interrogated Hang Bin Li on October 29, 2007 (Am. Compl. ¶ 126), and that Det. Chan "served as an interpreter" from the afternoon of October 24, 2007, until the morning of October 25, 2007, when Heffernan and Moser interrogated the Lis (Am. Compl. ¶ 112).

forwarding false or fabricated evidence to the prosecution, or concealing exculpatory information from the prosecutors or the defense. The translating officers' mere presence at the Lis' interviews is simply not enough to allege their direct involvement in the *unlawful* conduct at issue in this case, as opposed to their incidental involvement in some of the events related to Plaintiff's arrest and detention. All claims against P.O. Yam, Sgt. Cai, and Det. Chan are, therefore, dismissed.

### 3. Dets. Moser, Phelan, and Heffernan

With respect to Dets. Moser, Phelan, and Heffernan, the Court finds that Plaintiff has provided sufficient allegations as to their personal involvement in the conduct giving rise to some, but not all, of Plaintiff's claims, as discussed *infra*. (*See* Am. Compl. ¶¶ 112, 119, 126, 130 (alleging Det. Moser's involvement in the investigation of the Lis); ¶¶ 102–104, 106, 109–111 (alleging Det. Phelan's involvement to the extent that he went to the hospital, spoke to the hospital staff, examined relevant medical charts, and interrogated Ying Li); ¶¶ 112, 126, 130 (alleging Det. Heffernan's involvement to the extent that he interrogated Hang Bin Li and other witnesses).)

\*     \*     \*

Accordingly, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan are dismissed as Defendants due to the insufficiency of allegations establishing personal involvement. *See Zurich American Ins. Co. v. Dah Sing Bank, Ltd.* No. 03–civ–7778, 2004 WL 1328215, at \*6 (S.D.N.Y. Jun. 15, 2004) (dismissing claims against one defendant bank where plaintiff did not put forth "a single factual allegation" but instead "lump[ed] the three bank defendants together and assert[ed] that they collectively processed the checks"); *Hernandez v. Goord*, 312 F. Supp. 2d 537, 548 (S.D.N.Y. 2004) (dismissing individual defendants who were merely listed at the beginning of the complaint and

were never connected in the complaint to any particular adverse action); *see also B. v. City of New York*, No. 14–cv–1021, 2016 WL 4530455, at *13 (E.D.N.Y. Aug. 29, 2016) (dismissing claims where the complaint did "not even directly name any of the defendants or allege the particular actions they undertook" (citation omitted)); *Barber v. Ruzzo*, No. 10–cv–1198, 2011 WL 4965343, at *2 (N.D.N.Y. Oct. 19, 2011) ("Simply stating that [defendants] were 'personally and actively involved in the continuation of criminal proceedings against [a plaintiff],' is grossly insufficient to establish personal involvement in the actual prosecution.").

## IV.    FALSE ARREST

A claim for false arrest under Section 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law.[13] *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  In analyzing Section 1983 claims for false arrest, courts "generally look[] to the law of the state in which the arrest occurred." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)).  Under New York law, a plaintiff must establish, *inter alia*, that "the defendant intentionally confined him without his consent and without justification." *Id.* at 107 (quoting *Weyant*, 101 F.3d at 852) (quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)).

---

[13] Plaintiff also alleges a false imprisonment claim under Section 1983.  However, the Court does not address this claim separately, because pursuant to New York law, false arrest and false imprisonment are "synonymous."  *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer*, 63 F.3d at 118 ("The common law tort of false arrest is a species of false imprisonment." (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975))).

### A.     Plaintiff's False Arrest Claim is Barred by the Statute of Limitations

The statute of limitations for Section 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. *See Owens v. Okure*, 488 U.S. 235, 251 (1989) (discussing *Wilson v. Garcia*, 471 U.S. 261 (1985), which held that courts deciding claims under Section 1983 should "borrow" the State statute of limitations for personal injury actions); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing *Owens*). In New York State, the applicable statute of limitations for personal injuries is three years. N.Y. C.P.L.R. § 214 (McKinney). Thus, Plaintiff should have filed her false arrest claim within three years of the date on which the cause of action accrued.

While the applicable limitations period is determined by State law, the accrual date "is a question of federal law". *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in the original)). Under federal law, a Section 1983 false arrest claim accrues at the time that the alleged false arrest ends, *i.e.,* when the arrestee "becomes held pursuant to [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389; *see also Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 F. App'x 672, 675 (2d Cir. 2009) (summary order) (applying *Wallace* to find that plaintiff's § 1983 false arrest claim was time-barred).

Here, the Medical Center Defendants and the City Defendants contend that Plaintiff's false arrest claim as to all Defendants is time-barred. (Dkt. 55 at 4; Dkt. 64 at 3.) Plaintiff concedes this (Dkt. 66 at 6), and the Court agrees. Plaintiff was arrested on March 11, 2008 in connection with her daughter's death. (Am. Compl. ¶ 133.) For Plaintiff's false arrest claim to be timely, she must have made an initial appearance or been arraigned on or after March 26, 2012, *i.e.*, three years from the filing of her complaint. *See Wallace*, 549 U.S. at 389 (false arrest

claim accrues when plaintiff's false arrest ends and plaintiff becomes held pursuant to legal process). However, Plaintiff alleges that she was arrested on March 11, 2008 and that she was incarcerated as of that date until March 26, 2012.[14]  Because Plaintiff did not bring her false arrest claim until March 2015, it is plainly barred by the applicable three-year statute of limitations.

### B. Equitable Tolling

Recognizing that the statute of limitations has run, Plaintiff contends that equity demands tolling of the statute of limitations.  (Dkt. 66 at 7.)  Plaintiff's claim for equitable tolling is based on the notion of fraudulent concealment.[15]  *See Pearl*, 296 F.3d at 81–84 (noting that the "taxonomy of tolling, in the context of avoiding a statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel," and also recognizing that the Second Circuit equates both equitable estoppel and equitable tolling with fraudulent concealment).

When a "defendant fraudulently conceals the wrong, the [statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have

---

[14] Although Plaintiff has not alleged in her Amended Complaint when she made her initial appearance in State court or when she was arraigned on the indictment, given her March 2008 arrest and incarceration date, her arraignment clearly took place long before March 2012.

[15] The Court recognizes that "the application of the doctrine of equitable tolling is not limited to [fraudulent concealment]."  *Valdez ex rel. Donely v. U.S.*, 518 F.3d 173, 183 (2d Cir. 2008).  However, based on Plaintiff's articulation of why equitable tolling should be granted, it is clear that she is seeking equitable tolling based on fraudulent concealment.  Plaintiff's MOL also mentions "equitable estoppel," which is applicable "where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit."  (Dkt. 66 at 7 n.7 (citing, *inter alia*, *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir. 1985)).)  However, equitable estoppel is inapplicable here, because Plaintiff's theory is that she was *unaware* of her false arrest claim, not that she was aware of it, but Defendants' conduct caused her to delay bringing the claim.  (*See* Am. Compl. ¶ 209; *see also* Dkt. 66 at 7 (asking the Court to toll the statute of limitations until 2013, "when Plaintiff *became aware*-that she had, in fact, been falsely arrested . . . ." (emphasis added)).)

discovered, the cause of action." *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)); *Pearl*, 296 F.3d at 81; *see also Halstead v. City of New York*, No. 13–cv–4874, 2015 WL 1506133, at *4 (E.D.N.Y. Mar. 31, 2015). To benefit from this doctrine of equitable tolling based on fraudulent concealment, the "plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong *which precludes his possible discovery of harms that he suffered*." *Pinaud*, 52 F.3d at 1157 (emphasis in original); *see also Govt. Employees Ins. Co. v. U.S.*, No. 13–cv–4063, 2014 WL 582164 (E.D.N.Y. Feb. 14, 2014) ("the 'burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff.'" (quoting *Boos v. Runyon*, 201 F.3d 178, 184–85 (2d Cir. 2000))). The Second Circuit has made clear that, "as a matter of fairness", the doctrine should only be applied "where a plaintiff has been 'prevented in some extraordinary way from exercising [her] rights'". *Pearl*, 296 F.3d at 85 (citation and quotation marks omitted). *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (noting that courts apply equitable tolling only in "rare and exceptional circumstances" (citation and internal quotation marks omitted)).

Here, Plaintiff presents only an unsupported, conclusory statement to justify equitable tolling: "[D]efendants' fraud, misrepresentation, and deception, induced plaintiff from filing a timely action. Defendants' misconduct caused the plaintiff to delay in bringing suit and/or wrongfully deceived or misled plaintiff in order to conceal the existence of a cause of action." (Am. Compl. ¶ 209.) The Amended Complaint does not allege (a) which of the numerous Defendants committed fraud, misrepresentation, or deception, (b) what information was kept from Plaintiff, or (c) how the alleged withholding of information made it impossible for Plaintiff to discover the harms she had suffered. *See, e.g., Harrison v. Harlem Hosp.*, 364 F. App'x. 686, 688 (2d Cir. 2010) (summary order) ("The appellants have failed to identify any specific fact

they have learned *since* the limitations period expired which, if known by them sooner, would have led them to file suit sooner." (emphasis in original)).

In her opposition brief, Plaintiff claims that she became aware of her false arrest only "when Plaintiff's attorneys were told . . . that there was no 'medical proof' that she could have saved her daughter," and that Plaintiff's reliance on Dr. Kupferman's assessment that earlier medical intervention could have saved Annie caused Plaintiff to delay filing her false arrest claim. (Dkt. 66 at 7.) However, as the Medical Center Defendants correctly point out, none of these factual allegations are in Plaintiff's Amended Complaint.[16]

Furthermore, even assuming *arguendo* that Dr. Kupferman had concealed information that might have supported Plaintiff's false arrest claim, equitable tolling is still not warranted if this alleged concealment did not sufficiently justify Plaintiff's failure to pursue her cause of action. *Paige v. Police Dept. of City of Schenectady*, 264 F.3d 197 (2d Cir. 2001). In *Paige*, the plaintiff, a minor at the time, was sexually assaulted by a police officer. *Id.* at 198. She reported the assault to the police department soon after it occurred, but the department told her that there was insufficient evidence to pursue the case. *Id.* Fifteen years later, the plaintiff found out through a newspaper article that the police department might have had an investigatory file with information identifying the assaulting officer as the suspect, but chose not to pursue the case. *Id.* at 199. In bringing a Section 1983 claim against the City, the police department, and the suspected assaulting officer, the plaintiff argued that none of her claims was time-barred because

---

[16] In fact, there is a discrepancy between what Plaintiff argues in her MOL and what she alleges in the Complaint regarding the suppressed or concealed information that warrants equitable tolling. In the Complaint, Plaintiff alleges that Dr. Landi stated that Plaintiff's failure to get earlier medical care contributed to Annie's death. (Am. Compl. ¶ 150.) But in her MOL, she attributes that statement to Dr. Kupferman. (Dkt. 66 at 7 ("Plaintiff relied on false statements made by Kupferman that Annie's death was caused by Ying Li not obtaining life-saving medical attention for Annie, and that had she come to the hospital sooner, she could have saved Annie.")).

(a) they did not accrue until the publishing of the newspaper article, and, in the alternative (b) the statute of limitations should be tolled until the date the article was published under the doctrine of equitable tolling. *Id.* The Second Circuit rejected both arguments finding, *inter alia*, that the plaintiff had sufficient knowledge to timely commence her causes of action without the investigatory file. *Id.* at 200 ("Although some of the facts putatively concealed by the defendants might have strengthened [plaintiff's] case . . . the absence of those facts did not sufficiently justify [plaintiff] in not pursuing her cause of action as to merit equitable tolling.")*; see also Pearl*, 296 F.3d at 78–85 (finding Section 1983 plaintiff, who alleged a brutal beating by four officers, was not entitled to equitable tolling, despite one of the officer's subsequent confession that the officers had fabricated evidence against plaintiff; explaining that plaintiff had full knowledge of his encounter with the officers and that the officer's recantation was "not newly developed awareness of a previously concealed cause of action", but simply "more persuasive evidence").

Even accepting Plaintiff's new, and improperly asserted, theory of fraudulent concealment, her case is indistinguishable from *Paige* and *Pearl*: Plaintiff "had full knowledge" of her actions relating to her child's death, including whether she knowingly delayed getting her child medical attention, and thus the purportedly withheld information that earlier medical intervention might not have saved Annie's life does not lead to a "newly developed awareness of a previously concealed cause of action", but simply provides potentially persuasive evidence for that claim. Indeed, Plaintiff fails to explain how Dr. Kupferman's purported diagnosis with regard to Annie made it "impossible" for Plaintiff to learn that she had a claim for false arrest. *See Pearl*, 296 F.3d at 85 (reiterating that, with respect to application of the equitable tolling doctrine, "we made it clear that we had in mind a situation where a plaintiff 'could show that it

would have been *impossible* for a reasonably prudent person to learn' about [her] cause of action." (emphasis in original)).  In fact, some allegations in the Amended Complaint suggest that Plaintiff always knew or believed that she had a false arrest claim.  For example, she alleges that she had "steadfastly denied wrongdoing throughout the numerous interrogations conducted by Defendants," even in the early stages of the investigation of Annie's death.  (*See* Am. Compl. ¶ 127; *see also* Am. Compl. ¶ 118 ("Ying Li, however was positive that she did not harm her daughter, that she never saw Hang Bin do anything but love and treasure Annie.  She maintained her innocence throughout.").)  Plaintiff also pleaded not guilty to all counts in the criminal complaint and indictment.  (Am. Compl. ¶ 179.)  Furthermore, Plaintiff also alleges in the Amended Complaint that she made diligent attempts to disprove the shaken baby syndrome diagnosis of Annie, thereby demonstrating her belief from the time of her arrest that the diagnosis was wrong and that Plaintiff had been falsely arrested and accused of causing her daughter's death, whether by SBS or failing to get her daughter prompt medical attention.  (*See*, *e.g.*, AC ¶ 197 ("In May of 2012[,] Judge Gregory Lasak ordered further DNA testing done on [the Lis], after the OI [Osteogenesis Imperfecta][17] gene had been detected in Hang Bin Li.").) While Plaintiff may have "diligently attempted to disprove Kupferman's . . . diagnosis (Dkt. 66

---

[17] Osteogenesis imperfecta is "a group of genetic disorders that mainly affect the bones. The term 'osteogenesis imperfecta' means imperfect bone formation.  People with this condition have bones that break easily, often from mild trauma or with no apparent cause.  Multiple fractures are common, and in severe cases, can occur even before birth. . . . The milder forms of osteogenesis imperfecta . . . are characterized by bone fractures during childhood and adolescence that often result from minor trauma. . . . Other types of osteogenesis imperfecta are more severe, causing frequent bone fractures that may begin before birth and result from little or no trauma. . . . The most severe forms of osteogenesis imperfecta . . . can include an abnormally small, fragile rib cage and underdeveloped lungs.  Infants with these abnormalities have life-threatening problems with breathing and often die shortly after birth." *See https://ghr.nlm. nih.gov/condition/osteogenesis- imperfecta* (Last visited 3/25/2017.)

at 7), in this case, it only reinforces the conclusion that Plaintiff was aware of her false arrest claim before 2013.

In sum, Plaintiff's Amended Complaint provides only an unsupported, conclusory assertion regarding "fraud, misrepresentation, and deception" that is patently insufficient to support equitable tolling with respect to her false arrest claim, which is barred by the three-year statute of limitations. Furthermore, even Plaintiff's belated and improper assertion of facts regarding the withholding of information by the Medical Center Defendants fails to show that Plaintiff could not have timely brought her false arrest claim, and thus even these facts, if accepted as true, would not support the application of the equitable tolling doctrine.

Accordingly, Defendants' motions to dismiss Plaintiff false arrest claim are granted.[18]

## V. MALICIOUS PROSECUTION

Plaintiff asserts a federal malicious prosecution claim against all Defendants. (Am. Compl. ¶ 211–213.) To allege a Section 1983 claim for malicious prosecution, a plaintiff must allege the four elements of a malicious prosecution claim under New York law—"(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions"—as well as a violation of the plaintiff's rights under the Fourth Amendment.[19] *Manganiello v. City of New York*, 612 F.3d

---

[18] Because Plaintiff's false arrest claim is time-barred, the Court does not address the Defendants' argument that there was probable cause to arrest Plaintiff.

[19] The Second Circuit in *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110 (2d Cir. 1995), left open the possibility of a plaintiff bringing a malicious prosecution claim premised on some other constitutional right. *Id.* at 116 n.5 ("It is theoretically possible . . . for a plaintiff to premise a malicious prosecution claim on some other constitutional right. Where that is the case, it will be the standard governing that right that will determine whether there has been a constitutional violation.")

149, 160–61 (2d Cir. 2010) (citations and quotation marks omitted); *Cornejo*, 592 F.3d at 129

("And § 1983, in recognizing a malicious prosecution claim when the prosecution depends on a

violation of federal rights, adopts the law of the forum state so far as the elements of the claim

for malicious prosecution are concerned." (citation omitted)); *see also Singer v. Fulton Cnty.*

*Sheriff*, 63 F.3d 110, 116–117 (2d Cir. 1995) (relying in part on common law and New York

State malicious prosecution law in analyzing § 1983 malicious prosecution claim).    In

establishing a violation of a Fourth Amendment right in relation to a Section 1983 malicious

prosecution claim, a plaintiff must demonstrate "a sufficient post-arraignment deprivation[] of

liberty."[20]  *Singer*, 63 F.3d at 117; *see also Rohman v. New York City Transit Auth.*, 215 F.3d

208, 215 (2d Cir. 2000) (noting that it is insufficient for a plaintiff to assert only the four

elements of New York State malicious prosecution claim alone).

     The Medical Center Defendants contend that Plaintiff cannot satisfy three out of the five

requisite elements—specifically, favorable termination, lack of probable cause, and malice.

(Dkt. 55 at 5–9.)  The City Defendants argue that Plaintiff's claim must be dismissed because

there was probable cause and because none of the Officer Defendants initiated the prosecution

against Plaintiff.  (*See* Dkt. 59 at 7–11.)  For the reasons stated below, the Court finds that

Plaintiff has adequately alleged a malicious prosecution claim against Det. Degnan, Dr. Landi,

and also Dr. Kupferman, but not as to all of the other Defendants.  The malicious prosecution

---

[20] "The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—*i.e.*, the right to be free of unreasonable unwarranted restraints on personal liberty.  A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' . . . To maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, the deprivation of liberty—the seizure—must have been effected 'pursuant to legal process.'" *Singer*, 63 F.3d at 116–17.

claim is dismissed as to Dets. Moser, Phelan, and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

### A. Initiation of a Criminal Proceeding

To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217) (alteration and internal quotation marks omitted). An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint. *See Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments); *see also Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014). Additionally, a defendant could have initiated a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello*, 20 F. Supp. 3d at 415; *see also Llerando-Phipps v. City of New York*, 390 F. Supp. 2d 372, 383 (S.D.N.Y. 2005) ("[A]n arresting officer may be held liable for malicious prosecution [if he] creates false information likely to influence a jury's decision and forwards that information to prosecutors." (citation and quotation marks omitted)); *Webster v. City of New York*, 333 F. Supp. 2d 184, 198–99 (S.D.N.Y. 2004) (noting that police officers could be held liable for malicious prosecution if they provided false information to prosecutors).

The Medical Center Defendants do not dispute that they took part in the initiation of the criminal proceeding (*see* Dkt. 55), whereas the City Defendants contend that Plaintiff's Amended Complaint only alleges active participation in the prosecution by Det. Degnan (*see* Dkt. 59 at 9 n.10). The Court finds that the Amended Complaint contains sufficient factual

allegations to support a plausible inference that not only Det. Degnan, but also Dr. Landi, initiated Li's prosecution.[21] (*See* Am. Compl. ¶ 149.)

Plaintiff has adequately alleged that Det. Degnan initiated the prosecution, because the Amended Complaint alleges that Det. Degnan swore to the criminal complaint. (*See* Am. Compl. ¶ 145.) Plaintiff has also alleged that Dr. Landi "swore under oath in the criminal complaint against plaintiff" and made assertions that were "false, misleading, and perjurious, and entirely unsupported and unsupportable by any medical science or clinical or forensic evidence." (Am. Compl. ¶¶ 149–150.) *See Cameron*, 598 F.3d at 63 (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments). The Amended Complaint also alleges that Dr. Landi "played an active role in the prosecution of Ying Li. She provided advice and encouragement, that went well beyond her role, and into ancillary and forensic aspects of motive, culpability, and the veracity of Ying Li." (Am. Compl. ¶ 155.)

These City Defendants "cannot hide behind the decision of the DA to prosecute" when they, according to Plaintiff's allegations, provided the prosecutor with false information. *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (rejecting the defendants' argument that the District Attorney, not the officers, initiated the prosecution); *Zahrey v. Coffey* ("*Coffey*"), 221

---

[21] The Court notes that Plaintiff's opposition did little to assist the Court in resolving this issue. In her response, Plaintiff directed the Court to thirty paragraphs in the Amended Complaint, many of which did not allege facts related to whether the City Defendants initiated Plaintiff's prosecution. (*See* Dkt. 61 at 10 (citing to paragraphs 168-198 of the Amended Complaint).) For example, paragraph 179 states, "As plaintiff did not commit or aid/abet in the any of the offenses with which she was charged, she pleaded not guilty to all counts, and bail was set at $250,000." (Am. Compl. ¶ 179.) This plainly has nothing to do with whether Plaintiff has adequately alleged, for each of the City Defendants, participation in the prosecution. Plaintiff is reminded that "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) (quotations and citations omitted); *see also 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005).

F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.")  Therefore, the Court finds that Plaintiff has adequately alleged that Det. Degnan and Dr. Landi participated in the initiation of Plaintiff's criminal proceeding.

By contrast, the Amended Complaint contains no factual allegations to support the inference that Dets. Moser, Phelan, and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan played an active role in initiating Plaintiff's prosecution.  Therefore, as to these Defendants, the malicious prosecution claim is dismissed.  *See, e.g., Jean-Laurent v. Bowman*, No. 12–cv–2954, 2014 WL 4662221, at * 6 (E.D.N.Y. Jul. 7, 2014) (finding that plaintiff failed to demonstrate that some of the defendants played an active role in commencing the criminal prosecution against plaintiff, even though plaintiff alleged that they "authorized, approved and/or participated" in plaintiff's criminal prosecution, because the defendants neither swore out a criminal complaint or corroborating affidavit, nor presented any information to the prosecutor).

## B.    Favorable Termination

The second element of a malicious prosecution claim is termination of the criminal proceeding in the plaintiff's favor.  The Medical Center Defendants argue that Plaintiff's criminal proceeding did not terminate in her favor because (i) the prosecution was not terminated on its merits, (ii) Plaintiff does not set forth factual allegations to support an inference that the charges were dropped because she was innocent, and (iii) a dismissal "in the interest of justice" does not constitute a favorable termination.  (*See* Dkt. 56 at 5–8.)  The Court disagrees, and finds

that Plaintiff has sufficiently alleged a favorable termination for purposes of her malicious prosecution claim.[22]

The Court looks to New York law to determine whether Plaintiff has sufficiently alleged a favorable termination of her Queens County criminal proceeding. *Neal v. Fitzpatrick*, 250 F. Supp. 2d 153, 154 (E.D.N.Y. 2003) (citing *Hygh v. Jacobs*, 961 F.2d 359, 367 (2d Cir. 1992)). "Under New York law, there are two ways to establish [a] favorable termination: '(1) an adjudication of the merits by the tribunal in the prior action,' or (2) 'an act of withdrawal or abandonment on the part of the party prosecuting the prior action.'" *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267 (E.D.N.Y. 2014) (quoting *Morgan v. Nassau County*, No. 03–cv–5109, 2009 WL 2882823, at *8 (E.D.N.Y. Sept. 2, 2009) and citing *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 850 N.Y.S.2d 483, 485 (2008)); *Castro*, 850 N.Y.S.2d at 485 ("The favorable termination element must be established by evidence that 'the court passed on the merits of the charge or claim . . . under circumstances as to show . . . nonliability,' or evidence that the action was abandoned under circumstances 'which fairly imply the plaintiff's innocence.'" (citation and internal quotation marks omitted). Thus, the fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination. *See Castro*, 850 N.Y.S.2d at 485; *see also Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 158 (E.D.N.Y. 2014) (noting, on reconsideration, "the fact that the underlying prosecutions against the Plaintiff [were dismissed pursuant to statutes that] did not reach the merits does not, without more, render the termination of the prosecution inconsistent with innocence"); *Verboys v. Town of Ramapo*, 785 N.Y.S.2d 496, 497 (App. Div.

---

[22] At this stage, the Court need not decide whether the termination of Plaintiff's criminal case was, in fact, a favorable one; rather, the only issue before the Court is whether Plaintiff has sufficiently *alleged* a favorable termination. *See Bacquie v. City of New York*, No. 99 CIV10951, 2000 WL 1051904, at *3 (S.D.N.Y. Jul. 31, 2000).

2004) (holding that favorable termination can be shown by "the formal abandonment of the proceedings").

Furthermore, "New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citing *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195–96 (2000)). "[A]ny final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action," *Smith-Hunter*, 95 N.Y.2d at 195–96, unless the disposition was "inconsistent with the innocence of the accused," *Cantalino v. Danner*, 96 N.Y.2d 391, 396 (2001). *See Rothstein*, 373 F.3d at 275 (discussing New York Law regarding the favorable termination element and citing to both *Smith-Hunter*, 95 N.Y.2d 191, and *Cantalino*, 96 N.Y.2d 391); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014) (applying *Smith-Hunter*, 95 N.Y.2d 191 (2000)).

While New York and federal courts in this circuit have consistently applied the *Cantalino* "not inconsistent with innocence" standard in deciding whether a termination is favorable, there is open disagreement and divergence in this circuit on the constituent issue of whether the termination of a criminal case "in the interest of justice" is a favorable termination, *i.e.*, a termination that is not inconsistent with innocence.[23] *See Gem Financial Serv., Inc. v. City of New York*, No. 13–cv–1686, 2014 WL 1010408, at *10 n.10. (E.D.N.Y. Mar. 17, 2014) (recognizing "an apparent fissure amongst Second Circuit opinions with respect to the proper

---

[23] The Medical Center Defendants cite *Singer*, 63 F.3d 110, in support of their argument. (Dkt. 56 at 5.) However, as discussed below, because the New York Court of Appeals decision in *Cantalino* largely negates this aspect of *Singer,* the Court does not address *Singer*. In any event, the Medical Center Defendants need not rely on *Singer*, given the numerous federal court decisions, including one by the Second Circuit, reaching the same conclusion as *Singer.*

standard for assessing a favorable termination" where an "interest of justice" dismissal is involved). On the one hand, the New York Court of Appeals in 2001 held in *Catalino* that there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination." 96 N.Y.2d at 396.[24] Nonetheless, in 2009, the Second Circuit in a summary order in *Lynch v. Suffolk County Police Dep't, Inc.* found, "as a matter of law", that a dismissal in the interest of justice could not "provide the favorable termination required as the basis for a claim of malicious prosecution", because such a dismissal was "neither an acquittal of the charges nor any determination of the merits[, and left] the question of guilt or innocence unanswered". 348 F. App'x 672, 675 (2d Cir. 2009) (citing *Hygh*, 961 F.2d 359). Even after the *Lynch* decision, district courts in this circuit have continued to apply *Catalino* to find that an "interest of justice" termination can be deemed favorable in a malicious prosecution action. *See Norton*, 47 F. Supp. 3d at 106 (collecting district court cases that adopted *Cantalino* even after *Lynch*); *Guzman v. United States*, No. 11–CV–5834, 2013 WL 543343, at *8 (S.D.N.Y. Feb. 14, 2013) (collecting cases decided by the Southern District of New York that applied *Cantalino* even after the Second Circuit decided *Lynch*); *see*, *e.g.*, *Genovese v. Cnty. of Suffolk*, 128 F. Supp. 3d 661, 672 n.3 (E.D.N.Y. 2015) (declining to apply the standard set forth in *Lynch*, noting that it is a non-binding summary order failing to cite to *Cantalino*, which had already been decided at the time *Lynch* was decided). Other courts, however, have followed *Lynch* in dismissing malicious prosecution claims involving "interest of justice" dismissals. *See Norton*, 47 F. Supp. 3d at 160–161 (citing *Tribie v. Parwanta*, No. 10 Civ. 6016, 2012 WL 246619, at *8 (S.D.N.Y. Jan. 26, 2012) and *Paulin v. Figlia*, 916 F. Supp. 2d 524, 533 (S.D.N.Y. 2013)). However, as discussed

---

[24] Significantly, reiterating part of its holding in *Smith-Hunter*, the Court of Appeals in *Cantolino* stated, "[t]o be sure, there are circumstances where a dismissal in the interest of justice is inconsistent with innocence because it represents 'mercy requested or accepted by the accused'". 96 N.Y.2d at 396 (quoting *Smith-Hunter*, 95 N.Y.2d at 197).

below, notwithstanding the Medical Center Defendants' argument, the Court need not resolve this issue in order to determine whether Plaintiff has sufficiently *alleged* a favorable termination.

The Court now turns to the Medical Center Defendants' three arguments. First, the argument that Plaintiff cannot show a favorable termination because her criminal case was not terminated on the merits is plainly unavailing. As discussed, there are "two ways to establish a favorable termination", one of which is the "act of withdrawal or abandonment" of the case by the prosecution, which is what Plaintiff alleges happened here. (Am. Comp. ¶ 201 ("Contemporaneously with the commencement of Hang Bin's trial, all charges against plaintiff were dismissed.").)

Second, the argument that Plaintiff has not sufficiently alleged malicious prosecution because she has not alleged facts from which it can be inferred that the criminal charges against her were dropped because she was innocent similarly lacks merit. As the New York Court of Appeals made clear in *Smith-Hunter*, a claim of malicious prosecution does not require that the plaintiff prove her innocence of the charges that were dropped, or even that the termination of her prosecution was indicative of innocence. 95 N.Y.2d at 195–96.[25] Rather, all that is required

---

[25] The Medical Center Defendants rely on decisions that define a favorable termination as one that "involves the merits and indicates the accused's innocence." *McFawn v. Kresler*, 666 N.E.2d 1359, 1360 (1996); (*see* Dkt. 55 at 6–7) (citing *Russell v. Smith*, 68 F.2d 33, 36 (2d Cir. 1995); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980), *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *Hershey v. Goldstein*, 938 F. Supp.2d 491, 518 (S.D.N.Y. 2013)). However, the Court does not find this authority persuasive in light of *Smith-Hunter*, which implicitly rejected this position in favor of the principle that "a criminal proceeding is terminated favorably to the accused when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense'", recognizing only a few exceptions to this rule. *Smith-Hunter*, 95 N.Y.2d at 195–96 (noting as exceptions termination "inconsistent with innocence"; charges withdrawn pursuant to a voluntary compromise with the accused; and charges being dismissed out of mercy requested or accepted by the accused (citing *Robbins v. Robbins*, 133 N.Y. 597, 599 (1892))). Notably, *Smith-Hunter* also distinguished *McFawn* on the basis that it involved a dismissal *without* prejudice, which also distinguishes it from the instant case. *Id*. at 197 (noting that *McFawn* was "[f]ar from controlling in the case at

after *Smith-Hunter* and *Cantalino* is that the termination of Plaintiff's case was "final," *e.g.*, that the charges were dismissed with prejudice, and that the termination did not fall into one of the exceptions recognized by *Catalino*, *e.g.*, that the disposition of Plaintiff's criminal case was "inconsistent with innocence". *Cantolino*, 96 N.Y.2d at 396. Thus, the absence of any allegations demonstrating that the termination of Plaintiff's prosecution is indicative of her innocence of the charges that were dropped does not preclude her malicious prosecution claim.

Third, the Medical Center Defendants argue that the termination of Plaintiff's prosecution was an "interest of justice" dismissal and therefore does not constitute a favorable termination. However, the Court cannot make that determination at this stage, because it cannot determine the reason or reasons for the District Attorney's dismissal of the charges against Plaintiff. The Amended Complaint simply alleges that, "Defendants . . . caused plaintiff to be prosecuted with malice and without probable cause—*a prosecution that terminated in plaintiff's favor* . . . ."[26] (Am. Compl. ¶ 212 (emphasis added).) Although Plaintiff does not allege the specific disposition of the case, the Court finds she has sufficiently alleged favorable termination to

---

hand" and "simply held that a plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated." (emphasis in original).

Though the Court did not factor this into its decision, at the status conference in which the charges against Plaintiff were dismissed, Plaintiff explicitly refused any conditions, *i.e*., any compromise (Dkt. 63–6, Ex. F at 3:22–24; *see Smith-Hunter*, 95 N.Y.2d at 196 ("noting that an action terminated by settlement cannot sustain a malicious prosecution claim").)

[26] Even if the Court were to consider the City Defendants' Exhibit B, the dismissal hearing transcript, and draws all inferences in favor of Plaintiff—as it must at this stage—the transcript indicates that dismissal of the criminal prosecution was with prejudice. (Ex. F, Dkt. 63–6 at 7:8–9.) While the transcript also includes the prosecution's explanation for why it is dismissing the charges (*see* Ex. F, Dkt. 63–6 at 5:29–6:18), it is inappropriate for the Court to interpret articulated reasons given by the prosecutor as the real motivation for the government's dismissal of the case. *See Liang v. City of New York*, 2013 WL 5366394, at *5; *see also Nielsen*, 746 F.3d at 62 (noting that the court must draw all reasonable inferences in favor of the plaintiff).

survive a motion to dismiss. *See Rivers v. Towers, Perrin, Foster & Crosby Inc.*, No. 07–cv–5441, 2009 WL 817852, at *4 (E.D.N.Y. Mar. 27, 2009) ("There is nothing implausible about a bare allegation that the prosecution terminated in plaintiff's favor and hence there is no need to amplify that allegation by pleading specific facts."); *see also Norton*, 47 F. Supp. 3d at 161 (reinstating plaintiff's malicious prosecution claim on reconsideration after concluding that the court cannot conclude that the dismissal of the charges was inconsistent with plaintiff's innocence); *McLennon v. New York City*, No. 13–cv–128, 2015 WL 1475819, at *6 n.16 (E.D.N.Y. Mar. 31, 2015); *Peros v. Castano*, No. CV–01–4457, 2002 WL 603042, at *4 (E.D.N.Y. Mar. 22, 2002) (stating, "Although there apparently is some uncertainty as to the precise basis of the state court's dismissal of the criminal charges, I cannot say at this point that there is no set of facts on which plaintiff could satisfy the favorable termination element of his claim," when plaintiff's Complaint alleged "[t]hat after the Plaintiff was arraigned on [ ] charges [and] appeared in Court . . . the case was finally disposed of by the Court granting the Motion to Dismiss." (citation omitted)); *accord Tommy Hilfiger Lic., Inc. v. Bradlees, Inc.*, No. 99–CIV–4677, 2002 WL 737477, at *6 (S.D.N.Y. Apr. 25, 2002) (finding that the defendant sufficiently alleged favorable termination to withstand a motion to dismiss because the basis for the dismissal of the criminal action was unclear at that particular stage of litigation) (citation omitted); *Bacquie v. City of New York*, No. 99–CIV–10951, 2000 WL 1051904, at *3 (denying defendant's motion to dismiss plaintiffs' malicious prosecution claim where the plaintiffs alleged that the charges against them were dismissed by the district attorney's motion and where, at the early stage in the litigation, the Court could not tell why the charges had been dropped); *but see Campbell v. Giuliani*, No. 99–cv–2603, 2000 WL 194815, at *4 (E.D.N.Y. Feb. 16, 2000) ("I find that the bare allegation of dismissal, absent any explanation of the basis on which the case was

dismissed, is insufficient to meet the favorable termination requirement."); *Weaver v. Warrington*, No. 14–cv–7097, 2015 WL 4645298, at *5 (E.D.N.Y. Aug. 4, 2015) (directing plaintiff to amend the complaint alleging additional facts that make clear whether the dismissal was under circumstances not inconsistent with plaintiff's innocence). It is important to note that while the Court has taken judicial notice of the criminal court records submitted by Plaintiff and the City Defendants, including the transcript of the conference at which Plaintiff's case was dismissed, the Court has only considered those documents to establish the date and fact of the dismissal, but not for the truth of statements made by ADA Bishop at the conference as to why Plaintiff's case was being dismissed. *See Global Network Commc'ns, Inc.*, 458 F.3d at 157 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

Accordingly, the Court finds that Plaintiff has adequately alleged a favorable termination of her criminal proceedings.

## C.  Probable Cause

The Medical Center Defendants also contend that Plaintiff's malicious prosecution claim must be dismissed because there was probable cause. (Dkt. 55 at 8.) Specifically, they assert that the Amended Complaint's factual allegations regarding Annie's condition when she arrived at FHMC and her subsequent medical test results are sufficient to establish the existence of probable cause at the time criminal proceedings were initiated against Plaintiff. (Dkt. 55 at 8) They also argue that there is a presumption of probable cause unless the indictment was procured through improper means. (Dkt. 55 at 9.) For the reasons explained below, the Court finds that Plaintiff has rebutted the presumption of probable cause, and that the facts alleged in the

Amended Complaint support a plausible inference that there was no probable cause for Plaintiff's prosecution.

As an initial matter, the Court notes that probable cause for malicious prosecution is different from probable cause for false arrest. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim . . . ."). For a malicious prosecution claim, probable cause to prosecute consists of "facts and circumstances [that] would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248 (N.Y. 1983)). Probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond v. Castro*, 522 F. Supp. 2d 677, 677–78 (S.D.N.Y. 2007) (citations and quotation marks omitted).

A grand jury indictment "gives rise to a presumption that probable cause exists" and thereby defeats a claim for malicious prosecution. *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (quoting *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006)). "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan*, 439 F.3d at 145 (quoting *Colon*, 60 N.Y.2d at 83). A plaintiff may demonstrate fraud or perjury through "evidence establishing that the [ ] witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence

or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283 (quoting *Colon*, 60 N.Y.2d at 82–93).

### 1. Rebutting the Presumption of Probable Cause as to the City Defendants

Plaintiff alleges that the indictment against her was procured by bad faith on the part of the City Defendants. Plaintiff alleges that "the Officer Defendants failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses. Officers sought to strengthen their case against plaintiff in order to avoid acquittal, leading them to falsify and omit information in their reports and representations to the district attorney's office." (Am. Compl. ¶ 178; *see also id.* ¶ 181.) More specifically, Plaintiff alleges that "it was apparent from medical evidence that [she] was innocent." (Am. Compl. ¶ 201.) Plaintiff also alleges that Dr. Landi "enthusiastically and with commitment" sought the Lis' prosecution and conviction "despite the lack of any evidence connecting them with any crime whatsoever." (Am. Compl. ¶ 171.) The Amended Complaint further alleges that Dr. Landi misrepresented that the medical evidence conclusively showed Plaintiff's guilt. (Am. Compl. ¶ 208.)

Taking these allegations as true and given the circumstantial nature of the case against Plaintiff, which, in turn, rested almost entirely on Dr. Landi's and Dr. Kupferman's medical conclusions, the Court finds that these allegations are sufficient to rebut the presumption of probable cause created by the grand jury indictment. *See Anilao v. Spota*, 774 F. Supp. 2d 457, 494 (E.D.N.Y. 2011) (denying defendant's motion to dismiss finding that plaintiff sufficiently overcame the presumption of probable cause by alleging that the grand jury indictment was based on falsified evidence and testimony in spite of defendant's knowledge of significant exculpatory evidence, and that the defendants agreed to present false evidence to the grand jury);

*McLennon*, 2015 WL 1475819, at *8 (finding sufficient allegations similar to Plaintiff's allegations about Defendants procuring indictment in bad faith); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 273–74 (S.D.N.Y. 2010) (denying summary judgment to defendant with respect to malicious prosecution claim where jury could reasonably find that the indictment was secured through bad faith or perjury).

Accordingly, the Court finds that Plaintiff has sufficiently rebutted the presumption of probable cause.

> 2.     Rebutting the Presumption of Probable Cause Against the Medical Center Defendants

Plaintiff also sufficiently alleges that the indictments were procured in bad faith by the Medical Center Defendants. For example, Plaintiff alleges that "Defendant FHMC and Kupferman made no efforts to seek a diagnosis other than SBS."[27] (Am. Compl. ¶ 122.) This claim is analogous to an allegation that a police officer failed to obtain evidence inconsistent with a plaintiff's guilt, which has been considered sufficient to allege that an indictment was procured in bad faith. *See McLennon*, 2015 WL 1475819, at *8 (finding bad faith sufficiently alleged where officer defendants accused of, *inter alia*, failing to obtain or disclose evidence inconsistent with plaintiff's guilt and not informing the district attorney's office of exculpatory evidence).

While the Court acknowledges that a grand jury witness is entitled to absolute immunity in Section 1983 actions, *Rehberg v. Paulk*, 566 U.S. 356 (2012), the Second Circuit's decision in *Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015), provides a clarification of this principle that is

---

[27] The Complaint also alleges that "Dr. Kupferman testified to the forensic interrogation she conducted with Ying Li . . . [and] deliberately testif[ied] falsely under oath that 'If you read any book, it is a classical case of shaken baby syndrome.' Defendant Kupferman knew that these statements were false and misleading and contrary to all valid and reliable medical evidence." (Am. Compl. ¶ 160.)

applicable to Plaintiff's malicious prosecution claim against Dr. Kupferman.  In *Coggins*, the plaintiff was arrested and charged with various felonies based on allegations made by two officers in police paperwork and also verbally to the grand jury.  776 F.3d 108.  The Second Circuit affirmed the district court's denial of absolute immunity to one of the police officers because the plaintiff's Section 1983 claims against that officer were based on alleged misconduct "prior to and independent of [the police officer's] perjurious grand jury appearance."  *Id.* at 113 ("The fact that [the police officer's] grand jury testimony paralleled information he gave in other contexts does not mean that [plaintiff's] malicious prosecution claim was 'based on' [the officer's] grand jury testimony[;] . . . [thus,] the district court properly found that absolute immunity is inappropriate.")  Similarly, here, Plaintiff alleges that, separate and apart from Dr. Kupferman's grand jury testimony, the Medical Center Defendants, including Dr. Kupferman, diagnosed Annie with SBS in bad faith and provided false information about the cause of Annie's death to the prosecutor.  (*See* Am. Compl. ¶¶ 122, 150-52.)[28]  Therefore, even assuming that Plaintiff cannot rebut the presumption of probable cause based on Dr. Kupferman's grand jury testimony alone, Plaintiff has done so based on other allegedly wrongful acts by Dr. Kupferman.  Accordingly, the Court finds that Plaintiff has rebutted the presumption of probable cause.

---

[28] In her Amended Complaint, Plaintiff alleges that despite Annie's "lab results . . . consistent with metabolic bone disease[, an alternative explanation for Annie's injuries,] Dr. Kupferman made no effort to seek a diagnosis other than SBS."  (Am. Compl. ¶ 122.)  Plaintiff also alleges that Dr. Landi falsely "swore under oath in the criminal complaint" as to Annie's death and that her opinion was "largely based on the evidence" presented by Dr. Kupferman.  (*Id.* ¶¶ 150-52.)  From this, the Court can reasonably infer that Dr. Kupferman also provided false information that eventually was relayed to the prosecutor.

3.  Amended Complaint Sufficiently Alleges Lack of Probable Cause to Prosecute

For the same reasons just discussed, the Court finds that the allegations in the Amended Complaint are sufficient to create a plausible inference that there was no probable cause to prosecute Plaintiff at the time she was indicted. The case against Plaintiff was almost entirely circumstantial and depended upon the accuracy of the Medical Center Defendants' determination that SBS and the failure to obtain prompt medical attention caused Annie's death. Plaintiff's allegations that both the Medical Center Defendants and the City Defendants failed to obtain evidence that would have contradicted these findings—*i.e.*, that Annie suffered from osteogenesis imperfecta, and that Annie's brain damage was so extensive that prompter medical intervention would not have saved her life—and the resulting communication of false or incomplete information to the prosecutors support a plausible inference that there was no probable cause to prosecute when Plaintiff was indicted.

**D.  Malice**

To plead a malicious prosecution claim, Plaintiff must also allege malice for each of the Defendants. *Manganiello*, 612 F.3d at 160–61. "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Id.* at 163; *see also TADCO Const. Corp. v. Dormitory Auth. of State of New York,* 700 F. Supp. 2d 253, 271 (E.D.N.Y.2010) ("Actual malice requires pleading facts that show the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" (citation and quotation marks omitted)); *Manbeck v. Micka,* 640 F.Supp.2d 351, 377 (S.D.N.Y.2009) ("Malice in this context does not have to be actual spite or hatred." (citation, internal quotation marks, and alteration omitted)); *Newton v. City of New York*, 566 F. Supp. 2d 256, 273 (S.D.N.Y.

2008) (Malice is "a wrong or improper motive[.]" (citations and quotation marks omitted)). "[A] lack of probable cause *generally* creates an inference of malice." *Manganiello*, 612 F.3d at 163 (citation and quotation marks omitted) (emphasis added); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause— while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" (quoting *Conkey v. State*, 427 N.Y.S.2d 330, 332 (App. Div. 1980))).

### 1. The City Defendants' Malice

Drawing all inferences in favor of Plaintiff, the Court finds that Plaintiff has adequately pled malice only for Det. Degnan and Dr. Landi. (Am. Compl. ¶ 145 (alleging that Degnan signed the criminal complaint knowing that its content was false and fabricated); *see also* Am. Compl. ¶ 150 (alleging that Dr. Landi swore under oath in the criminal complaint and made a statement that was false, perjurious, and entirely unsupported by any medical science or clinical or forensic evidence).) Plaintiff incorrectly argues that she has "plainly alleged malice" for all Defendants and directs the Court to Paragraph 215 of the Complaint. However, that paragraph is conclusory and is one of the numerous instances where Plaintiff resorts to "group pleading" against all the Defendants.[29] While Paragraph 215 properly alleges an improper motive for her prosecution, *i.e.*, to "us[e] plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty

---

[29] Paragraph 215 states, "Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process. Such collateral objectives included, but were not limited to, using plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification, or probable cause."

and covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification, or probable cause[,]" it fails to allege any facts upon which to plausibly infer that *each* of the City Defendants acted out of this improper motive, and instead categorically states that they *all* had the same improper motive. Such conclusory allegations are not enough to infer malice on the part of all City Defendants. The Court, therefore, finds that malice has been sufficiently alleged only as to Det. Degnan and Dr. Landi.

## 2. The Medical Center Defendants' Malice

Notwithstanding Plaintiff's failure to cite to the relevant paragraphs in the Complaint, the Court finds that Plaintiff has adequately alleged malice on the part of the Medical Center Defendants. Plaintiff alleges that Defendants "arrested and imprisoned [her] despite knowing that there was no legal justification . . . in order to pressure plaintiff to testify against her husband . . . or to put pressure on plaintiff's husband to plead guilty." (Am. Compl. ¶ 196.) More specifically, Plaintiff alleges that "[d]espite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disesase," FHMC and Dr. Kupferman "made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122.) Plaintiff also alleges, in describing "the interrogations and searches of [the Lis'] home by three separate squads . . . [and] forensic interrogations by several medical personnel at Flushing Hospital," that she was treated with "suspicion and unconcealed and unrestrained racism." (Am. Compl. ¶ 114.) Drawing inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged malice on the part of the Medical Center Defendants, based on their motives in concealing exculpatory medical evidence to enable the prosecutor's use of Plaintiff as a

"bargaining chip" against Plaintiff's husband[30] and conducting racially biased "forensic interrogations" of her.

*     *     *

Accordingly, the Medical Defendants' motion to dismiss the malicious prosecution claim is denied in its entirety, and the City Defendants' motion to dismiss Plaintiff's malicious prosecution claim is denied as to Det. Degnan and Dr. Landi, but is granted as to all other City Defendants.[31]

## VI. ABUSE OF PROCESS

Plaintiff also asserts a claim of abuse of process under Section 1983 against the City Defendants.[32] As with malicious prosecution, the Court looks to State law for the elements of a Section 1983 abuse of process claim. *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) and *Savino v. City of New York*, 331 F.3d 63, 76–77 (2d Cir. 2003)). Under New York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80); *Hoffman v. Town of*

---

[30] While Plaintiff may face a steep challenge in ultimately proving that the Medical Center Defendants colluded with the City Defendants to the extent of sharing the alleged goal of using Plaintiff as leverage against her husband, at this stage, the Court finds that she has sufficiently alleged facts to support a plausible inference of such a coordinated effort.

[31] The Court discusses *infra* Defendants' claims of immunity with respect to all claims. In sum, the Courts finds that: (1) ADA Bishop is entitled to absolute immunity from all claims; (2) the Officer Defendants and Dr. Landi are not entitled to qualified immunity at this juncture; and (3) Dr. Kupferman is not entitled to statutory immunity. (*See infra* at Section XIII.)

[32] Plaintiff withdrew her malicious abuse of process claim against the Medical Center Defendants. (*See* 1/7/2016 Minute Entry.)

*Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013) (summary order) (citing *Savino*, 331 F.3d 63). In the context of an abuse of process claim, "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook,* 41 F.3d at 80 (quoting *Mormon v. Baran,* 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942)). So, for example, an arrest executed by the officers for a "'collateral objective outside the legitimate ends of the process', satisfies the first element of an abuse of process claim." *Crockett v. City of New York*, No. 11–CV–4378, 2015 WL 5719737, at *10 (E.D.N.Y. Sept. 29, 2015) (citation and quotation marks omitted); *see also Cook*, 41 F.3d at 80 (finding, with respect to abuse of process claim, that New York State Troopers who stopped and arrested plaintiff "clearly employed criminal process against [plaintiff] by having him arraigned on charges" that caused him to be held in custody). Notably, in *TADCO Const. Corp.*, the court found that allegations that defendants "improperly contributed to [plaintiff's] arrest, but not that they took any further actions in his prosecution" were sufficient to withstand a motion to dismiss an abuse of process claim. 700 F. Supp. 2d at 272 (recognizing "split of opinion" on whether mere act of issuing process is sufficient for first element of malicious abuse of process claim).

"The crux of a malicious abuse of process claim is the collateral objective element." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011). To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose": "[A plaintiff] must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

The City Defendants argue that Plaintiff's abuse of process claim should be dismissed because the claim accrued at the time of Plaintiff's arrest, and therefore the three-year statute of

limitations expired sometime around March 2011. (Dkt. 59 at 21.) The Court, however, finds that because Plaintiff could not have discovered one of the two collateral objectives she alleges until her prosecution was dismissed on January 12, 2013, her complaint in this action was timely filed.

A claim for abuse of process accrues "at such a time as the criminal process is set in motion—typically at arrest—against the plaintiff. However, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim." *Duamutef v. Morris*, 956 F. Supp. 1112, 1118 (S.D.N.Y. 1997) (Sotomayor, J.) (citing *Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir. 1989) and *Singleton*, 643 F.2d at 192); *see also Hadid v. City of New York*, No. 15–cv–19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015) (citing *Duamutef*, 956 F. Supp at 118). Unlike the plaintiffs in other cases, Plaintiff in this case does not even allege in the Complaint when she learned of her abuse of process claim. *See, e.g., Duamutef*, 956 F. Supp. at 1118–19 (finding that plaintiff's abuse of process claim was not time-barred because "[a]ccording to the allegations in [plaintiff's] Complaint, plaintiff was unaware that he was being retaliated against until September 28, 1995, when he received an affidavit detailing defendants' intention to stifle his political activities through a criminal prosecution"); *Lukowski v. Cnty. of Seneca*, No. 08–cv–6098, 2009 WL 467075, *8 (W.D.N.Y. Feb. 24, 2009) ("The Complaint alleges that plaintiffs learned of the allegedly illegal conduct of the defendants in 'late March 2007, . . . after being contacted by Ontario County District Attorney Michael Tantillo[.]'")

Here, Plaintiff alleges that Defendants had two collateral objectives for prosecuting her: (1) using her as a "bargaining chip" to get her husband to plead guilty; and (2) covering up their illegal arrest of her. (*See* Am. Compl. ¶ 215). While these two objectives are sufficient to state

an abuse of process claim[33], the "cover-up" objective does not provide a basis for finding this claim timely. As the Court has already found in connection with Plaintiff's false arrest claim, Plaintiff believed from the time of her arrest that her arrest was illegal, and thus Plaintiff was aware of or should have been aware of the facts providing a basis for her claim, *Duamutef*, 956 F. Supp. at 118, that at least one purpose of her prosecution was to cover up this illegal arrest. Were Plaintiff's abuse of process claim based solely on this objective, that claim would have accrued, as the City Defendants maintain, on the date of her arrest, and therefore would be time-barred.

However, Plaintiff also alleges that another purpose of her prosecution was to use her as leverage to get her husband to plead guilty. As to that collateral objective, the Court finds that Plaintiff was not reasonably aware of that possible objective until the dismissal of her case, without any effort to pursue her prosecution during the four years of her pretrial incarceration and only after her husband was convicted. It was only when Plaintiff's case was dismissed, without prosecution and following her husband's conviction, did the objective of using Plaintiff as a "bargaining chip" become clear.[34] Accordingly, the Court finds that Plaintiff's abuse of process claim did not accrue until the date on which her case was dismissed, January 2, 2013, and thus her abuse of process is not time-barred.[35]

---

[33] *See, e.g., Pinter v. City of New York*, 976 F. Supp. 2d 539, 569 (S.D.N.Y. 2013) (finding that there was a collateral objective for plaintiff's arrest where the defendant "us[ed] prostitution arrests for leverage in negotiations over nuisance abatement, without any apparent interest in conviction").

[34] Although Plaintiff has not made this exact argument, the Court has the obligation at this stage to draw all reasonable inferences in Plaintiff's favor. *See Nielsen*, 746 F.3d at 62.

[35] The Court also rules that, for the time being, her abuse of process claim can proceed on the basis of both collateral objectives, even though, as previously discussed, a claim based solely on the "cover-up" objective would have been time-barred. *See Bacchus v. New York City Bd. of Ed.* 137 F. Supp. 3d 214 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim

The Court briefly addresses the City Defendants' two other grounds for dismissing Plaintiff's abuse of process claim. First, they contend that neither police officers nor medical examiners, such as Dr. Landi, have the authority to offer and/or to induce defendants to accept plea deals and that, therefore, Plaintiff's abuse of process claim against them fails "as a matter of practicality." (Dkt. 59 at 20.) However, the City Defendants do not cite any legal authority for this contention, and it is unclear to the Court why the police officers and medical examiners would not be liable if they worked with the prosecutors to pursue Plaintiff's prosecution for the purposes of getting Plaintiff's husband to plead guilty or covering up an unlawful arrest. Second, the City Defendants argue that, although "there is a split in the Second Circuit as to whether probable cause is a defense against abuse of process claims", the Court should follow the line of cases finding probable cause to be a complete defense to this claim. (Dkt. 59 at 21 n.17.) The Court declines that invitation, and instead adheres to the view that "[t]he Second Circuit has long recognized that probable cause is not a complete defense to malicious abuse of process." *Goldring v. Zumo*, No. 14–Civ–4861, 2015 WL 148451, at *5 (E.D.N.Y. Jan. 12, 2015). In any event, as the Court has already found, in connection with Plaintiff's malicious prosecution claim, the Amended Complaint contains sufficient allegations from which the absence of probable cause to prosecute Plaintiff can be reasonably inferred.

---

based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.,* 13–CV–5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").

However, to the extent that Plaintiff argues in her MOL (Dkt. 61) that another "collateral motive . . . [for Plaintiff's arrest was to obtain Hang Bin's confession because] such confessions are very valuable to promoting the City's agenda in promoting the truth of SBS science," Plaintiff will not be permitted to pursue this as part of her abuse of process claim, since there is nothing remotely related to this allegation in the Complaint, nor does Plaintiff cite to any paragraph in the Complaint to support this newly proffered objective.

While the Court finds that Plaintiff has sufficiently and timely pled an abuse of process claim, she has not adequately alleged that claim as to all City Defendants. Plaintiff, again, indiscriminately group pleads her abuse of process claim against *all* Defendants. (*See* Am. Compl. ¶¶ 215-217.) As with Plaintiff's malicious prosecution claim, however, her abuse of process claim is only properly pled as to Det. Degnan and Dr. Landi. These are the only City Defendants as to whom Plaintiff has adequately pled involvement in the use of legal process, *i.e.*, arresting and detaining Plaintiff on the basis of allegedly false or incomplete evidence, and thus these are the only Defendants as to whom the pursuit of one or both of the alleged collateral objectives could be plausibly inferred. Although the court in *TADCO Const. Corp.* suggested that individuals who "improperly contributed" to the plaintiff's arrest could be held liable for malicious abuse of process, there, the defendants were alleged to have directly contributed to the plaintiff's arrest. Here, while Dets. Moser, Phelan, and Heffernan are alleged to have participated in the investigation of Plaintiff's case, there is nothing in the Amended Complaint from which to infer that they participated in the actual legal process that was used against Plaintiff, *i.e.*, her arrest and detention.[36]

Accordingly, Defendants' motion to dismiss Plaintiff's abuse of process claim is denied as to Det. Degnan and Dr. Landi, and granted as to all other City Defendants.

## VII.    FAILURE TO INTERVENE

The Amended Complaint asserts, as part of Plaintiff's Section 1983 claim, that *all* Defendants failed to intervene to prevent other Defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process. Both

---

[36] By contrast, as discussed *infra*, the involvement of these detectives in the investigation is sufficient to state a claim against them for Section 1983 conspiracy, unreasonably prolonged detention, and violating some of Plaintiff's substantive due process rights.

groups of Defendants argue for dismissal of this claim on the grounds that Plaintiff's claim is based on conclusory allegations. The Court agrees. Moreover, the Court independently finds these allegations irreconcilable with Plaintiff's theory of direct participation by each Defendant.

"It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d at 557 (citations omitted). To establish a claim for failure to intervene, a plaintiff must show (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citation and quotation marks omitted). Additionally, Plaintiff must show that the officer had "a realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *See Cerbelli v. City of New York*, No. 99–CV–6846, 2008 WL 4449634, at *11 (E.D.N.Y. Oct. 1, 2008) (citation and quotation marks omitted).

Plaintiff's failure to intervene claim is dismissed as to all Defendants for two reasons.[37] First, Plaintiff's allegations are merely conclusory.[38] Second, Plaintiff resorts to conclusory

---

[37] In addition to the deficiencies the Court discusses here, the City Defendants also argue that the failure to intervene claim is time-barred. (Dkt. 59 at 23.) Specifically, they argue that "because the alleged constitutional violations were being committed 'by other police officers,'

generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively. Such conclusory and generalized allegations do not give any of the Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests." *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 212 (N.D.N.Y. 2008) (quotation marks omitted); *see Bouche v. City of Mount Vernon*, No. 11–Civ–5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's failure to intervene claim because the plaintiff "only refer[red] to the defendants in the collective, never identifying which defendants were responsible for specific actions"); *see also Clay v. Cnty. of Clinton*, No. 8:10–cv–00239, 2012 WL 4485952, at *14 (N.D.N.Y. Sep. 27, 2012) (granting motion for judgment on the pleadings as to plaintiff's failure to intervene claim because the plaintiff "fail[ed] to distinguish which . . . Defendant was responsible for actually violating Plaintiff's constitutional rights and which, if any, Defendant failed to intervene to prevent such violations from occurring"). As the district court explained in *Hardy v. City of New York*, No. 12–Civ–17, 2013

---

and such conduct necessarily would have taken place during or before plaintiff's arrest in March 2008, the three-year statute of limitations has run." (*Id.*) The Court finds this argument unclear and unpersuasive. Plaintiff's Complaint alleges constitutional violations that are not limited to false arrest, and it is conceivable that her constitutional rights were violated after March 2008 since she was in prison—awaiting trial—for over four years. (Am. Compl. ¶¶ 234, 236.) In any event, because Plaintiff's claim fails to include sufficient factual allegations, the Court cannot even determine whether the statute of limitations has expired as to virtually all of the Defendants. The Court also finds Plaintiff's response to the City Defendants' argument deficient at best. Plaintiff simply recites, in a footnote, the law that the statute of limitations for Section 1983 actions arising in New York is three years and that New York law determines the tolling of the limitations period while federal law determines when the claim accrues. (Dkt. 61 at 21 n.35.) This recitation of boilerplate law is in no way responsive or illuminating on the issue of whether Plaintiff's failure to intervene claim is time barred.

[38] Plaintiff alleges that "[e]ach individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, in violation of plaintiff's right under the First, Fourth, and Fourteenth Amendments to the United States Constitution." (Am. Compl. ¶ 219.)

WL 5231459, at *4 (S.D.N.Y. Jul. 9, 2013), "restatement of the legal standard . . . does not sufficiently allege constitutional violations in which the [defendants] might have intervened. Where were the [defendants] in relation to Plaintiff and in relation to each other? What impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible."

Such a generalized pleading, which fails to differentiate between the Defendants, is especially problematic where, as here, Plaintiff is also alleging that Defendants are all liable under a theory of direct participation.[39] *See Chepilko v. City of New York*, No. 06–CV–5491, 2012 WL 398700, at *8 n.5 (E.D.N.Y. Feb. 6, 2012) (finding that if a defendant "may be liable under a theory of direct participation, there is no claim against [that defendant] for failure to intervene"); *see also Buchy v. City of White Plains*, No. 14–CV–1806, 2015 WL 8207492, *3 (S.D.N.Y. Dec. 7, 2015) (same) (citation omitted). Plaintiff's failure to specify which Defendants participated directly in the unlawful conduct, as opposed to failed to intervene in it, is fatal to her claim, even at this stage.

Accordingly, Defendants' motion to dismiss with regard to Plaintiff's failure to intervene claim is granted as to all Defendants.[40]

---

[39] Indeed, Plaintiff names every Defendant in all but her *Monell* and malicious abuse of process claims. (*See* Compl; *see also* Dkt. 61 at 21 ("Defendant Officers collectively caused Plaintiff's constitutional violations and each of those officers also can be found liable for failing to intervene to prevent his fellow officers from committing those acts." (citation omitted)).)

[40] Given the deficient pleading of Plaintiff's failure to intervene claim, the Court need not address the Medical Center Defendants' argument that, as a non-governmental hospital and a medical expert who provided testimony and information to the prosecuting authority, they had no affirmative duty to intervene to prevent the alleged false arrest, malicious prosecution, or abuse of process. (*See* Dkt. 55 at 10.)

## VIII. CONSPIRACY

Plaintiff asserts a Section 1983 conspiracy claim against all Defendants. (Am. Compl. ¶¶ 221–223.) "[T]o survive a motion to dismiss on [a plaintiff's] § 1983 conspiracy claim, [the plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). To state a Section 1983 conspiracy claim against a private entity, "the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."[41] *Id.* at 324 (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For the reasons stated below, the Court finds that Plaintiff has sufficiently pled a claim of conspiracy against specific City Defendants and the Medical Center Defendants.

While Plaintiff's pleading of her conspiracy claim is hardly robust, drawing all reasonable inferences in her favor, the Court finds that Plaintiff has adequately pled this claim as to Dets. Degnan, Moser, Heffernan, and Phelan, Dr. Landi, and Dr. Kupferman. The Complaint provides factual allegations that these Defendants acted jointly. For example, Plaintiff alleges that Det. Degnan was present at the autopsy of Annie that Dr. Landi performed (Am. Compl. ¶ 129) and that "Defendant Degnan and Heffernan engaged in lengthy communications with

---

[41] Given that the parties have not, at this stage, delved into the issue of whether the Medical Center Defendants can be considered "joint actors" that can be held liable under Section 1983, the Court's finding that Plaintiff has adequately pled her conspiracy claim is limited to whether Plaintiff's claim overcomes a 12(b)(6) motion.

FHMC staff, including Defendant Kupferman" (Am. Compl. ¶ 108). Plaintiff also alleged that Dr. Kupferman joined Dets. Heffernan and Moser in screaming at her during an investigation (Am. Compl. ¶ 115) and that Dr. Landi "made her determination largely based on the evidence presented to her by" Dr. Kupferman and other City Defendants (Am. Compl. ¶ 152). Moreover, Plaintiff alleges that Det. Phelan and Det. Degnan together interrogated the Lis, and participated in the early stages of investigating Plaintiff's criminal case. (*See, e.g.,* Am. Compl. ¶¶ 102–104, 106, 110.)

Pointing to Plaintiff's allegations in paragraphs 157 and 158 that Dr. Kupferman acted "as a deputy of the NYPD and the Queens County D.A.'s office," the Medical Center Defendants argue that they are "legally incapable of conspiring" with the City Defendants under the intra-corporate conspiracy doctrine. (*See* Dkt. 55 at 11–12.) Plaintiff responds that she has adequately pled facts to support this claim[42] and that "[j]ust because one is alleged to be [sic] State Actor, does not make them members of the NYPD, or break intro-corporate [sic] conspiracy." (*See* Dkt. 66 at 16–17.) In their reply, the Medical Center Defendants clarify that Plaintiff's counsel misconstrues the argument: "[T]he doctrine applies [not simply because Plaintiff alleged that Dr. Kupferman was a state actor but] because plaintiff alleged that Kupferman 'acted as a deputy of the NYPD and the Queen County D.A.'s office[.]'" (Dkt. 56 at ECF 15.)

Under the intra-corporate conspiracy doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of

---

[42] Though making this argument, Plaintiff does not, in fact, provide adequate citation to the Amended Complaint. For example, Plaintiff argues in her MOL that "Dr. Kupferman did not begin her extensive investigation notes imbedded in the medical records until October 25, 2007, two days after police were first notified of possible child abuse." (Dkt. 66 at 16.) However, she fails to provide relevant citation to the Amended Complaint to support this statement.

his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citation omitted). While the Court must accept the factual allegations set forth in the complaint as true, it must also draw all reasonable inferences *in favor* of the plaintiff. *See Nielsen*, 746 F.3d at 62. Here, the Court infers from paragraphs 157 and 158 that Plaintiff is alleging—albeit in exaggerated language—that Dr. Kupferman acted in concert with or "acted as a part of the team" that is the NYPD and the Queens County D.A.'s Office, not that Dr. Kupferman was an actual "employee" of the NYPD or District Attorney's Office. Indeed, any inference that Dr. Kupferman actually worked for those offices is belied by the Amended Complaint's allegations that Dr. Kupferman worked for FMHC. (Am. Compl. ¶ 108.) In *Herrmann*, the case on which the Medical Center Defendants rely, there was no question that all defendants accused of conspiracy belonged to a single corporation. *See* 576 F.2d 453, 459 ("Every one of the defendants . . . was either a trustee or faculty member of the Brooklyn Law School[.]") Therefore, at this stage of the proceedings, the Court does not find it appropriate to dismiss Plaintiff's conspiracy claim against Dr. Kupferman based on the intra-corporate conspiracy doctrine.

\*     \*     \*

Accordingly, the City Defendants' motion to dismiss Plaintiff's conspiracy claim is denied as to Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi, but granted as to all other City Defendants; the Medical Center Defendants' motion to dismiss Plaintiff's Section 1983 conspiracy claim is denied.[43]

---

[43] Furthermore, to the extent that Dr. Kupferman is alleged to have acted as an agent of FHMC, the hospital is also liable for the Section 1983 conspiracy. *See Niemann v. Whalen*, 911 F. Supp. 656, 664 (S.D.N.Y. 1996) (where bank employees who allegedly violated plaintiff's constitutional rights were acting as agents of defendant bank, plaintiff could bring § 1983 action against bank).

## IX. UNREASONABLY PROLONGED DETENTION

Plaintiff also asserts a Section 1983 claim for unreasonably prolonged detention in violation of her Fourth Amendment rights. (Am. Compl. ¶¶ 225–229.) Specifically, Plaintiff alleges that Defendants' mishandling, concealing, and suppressing of exculpatory evidence, and their intimidation and coercion of witnesses, caused her unreasonably prolonged detention. (*Id.* (citing *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007).).)

Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a Section 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. *Russo*, 479 F.3d at 208–09. To state such a claim, Plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct "shocks the conscience." *Russo*, 479 F.3d at 205 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)). In *Russo*, the Second Circuit considered the following three factors in determining whether the plaintiff's detention was excessive in violation of the Fourth Amendment: (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior. *Id.* at 209.

Applying these standards, the Court finds that Plaintiff has adequately alleged an unreasonably prolonged detention claim against some of the City Defendants, but not against the Medical Center Defendants.

### A. The City Defendants

The City Defendants argue that this claim should be dismissed because (1) Plaintiff only recites the elements of the cause of action, and (2) Plaintiff cannot allege the third element, *i.e.*,

that the alleged conduct "shocks the conscience", because the exculpatory evidence at issue is not equivalent to the exculpatory evidence in *Russo.*

First, the Court disagrees with the City Defendants' contention that Plaintiff only recites the elements of unreasonably prolonged detention and nothing more. In the Amended Complaint, Plaintiff alleges that she was held at Riker's Island Jail for about four years (Am. Compl. ¶¶ 180, 234), and that Defendants "disregarded plainly exculpatory evidence" (Am. Compl. ¶ 173), "failed to . . . disclose evidence inconsistent with plaintiff's guilt" (Am. Compl. ¶ 182), and mishandled and suppressed "exculpatory . . . evidence" (Am. Compl. ¶ 225). Had Plaintiff only alleged this, her claim would have been conclusory. However, Plaintiff provides specifics regarding these broad allegations. For example, she alleges that Defendants mishandled evidence that "Annie's injuries could have been caused by osteogenesis imperfecta or other natural causes" (Am. Compl. ¶ 137), and that Dr. Landi's statement was "entirely . . . unsupportable by any medical science" (*see* Am. Compl. ¶ 150). She also alleges that Dr. Landi withheld exculpatory evidence (Am. Compl. ¶ 154), falsely "swore under oath in the criminal complaint" that the Lis could have prevented Annie's death by getting her prompt medical attention the night she died (Am. Compl. ¶ 150), and "ignored signs of rib anterior flaring, and [the need for] any kind of thorough eye [sic] exam for eyes, or bones." (Am. Compl. ¶ 152.) To the extent that Dets. Degnan, Moser, Phelan, and Heffernan took an active role in investigating the Lis, the Court can infer that any exculpatory evidence concealed by Dr. Landi was also known by these Officer Defendants. From these allegations, the Court can plausibly infer that these City Defendants failed to disclose medical evidence that would have contradicted Dr. Landi's diagnosis and thus suppressed evidence that would have exculpated Plaintiff sooner.

Second, the Court disagrees with the City Defendants' contention that the exculpatory evidence in this case—*i.e.*, that Annie could not have been saved even if medical care was sought out sooner or that she died due to a condition other than SBS—is not equivalent to the definitive and conclusive exculpatory evidence contemplated by the Second Circuit in *Russo*. (Dkt. 59 at 25.) The failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience. *See, e.g., Wilson v. City of New York*, 480 F. App'x. 592, 595 (2d Cir. 2012) (summary order) (distinguishing *Russo* because the evidence in *Wilson* was conflicting and some of the testimonial evidence at issue identified the defendant as an accomplice to the charged crime). In *Russo*, the exculpatory evidence at issue was a video surveillance tape that showed the perpetrator of the robbery in question without tattoos on his arms; Russo, who was arrested for the robbery, had distinctive tattoos covering his arms and repeatedly alerted the defendant-officers that the surveillance video would establish his innocence. *Id.* 200. Here, the exculpatory evidence that Plaintiff alleges was concealed is the *absence* of any medical support for the charge that she caused Annie's death by SBS. (*Id.* ¶¶ 150, 135 (asserting that charge of SBS was "*entirely* . . . unsupportable by *any* medical science," that the "there was *no* evidence, and *no reasonable basis* to believe, that plaintiff had any time engaged in any conduct which could have caused or contributed to Annie's injuries and death," and that "there was *no* clinical or diagnostic medical evidence to support a finding of SBS [based on Annie's condition]." (emphasis added)).) Although the Amended Complaint is not a model of clarity, the Court infers that Plaintiff's unreasonably prolonged detention claim is based on the allegation that the City Defendants knew from conversations with, or information provided by, the Medical Center Defendants that there was no medical support for the conclusion that Annie died from SBS or that earlier medical intervention could have prevented her death—conclusions that were central

to the case against Plaintiff—and that the City Defendants concealed this information for over four years while Plaintiff remained in prison. At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that there was definitive and conclusive exculpatory evidence—and finds that Plaintiff has adequately pled the third element of her unreasonably prolonged detention claim.[44]

Accordingly, the City Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim is denied as to Dets. Degnan, Moser, Phelan, and Heffernan, and Dr. Landi, but granted as to all other City Defendants.

### B. The Medical Center Defendants

The Medical Center Defendants contend that Plaintiff cannot state a claim for unreasonably prolonged detention against Dr. Kupferman because that claim can only be brought against law enforcement officers. (Dkt. 55 at 12.) Plaintiff, citing no legal authority, argues that the Second Circuit's holding in *Russo* should be extended to non-law-enforcement officials. (Dkt. 66 at 19.) Plaintiff also argues that as long as the defendant acted under color of state law, that defendant is subject to an unreasonably prolonged detention claim recognized by the court in *Russo*. The Court disagrees with Plaintiff's overly expansive and unsupported reading of *Russo*.

In *Russo*, the Second Circuit specifically stated that a plaintiff has a right to be free from prolonged detention "stemming from *law enforcement officials'* mishandling or suppression of exculpatory evidence . . . ." *See Russo*, 479 F.3d at 205 (emphasis added). Indeed, all three

---

[44] While the City Defendants cite to a string of cases in support of their argument that Plaintiff has failed to adequately plead a claim of unreasonable detention (*see* Dkt. 59 at 26), the courts in those cases dismissed the claim either at the stage of summary judgment or after a trial was conducted. *See Nzegwu v. Friedman*, No. 10–CV–02994, 2014 WL 1311428 (E.D.N.Y. Mar. 31, 2014); *Harewood v. Braithwaite*, 64 F. Supp. 3d 384 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F. Supp. 2d 650 (S.D.N.Y. 2009); *Jackson v. City of New York*, 29 F. Supp. 3d 161 (E.D.N.Y. 2014). Citations to such cases are not persuasive.

prongs of the test for determining whether an unreasonably prolonged detention has occurred expressly references conduct by a law enforcement officer. *See id.* There is nothing in *Russo* or any case applying *Russo* that suggests that non-State individuals or entities can be held liable for unreasonably prolonged detention. *See*, *e.g.*, *Jackson v. City of New York*, 29 F. Supp. 3d 161, 178 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence . . . ."); *Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 401–03 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009); *Wilson v. City of New York*, 480 F. App'x 592, 594-95 (2d Cir. 2012) (summary order); *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 224-25 (E.D.N.Y. 2007). Nor does Plaintiff cite any such case law.

Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim as to them is granted in its entirety.

## X.    DUE PROCESS

Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This prohibition applies to municipalities. *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) (stating that the Fourteenth Amendment due process right applies only to government entities whose action may be fairly attributed to the State).

The Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)). Procedural due process requires that government action depriving an individual of substantial interest in life, liberty, or property "be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987). Substantive due process, as recognized by the Supreme Court, bars "certain government actions regardless of

the fairness of the procedures used to implement them," in order to "prevent governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331 (citation and quotations marks omitted); *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986). "In other words, while a procedural due process claim challenges the procedure by which [deprivation of liberty] is effected, a substantive due process claim challenges the 'fact of the [deprivation'] itself." *See Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2011) (alteration in original omitted) (differentiating a procedural due process claim from a substantive due process claim); *see also Kerry v. Din*, 135 S. Ct. 2128 (2015) ("[T]here are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed.").

The Court interprets Plaintiff's due process claim, set forth in her seventh cause of action, to be based on the alleged (1) concealment of exculpatory evidence, *i.e.*, a *Brady* violation (Am. Compl. ¶¶ 232–233), (2) fabrication of evidence (*id.*), (3) failure to investigate (Am. Compl. ¶ 235), (4) violation of the right to a speedy trial (Am. Compl. ¶ 234), and (5) violation of the right to be treated with dignity during her pretrial detention (¶ 236). While Plaintiff does not clearly articulate which due process claims are procedural and which are substantive, the Court interprets the first two claims, regarding the mishandling of evidence, to be procedural[45], and the others to be substantive.

---

[45] "The Supreme Court has never definitively held whether *Brady* is based on substantive or procedural due process. Nevertheless, it seems clear that it is a procedural due process aspect of the criminal defendant's right to a fair trial." Martin A. Schwartz, *The Supreme Court's Unfortunate Narrowing of the Section 1983 Remedy for Brady Violations*, Champion, May 2013 at 58, 59. As for Plaintiff's fabrication of evidence claim, it is unclear whether Plaintiff characterizes it as a procedural or substantive due process claim. (*See* Dkt. 66 at 20 ("Dr. Kupferman's actions [of fabricating evidence, *inter alia*,] deprived Plaintiff of the right to a fair

## A.     Procedural Due Process

A procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard.  *See B.D. v. DeBuono*, 130 F. Supp. 2d 401, 432–33 (S.D.N.Y. 2000).  "To determine whether a Section 1983 due process claim is plausibly alleged, the Court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest."  *Norton v. Town of Islip*, 97 F. Supp. 3d 241, 266 (E.D.N.Y. 2015); *see also Ciambriello*, 292 F.3d at 313.

Here, Plaintiff has asserted Section 1983 due process claims that are often referred to as fair trial claims.  "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights."  *Fappiano v. City of New York*, 640 F. App'x. 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)).  A defendant's right to a fair trial is violated when exculpatory evidence is withheld, *i.e.*, when a *Brady* violation occurs (*see Brady v. Maryland*, 373 U.S. 83 (1963)), and also when an officer forwards

---

trial under the doctrine of *procedural* due process." (emphasis added)); *but see* Dkt. 61 at 24–25 (first laying out the law of substantive due process and then immediately following it with a discussion of Plaintiff's claim of fabrication of evidence, among other claims).)  Regardless, courts in this Circuit have characterized the right to be protected against the deprivation of liberty based on fabricated evidence as a procedural due process issue.  *See Coffey*, 221 F.3d at 348–49 (the use of fabricated evidence amounts to a deprivation of liberty without due process); *see also Jean-Laurent v. Bowman*, No. 12–cv–2954, 2014 WL 4662221, at *12 (E.D.N.Y. Jul. 7, 2014); *Zachary v. City of Newburgh*, 13–cv–5737, 2014 WL 1508705, at *4–5 (S.D.N.Y. Apr. 1, 2014) (dismissing plaintiff's substantive due process claim but finding that plaintiff alleged a procedural due process claim based on fabricated evidence); *Maldonado v. City of New York*, No. 11–cv–3514, 2014 WL 787814, at * 12 (S.D.N.Y. Feb. 26, 2014) (dismissing plaintiff's substantive due process claim but noting that plaintiff's fabrication of evidence claims may proceed "via the Fourth Amendment and the procedural component of the Fourteenth Amendment's Due Process Clause"); *Pinter v. City of New York*, 976 F. Supp. 2d 539, 576 (S.D.N.Y. 2013) (recognizing a separate "fabrication-based due process claim").

fabricated evidence to prosecutors, *Ricciuti*, 124 F.3d at 130. "A plaintiff need not have gone to a full trial on the merits in order to have an actionable Section 1983 claim based on the denial of a fair trial." *Marom v. City of New York*, No. 15–CV–2017, 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016); *see Ricciuti*, 124 F.3d at 127 (plaintiffs who brought a Section 1983 claim for right to a fair trial had their criminal charges dismissed pretrial).

The Court finds that Plaintiff has adequately alleged fair trial claims against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and the Medical Center Defendants.

1.    *Brady* violation claim

The Supreme Court held that a prosecutor violates a criminal defendant's due process right when the prosecutor fails to disclose favorable material to the defendant, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Poventud v. City of New York*, 750 F.3d 121, 155 (2d Cir. 2014) ("[T]he constitutional right defined by *Brady* . . . is the criminal defendant's procedural due process right to the disclosure of 'evidence that is material to his guilt or punishment.'" (quoting *Cone v. Bell*, 556 U.S. 449, 469 (2009)). Police officers also "can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015). Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his obligations under *Brady*. *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense."); *see also Blake v. Race*, 487 F. Supp. 2d 187, 215–16 (E.D.N.Y. 2007) (noting that the Second Circuit had extended the *Brady* obligations to police officers in that they are required to turn exculpatory evidence over to the prosecutors).

"A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Fappiano v. City of New York*, 640 F. App'x. 115, 118 (2d Cir. 2016) (summary order) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcomes of the trial.'" *Id.* at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

Here, Plaintiff has sufficiently pled her *Brady* violation claim against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and Dr. Kupferman.[46] The Amended Complaint states that "the Officer Defendants failed to . . . disclose evidence inconsistent with plaintiff's guilt, *did not document or inform the district attorney's office of exculpatory evidence*, [and] falsely reported facts in reports and search warrant affidavits." (Am. Compl. ¶ 178 (emphasis added).) Plaintiff also alleges that Defendants "*maliciously* concealed *material* exculpatory evidence" (Am. Compl. ¶ 233 (emphasis added)), and that prejudice ensued because it resulted in her arrest (Am. Compl. ¶ 238). In addition, as previously discussed, the Amended Complaint describes the nature of this exculpatory evidence as relating to the false conclusions of Dr. Landi and/or Dr. Kupferman regarding the causes of Annie's death, which implicated Plaintiff and her husband in their daughter's death. (*Id.* ¶¶ 150, 152, 164.)

---

[46] Plaintiff's due process claim under *Brady* is distinct from her malicious prosecution claim. *See Fappiano*, 640 F. App'x at 120–21 (differentiating plaintiff's malicious prosecution claim from his "fair trial" claim stemming from defendants alleged *Brady* violation); *Alexander v. McKinney*, 692 F.3d 553, 556–57 (7th Cir. 2012) (listing the elements of a malicious prosecution claim and the elements of a due process claim under *Brady*, and identifying lack of probable cause as a requirement only of the former).

2.      Fabrication of Evidence claim

Separate from her malicious prosecution claim, Plaintiff alleges a procedural due process violation based on Defendants' alleged fabrication of evidence.  (*See* Am. Compl. ¶ 233.)[47]  The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, Fourteenth Amendments of the U.S. Constitution.  *See Holbrook v. Flynn*, 475 U.S. 560 (1986); *Zahrey v. City of New York*, No. 98–4546, 2009 WL 1024261, at *16 (S.D.N.Y. Apr. 15, 2009) (characterizing plaintiff's right to a fair trial claim as an action for violation of his right to procedural due process rooted in the Fifth, Sixth, and Fourteenth Amendments).  Fabrication of evidence constitutes a violation of this right to a fair trial.  *Coffey*, 221 F.3d at 344 ("[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty."); *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence" (citing *Ricciuti*, 124 F.3d at 130–31); *see also Zahrey*, 2009 WL 1024261, at *8 n.14 (S.D.N.Y. Apr. 15, 2009) ("Because evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process."); *Myers v. Cnty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011) (noting that when a police officer turned over fabricated evidence to

_____

[47] Specifically, Plaintiff alleges that Defendants "created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had abused her daughter[,] . . . [and] developed and cultivated witnesses to testify falsely . . . ."  (Am. Compl. ¶ 233.)

the prosecutor, such conduct can be redressed, not as a *Brady* violation, but as a deprivation of liberty on the basis of false and fabricated evidence).

To state a claim of fabrication of evidence, a plaintiff must allege that "an (1) investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016).

### a) The City Defendants

The City Defendants assert that Plaintiff's fabrication of evidence claims should be dismissed for three reasons: (1) none of the City Defendants could have possibly fabricated the SBS medical evidence, and the Complaint does not credibly allege that Dr. Landi "fabricated" evidence of SBS; (2) ADA Bishop is absolutely immune from the claims; and (3) the claims are time-barred, because Plaintiff was always aware of her theory that Annie died from a genetic disorder and not from any action taken by Plaintiff or her husband. (Dkt. 59 at 27–28.) Plaintiff provides a somewhat haphazard analysis in response and argues, "[Det.] Degnan states 'that he was informed by Dr. Landi that earlier medical attention for the complainant could have resulted in the complainant's survival, and that the lack of immediate medical attention contributed to the complainant's death' . . . . Whether such a statement was fabricated is discoverable." (Dkt. 61 at 25 (citing Plaintiff's Exhibit B, Criminal Court Complaint in *People v. Ying Li*)). Notwithstanding Plaintiff's cursory response to the City Defendants' arguments, the Court finds that Plaintiff has adequately alleged a plausible claim of fabrication of evidence against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

Although Plaintiff fails to identify the relevant paragraphs of the Amended Complaint, except for Paragraph 233, the Amended Complaint does contain allegations of fact that support her fabrication of evidence claim with regard to these City Defendants. (*See* Am. Compl. ¶¶ 145, 146, 150, 160, 178.) Specifically, Plaintiff alleges that Det. Degnan signed the criminal court complaint in spite of his knowing that its content was not true (Am. Compl. ¶ 145), that Plaintiff was arraigned based on the fabricated information Defendants forwarded to the District Attorney's Office (Am. Compl. ¶ 146), and that Defendants "falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses." (Am. Compl. ¶ 178.)[48] Plaintiff also alleges that Dr. Landi swore under oath in the criminal complaint that had Annie received medical care sooner, she could have survived—a fact that was, according to the Complaint, "false, misleading, and perjurious, and entirely unsupported . . . by any medical science . . . ." (Am. Compl. ¶ 150.) At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that the content of the criminal complaint, reports, and search warrant affidavits contained false information that certain City Defendants knowingly provided and/or swore to—and finds that Plaintiff has adequately pled her fabrication of evidence claim against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

b) The Medical Center Defendants

As previously discussed (*see supra* Sections X.A.1), Plaintiff has alleged that Dr. Kupferman ignored evidence suggesting that Annie's death was not caused by SBS and provided false information to Dr. Landi, who based her conclusions on that false information.

---

[48] As previously discussed, because the Amended Complaint does not allege direct involvement by all Defendants in the investigation of Plaintiff's case, these group pleadings are insufficient in themselves to state a fabrication of evidence claim as to those City Defendants as to whom there are no specific allegations of involvement.

Although the Medical Center Defendants argue that "the [Amended] Complaint does not contain an allegation regarding violation of plaintiff's right to a fair trial" (*see* Dkt. 56 at 10), the Court disagrees, given the numerous allegations of fabrication of evidence and Dr. Kupferman's alleged failure to consider Annie's lab results that were consistent with metabolic bone disease. (*See* Am. Compl. ¶¶ 122, 145, 146, 150, 178, 232, 233.) Even though, as the Medical Center Defendants point out, the Amended Complaint does not specifically mention the Fifth Amendment, the Court finds that the factual allegations in the complaint have given the Medical Center Defendants sufficient notice of this claim.[49]

### 3.   Statute of Limitations With Respect to Fair Trial Claims

Having found that Plaintiff adequately pled both her *Brady* violation and fabrication of evidence claim against the City Defendants and the Medical Center Defendants, the Court turns to those Defendants' argument that these claims are time-barred (*see* Dkt. 59 at 28). The City Defendants contend that Plaintiff's fair trial claim accrued at the time of her arrest because "she was always aware of her theory that her baby died from a genetic disorder and not any action taken by plaintiff or her husband." (*Id.*) In response to this argument, Plaintiff simply states, without citing any legal authority, that her procedural due process claim is not time barred because "Federal equitable tolling standards should apply." (Dkt. 61 at 25.) Plaintiff makes no other argument. Notwithstanding Plaintiff's inadequate response, the Court finds the City Defendants' argument unpersuasive.

---

[49] The Medical Center Defendants also assert that even assuming that Dr. Kupferman diagnosed Annie with SBS and that she failed to consider alternative causes for Annie's death, Dr. Kupferman cannot be liable for violating Plaintiff's right to a fair trial because Plaintiff's indictment was based on her failure to seek timely medical attention and not based on Dr. Kupferman's opinions on the cause of Annie's death. (Dkt. 56 at 10.) The Court this argument unpersuasive as it is plausible that Dr. Kupferman's conclusion that Annie died of SBS proximately caused Plaintiff's indictment for failure to seek medical attention sooner.

Fabrication of evidence claims accrue "when the plaintiff learns that evidence was fabricated and an injury was caused by the fabrication." *Carr v. City of New York*, No. 11–Civ– 6982, 2013 WL 1732343, at *6 (S.D.N.Y. Apr. 19, 2013) ("[P]laintiff arguably learned of the alleged fabrication as soon as the criminal complaint was filed and certainly no later than when [the defendant] took the stand at [ ] trial . . . ."); *see also Garnett v. Undercover Officer C0039*, No. 13–cv–7083, 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015) ("[A fabrication of evidence] claim accrues when the officer forwards the false information to the prosecutors."). Because the statute of limitations is an affirmative defense, "[t]he burden is on the defendant to establish when a federal claim accrues." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011).

Here, the Court finds that the City Defendants have not established that Plaintiff knew all along that she had *Brady* violation and fabrication of evidence claims simply because she believed in her innocence; the City Defendants' contrary assertion is too sweeping. At a January 2, 2013 status conference, Plaintiff learned that ADA Bishop moved to dismiss the criminal charges against Plaintiff because Dr. Kupferman informed ADA Bishop that Annie's brain injuries were so severe that immediate medical intervention would likely not have saved her. (*See* Dkt. 63 at Ex. F at ECF 6.) Therefore, it is plausible to infer that in January 2013 Plaintiff specifically learned that she might have a fabrication of evidence claim against the City Defendants based on Dr. Landi's earlier contrary assessment of how Plaintiff was responsible for Annie's death, in part, because Plaintiff failed to get medical attention for her daughter quickly enough. *See Mitchell v. Home*, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005) ("[A] fair trial claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury[.]" (citing *Veal v.*

*Geraci*, 23 F.3d 722, 724–25 (2d Cir. 1994)); *see also Bailey v. City of New York*, 79 F. Supp. 3d 424, 444 (E.D.N.Y. 2015) (same).[50]

As for Plaintiff's *Brady* violation claim, the Court cannot assess when it was that the claim could have plausibly accrued because Plaintiff does not specifically allege what exculpatory evidence the City Defendants concealed. However, because the City Defendants have the burden of establishing that the statute of limitations has expired, and in light of the cursory argument put forth by the City Defendants, the Court denies the City Defendants' motion to dismiss Plaintiff's fair trials claims on statute of limitations grounds with respect to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi. For the reasons previously discussed, the Medical Center Defendants' motion to dismiss Plaintiff's fair trials claims against them is also denied.

## B. Substantive Due Process

"[D]ue process protection in the substantive sense limits what the government may do in both its legislative, and its executive capacities . . . ." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citing *Griswold v. Connecticut*, 381 U.S. 479 (1965) and *Rochin v. California*, 342 U.S. 165 (1952)). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). "[C]riteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at

---

[50] This conclusion is not inconsistent with the Court's finding that the fact that Plaintiff might not have known until long after her arrest that there was evidence that could have supported her claim of innocence—such as Dr. Kupferman's contrary conclusion about the preventability of Annie's death—did not warrant equitable tolling. *See supra* at Section IV.B. In analyzing specifically the accrual of a fabrication of evidence claim, when Plaintiff learned of the alleged fabricated evidence *is* the triggering date, but not so for a claim of false arrest or malicious prosecution.

issue." *Cnty. of Sacramento*, 523 U.S. at 845. "[F]or executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2d Cir. 2010) (citation and quotations marks omitted). "It is not enough that the government act [was] 'incorrect or ill-advised[.]'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (citation and quotation marks omitted).

### 1.   Failure to Investigate

Against the Medical Center Defendants and Dr. Landi, Plaintiff asserts a claim best characterized as a claim of failure to investigate, in violation of Plaintiff's substantive due process rights. (*See* Am. Compl. ¶ 235; *see also* Dkt. 66 at 20.)[51] More specifically, this claim is based on the argument that the Medical Center Defendants and Dr. Landi failed to "exhaust all possibilities" before rendering an SBS diagnosis, and therefore violated Plaintiff's liberty. (*See* Dkt. 66 at 20–21; Am. Compl. ¶ 238 ("Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of plaintiff's liberty . . . .").)

---

[51] The City Defendants interpret Paragraph 235 of the Amended Complaint as stating a claim of professional malpractice, and argues that "such a claim is not cognizable under § 1983." (Dkt. 59 at 28–29; *id.* at 26 ("For good measure, [Plaintiff] appears to include a professional malpractice claim of sorts against defendants Landi, Kupferman and FHMC . . . .").) This is a misunderstanding of Plaintiff's allegation. A more suitable reading of Plaintiff's allegation in Paragraph 235 would be that it is touching on the "professional judgment" standard that is discussed in the context of substantive due process claims. The Supreme Court has articulated this "professional judgment" standard in *Youngberg v. Romeo*, 457 U.S. 307 (1982). The Supreme Court held in *Youngberg* that State officials are liable for treatment decisions concerning involuntarily committed mental health patients only if the officials' decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323 (citation and quotation marks omitted).

Both groups of Defendants contend that all of Plaintiff's substantive due process claims are solely based on Plaintiff's Fourth Amendment claims of false arrest, malicious abuse of process, and conspiracy, and thus are duplicative of her Fourth Amendment claims and should be dismissed. (*See* Dkt. 55 at 14; Dkt. 56 at 10; Dkt. 59 at 26.) Plaintiff responds that "the Fourth Amendment does not 'cover a cause of action for government abuse of process in the investigation or pursuit of a suspect', and that she therefore has a separate, standalone substantive due process claim against certain Defendants for failing to investigate other explanations for Annie's death before concluding that she died from SBS. (Dkt. 66 at 20 (citing *Russo v. City of Hartford*, 184 F. Supp. 2d 169, 184 (D. Conn. 2002)).)

"The right [to be free from arbitrary government action,] to the extent it exists, is the right to be free of arbitrary government action *that infringes a protected right*." *Connor v. Pierson*, 426 F.3d 187, 200 n. 6 (2d Cir. 2005). Here, Plaintiff does not provide adequate legal support for her assertion of a substantive due process right to have investigating officials "exhaust all possibilities" that could have explained the cause of Annie's death before concluding that it was SBS. (*See* Dkt. 66 at 20–21.)[52] Moreover, even though Plaintiff attempts to distinguish her

---

[52] In her MOL, Plaintiff argues that, "Plaintiff properly pleads that [the Medical Center] Defendants failed to exhaust all possibilities before rendering an SBS diagnosis and adopted an improper burden shifting presumption that presumes subdural hemorrhaging is caused by abuse. (FAC ¶¶ 122, 160, 208, 235, 257). . . . Kupferman's actions shocked the conscious [sic] because Plaintiff had the right to liberty protected under the Fifth Amendment and Kupferman and FHMC acted 'so outrageous [sic], that it may fairly be said to shock the contemporary conscience.'" (Dkt. 66 at 20–21 (citation omitted).) Plaintiff cites to one Middle District of Pennsylvania case, *Isbell v. Bellino*, 983 F. Supp. 2d 492 (M.D.P.A. 2012), but does not discuss the case. Setting aside the fact that this case is not Second Circuit law, *Isbell* does not even support a finding that the protection of substantive due process creates an obligation for a government official to follow alternative investigatory paths. Indeed, the court in *Isbell* concluded that where the plaintiff went "to the emergency room with an infant suffering from subdural hematomas, retinal hemorrhaging, reinoschisis, and rib fractures . . . [and] the injuries were later revealed to have been caused by a Vitamin D deficiency and congenital rickets," the defendant's child abuse diagnosis *did not* shock the conscience. *Id.* at 500. The *Isbell* court also

substantive due process claim from her Fourth Amendment claims, Plaintiff's failure to investigate claim, at the end of the day, is based on her substantive due process right to be free of prosecution and arrest *without probable cause*.[53] *Cf. Campbell*, 2000 WL 194815, at *3 ("allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution."). This is evidenced by Plaintiff's own brief and the Amended Complaint, which both state that Defendants' failure to investigate "effectuated Plaintiff's arrest."[54] (Dkt. 66 at 22.)

"As a general matter, [the U.S. Supreme Court] has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright*, 510 U.S. at 271–72 (citing *Collins v.*

---

explained that "mere negligence or deliberate indifference on the part of the Defendants [under Third Circuit law was] insufficient to support a substantive due process claim." *Id.* at 499–500.

[53] The Court is not persuaded by Plaintiff's reliance on *Russo v. City of Hartford*, 184 F. Supp. 2d 169 (D. Conn. 2002) in attempting to distinguish her substantive due process failure-to-investigate claim from her Fourth Amendment claims. In *Russo*, the court stated, "[W]hile claims arising from a plaintiff's arrest and prosecution would fall within the scope of the Fourth Amendment, that Amendment would not cover a cause of action for government abuse of process in the investigation or pursuit of a suspect." *Id.* at 184. However, the plaintiff in *Russo* specifically argued that "allegations of a conspiracy to discredit him, jeering *after* his arrest, and continued harassment state a claim for substantive due process." *Id.* It also appears that the plaintiff in *Russo* alleged injury besides his arrest and prosecution that was caused by the defendant's violation of his substantive due process rights. *Id.* ("Supporting his substantive due process cause of action, Russo claims that the [defendants] conspired to ruin Russo's credibility . . . ."). In contrast, the sole injury Plaintiff alleges here relating to her substantive due process violation claim is deprivation of liberty, *i.e.*, her arrest and incarceration. (*See* Am. Compl. ¶ 238.)

[54] The overlap between Plaintiff's substantive due process failure to investigate and her Fourth Amendment claims is further evidenced by the Due Process section of the Amended Complaint, which begins with a paragraph stating, "By the conduct and actions described above, defendants . . . violat[ed] rights secured to plaintiff by the Constitution of the United States . . . including, but not limited to, Plaintiff's Fourth and Fourteenth Amendment rights." (Am. Compl. ¶¶ 231, 238) and closes with, *inter alia*, a paragraph that states, "Defendants' conduct precipitated and caused the sequence of events that *ultimately resulted in the deprivation of plaintiff's liberty . . . ."* (Am. Compl. ¶ 238.)

*Harker Heights*, 503 U.S. 115 (1992)).  The Supreme Court has instructed that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims."  *Id.* at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) and holding that substantive due process cannot afford plaintiff relief when the plaintiff "ask[ed] [the Supreme Court] to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause").  In light of this guidance and given the plain overlap between Plaintiff's substantive due process claim alleging a failure to investigate and her Fourth Amendment claims, the Court finds that, to the extent Plaintiff has a viable failure to investigate claim[55], it falls under the Fourth Amendment rubric.  Here, Plaintiff's claim of failure to investigate, as a practical matter, will be subsumed by all of her other Section 1983 claims.

Accordingly, both the City Defendants' and the Medical Center Defendants' motions to dismiss Plaintiff's substantive due process claim based on a failure to investigate are granted.

---

[55] Whether the alleged failure to investigate gives rise to a constitutional claim is far from clear.  Courts have explained that failure to pursue a particular investigative path does not give rise to an independent due process claim apart from claims of false arrest, malicious prosecution, or violation of right to a fair trial.  *See, e.g.*, *Blake v. Race*, 487 F. Supp. 2d 187, 212 n.18 (E.D.N.Y. 2007) (rejecting an independent due process claim of failure to investigate and finding the allegations of failure to investigate should be regarded as part of plaintiff's false arrest and malicious prosecution claims); *Stokes v. City of New York*, No. 5–CV–0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate; rather, such allegations are considered, to the extent they are relevant, within the framework of claims for false arrest, false imprisonment, or malicious prosecution."); *Newton v. City of New York*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation.  Accepting [plaintiff's] allegations as true, his rights were violated as a result of the malicious prosecution, not the failure to investigate."); *McCaffrey v. City of New York*, No. 11–cv–1636, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim.").

2.    Speedy Trial

Plaintiff also alleges that she was denied a speedy trial, in violation of her right under the speedy trial clause of the Sixth Amendment.  (*See* Am. Compl. ¶ 234.)  The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  Specifically, Plaintiff alleges that she was held for more than four years in pretrial detention and that all Defendants encouraged this for the purpose of using Plaintiff's confinement as a bargaining chip to pressure her husband to plead guilty.  (Am. Compl. ¶ 234.)

The Medical Center Defendants argue that Plaintiff failed to allege, other than in conclusory fashion, the causation element of this claim with respect to the Medical Center Defendants.  (*See* Dkt. 55 at 14.)  The Court agrees.

A Section 1983 action, "like its state tort analogs, employs the principle of proximate causation."  *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *see also Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (Jacobs, C.J., concurring) ("Our cases affirm that traditional tort law principles apply equally to a Section 1983 plaintiff and require him to show the causal link from the original police misconduct up to the point of injury in order to proceed on his claim.").  "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment."  *Townes*, 176 F.3d at 147.  Here, Plaintiff fails to allege any facts to support a causal link between the Medical Center's alleged conduct and the unreasonable delay in Plaintiff criminal case being resolved.

The City Defendants do not discuss Plaintiff's speedy trial claim in their briefing.  In any event, the Court finds that Plaintiff's allegations that Defendants sought to use her as a "bargaining chip" to obtain a guilty plea from her husband, coupled with the four-year delay in

her case being resolved and her case being dismissed shortly after her husband's conviction, is sufficient to state a speedy trial claim as to the City Defendants who were involved in her prosecution.

Accordingly, the Court denies the City Defendants' motion to dismiss Plaintiff's speedy trial claim as to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi, but grants the Medical Center Defendants' motion to dismiss this claim as to them.

### 3. Unconstitutional Conditions of Confinement

Plaintiff also alleges that certain conditions of confinement violated her substantive and procedural due process rights. (Am. Compl. ¶ 236.)[56] "A pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. City of New York*, No. 15–2870, slip op. at 26 (2d Cir. Feb. 21, 2017) (citing, *inter alia*, *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)).

Only the Medical Center Defendants discuss this claim; they assert that their conduct did not proximately cause Plaintiff's condition of detention. (*See* Dkt. 55 at 14.) Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it. *See deVere Grp . GmbH v. Op. Corp.*, 877 F. Supp. 2d 67, 70 n.3 (E.D.N.Y. 2012) ("Because plaintiff did not address defendants' motion to dismiss with regard to this claim, it is

---

[56] Specifically, Plaintiff alleges that every Defendant violated her due process right during her detention by (1) refusing to tell Plaintiff where her daughter's body was buried, (2) refusing the usual and customary medical services, including OB-GYN care, (3) forcing Plaintiff to give birth to her second daughter while handcuffed and shackled, (4) refusing Plaintiff the opportunity to breastfeed or bond with her infant daughter after childbirth, and (5) taking away Plaintiff's infant daughter two-and-a-half days after delivery. (Am. Compl. ¶ 236.) While Plaintiff argues that these deprivations constitute both a substantive and procedural due process violation (Am. Compl. ¶ 237), the Court need not decide whether these claims allege substantive or procedural due process violations because they must be dismissed due to the lack of connection to any Defendant in this case.

deemed abandoned and is hereby dismissed." (quoting *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005)); *Harley v. City of New York*, 14–CV–5452, 2016 WL 552477, at *7 (E.D.N.Y. Feb. 10, 2016) (finding plaintiff's claims abandoned where plaintiff's response to motion to dismiss "did not dispute, and in fact wholly ignore[d], defendants' argument" (citing *Jackson v. Federal Exps.*, 766 F.3d 189 (2d Cir. 2014))); *Moccio v. Cornell Univ.*, No. 09–Civ–3601, 2009 WL 2176626, at *4 (S.D.N.Y. Jul. 21, 2009) ("Whatever the merit of [the defendants'] argument [for dismissal], plaintiff has abandoned the . . . claim, as her motion papers fail to contest or otherwise respond to defendants' contention."), *aff'd*, 526 F. App'x 124 (2d Cir. 2013); *see also Simon v. City of New York*, No. 14–CV–8391, 2015 WL 4092389, at *2 (S.D.N.Y. Jul. 6, 2015) (collecting cases).

In any event, the Medical Center Defendants are correct. Plaintiff's claim of unconstitutional conditions of confinement must be dismissed as to all Defendants because the Amended Complaint does not allege any facts establishing the personal involvement of any Defendant with respect to those conditions. *See Spavone*, 719 F.3d at 135; *Johnson v. Barney*, 360 F. App'x. 199, 201 (2d Cir. 2010) (summary order) (finding that plaintiff's claim failed "as a matter of law" where plaintiff failed to allege sufficient personal involvement on the part of the prison superintendent); *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (dismissing claim against Department of Correctional Services ("DOCS"), where plaintiff had argued that DOCS violated her constitutional rights by arresting her for non-compliance with her post-release supervision ("PRS"), since "the practice of re-incarcerating persons who violated their administratively-imposed PRS was a practice of the Division of Parole, and not of [DOCS]").[57]

---

[57] To the extent Plaintiff has a viable claim based on the conditions of her confinement in a State correctional facility, that claim should have been brought against the State, the correctional facility, or the prison officials, not the prosecutor or police officers who handled

Accordingly, the Court grants the Medical Center Defendants' motion to dismiss Plaintiff's conditions of confinement claim as to them. The Court also dismisses that claim *sua sponte* as to the City Defendants since there are no factual allegations in the Amended Complaint that support such a claim as to these Defendants. *See, e.g., Barreto v. Suffolk Cnty.*, No. 10–CV–0028, 2010 WL 301949, at *2 (E.D.N.Y. Jan. 20, 2010) ("When a complaint fails to comply with the requirements of Rule 8, district courts have the authority to dismiss the complaint *sua sponte*." (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 41 (2d Cir. 1988))); *LeBarron v. Warren Cnty. Sheriff's Office*, No. 1:13–CV–1572, 2015 WL 2248749 (N.D.N.Y. May 13, 2015) (*sua sponte* dismissing plaintiff's claim where the claim failed to allege facts plausibly suggesting personal involvement of individual defendants even though the defendants did not raise a lack-of-personal-involvement challenge to the claim); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district courts have power to *sua sponte* dismiss complaints "in order to preserve scarce judicial resources").

## XI. *MONELL* CLAIMS

### A. Against the City

Plaintiff asserts a *Monell* claim against the City based on her Section 1983 claims for false arrest, malicious prosecution, and violation of right to a fair trial, alleging a theory of "deliberate indifference" to provide adequate training for its officers who work on SBS cases or to properly instruct Defendants of "applicable provisions of [New York] State Penal Law . . .

---

Plaintiff's criminal case. *See, e.g., Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia*, 877 F. Supp. 634 (D.D.C. 1994), *modified in part on other grounds*, 899 F. Supp. 659 (D.D.C. 1995), *vacated in part and remanded on other grounds*, 93 F.3d 910 (D.C. Cir. 1996); *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc); *Brawley v. Washington*, 712 F. Supp. 2d 1208 (W.D. Wash. 2010); *Zaborowski v. Dart*, No. 08–cv–6946 (N.D. Ill. Dec. 20, 2011); *Villegas v. Metropolitan Govt. of Nashville*, 709 F.3d 563 (6th Cir. 2013).

federal and state constitutional limitations . . . ."  (*See* Am. Compl. ¶ 243, 244, 248.)  The Court finds Plaintiff's allegations of municipal liability adequate to state a *Monell* claim against the City.

A municipality may be liable under Section 1983 if a municipal "policy or custom" causes "deprivation of rights protected by the Constitution."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations" that the violation of  the plaintiff's constitutional rights resulted from the municipality's custom or official policy.  *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases).  "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff."  *Moran v. Cnty. of Suffolk*, No. 11 Civ.3704, 2015 WL 1321685 (E.D.N.Y. Mar. 24, 2015) (citing *Parker v. City of Long Beach,* 563 F. App'x 39 (2d Cir. 2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Hines v. Albany Police Dep't,* 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester,* 556 F. App'x 5, 8 (2d Cir. 2014) (failure to train or supervise); *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality)).

Here, Plaintiff advances two theories of municipal liability. First, Plaintiff asserts that the City has a custom of zealously promoting "debated science", here, the diagnosis of SBS. (Dkt. 61 at 26–27.) Second, Plaintiff asserts that the City failed to train its employees, especially child abuse detectives, regarding SBS cases. (Dkt. 61 at 29, 30).[58] The City contends that Plaintiff's *Monell* claim must be dismissed because the claims against individual City Defendants are without merit (Dkt. 59 at 29) and because Plaintiff has not identified any municipal policy that could serve as the basis of a *Monell* claim (*id.* at 31).[59] The Court disagrees.

Plaintiff has alleged that "the NYPD and their precinct(s) and/or the OCME [Office of Chief Medical Examiner of the City of New York] . . . [r]outinely conclude[ed] that Shaken Baby Syndrome is responsible for many infant fatalities despite the absence of evidence necessary to make such a finding." (Am. Compl. ¶ 243a.) Additionally, Plaintiff alleges, *inter alia*, that the NYPD and the OCME routinely ignored the existence of debate and doubt in the medical community concerning SBS diagnoses (*id.* ¶ 243b), and routinely failed to perform tests to rule out SBS or consider evidence that contradicts an SBS diagnosis (*id.* ¶ 243c-d).[60] Plaintiff

---

[58] It appears that Plaintiff is also arguing that the City's failure to train its employees as to SBS is consistent with the custom of zealously promoting a diagnosis of SBS. (*See* Dkt. 61 at 28 ("Instead of training its Detectives on diligently and cautiously investigating SBS cases to avoid constitutional violations[,] . . . the District Attorney's Office, in conjunction with the Office for the Chief Medical Examiner puts on yearly conferences advocating for the continued finding of SBS.").)

[59] The City also denies Plaintiff's allegation that the police abdicated their investigatory obligations to medical professionals when arresting Plaintiff, and her allegation that Defendants were deliberately indifferent. (*Id.* at 31.)

[60] The Amended Complaint includes many more allegations in support of Plaintiff's *Monell* claim that are generally conclusory, insufficient, or irrelevant. For example, she alleges that, "[t]he foregoing customs, policies, practices . . . include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury." (Am. Compl. ¶ 243.) She also alleges that the City failed to properly instruct Defendants on the "proper and prudent use of force" (*id.* ¶ 248).

also alleges that the City "with deliberate indifference failed to provide adequate training and standards and policies and practices for its police officers in SBS related cases." (*id.* ¶ 243.) The Court finds these allegations sufficient to overcome a 12(b)(6) motion.

### B. *"Monell*-type" claim against FHMC

Plaintiff brings a "*Monell*-type" claim[61] against FHMC based on multiple theories: (1) FHMC has a policy pursuant to which its employees, such as Dr. Kupferman, conduct forensic and factual investigation of SBS cases "for non-medical purposes, in order to reach non-medical conclusions, and with knowledge that law enforcement will rely on these investigative conclusions in directing the course of an arrest and prosecution" (Am. Compl. ¶ 257); (2) FHMC "perpetuated this policy [of having its staff conduct investigations for 'non-medical purposes'] in order to see those accused of SBS arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever" (Am. Compl. ¶ 259); (3) FHMC failed to train its staff on advances in the field of Child Abuse Diagnosis and Investigation, including SBS (Am. Compl. ¶ 260); (4) FHMC was aware that its employees, including Dr. Kupferman, had a tendency to jump to conclusions and to diagnose SBS without supporting evidence (Am. Compl. ¶ 264); (5) FHMC failed to supervise its employees (Am. Compl. ¶¶ 265–266); and (6) FHMC failed to adequately screen and hire its employees "to respect the constitutional rights of those individuals with whom FHMC comes in contact" (Am. Compl. ¶ 266).

---

[61] In *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406 (2d Cir. 1990), the Second Circuit explicitly extended *Monell* to Section 1983 suits against private entities. *Id.* at 408–09 ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.' Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." (quoting *Monell*)).

While Plaintiff's pleading of a *Monell*-type claim against FHMC is largely based on conclusory allegations,[62] Plaintiff does specifically allege that Dr. Kupferman had a history of overzealously diagnosing SBS of which FHMC was aware, and that Dr. Kupferman was a "final policymaker"[63] with respect to these diagnoses, which resulted in no confirmation being sought with respect to her conclusion that "Annie's death was due to SBS." (Am. Compl. ¶ 164.)[64] Taking Plaintiff's allegations as true, the Court finds that she has nudged her *Monell* claim

---

[62] FHMC argues that Plaintiff's *Monell* claim is deficient because: (1) Plaintiff fails to allege the existence of a policy or custom; (2) Plaintiff puts forth an implausible allegation that "a private hospital dedicated to the well-being of its patients had a policy and procedure for its staff 'to reach non-medical conclusions' 'in order to see those accused of SBS [ ] arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever'"; (3) Plaintiff fails to sufficiently allege a *Monell* claim based upon failure to train; (4) co-Defendants' actions were an intervening cause; (5) "by requesting discovery to determine whether FHMC 'even had a policy in place' for diagnosing and investigating child abuse and SBS cases," Plaintiff has acknowledged that she has no basis to support a *Monell* claim against the hospital; (6) Plaintiff has not alleged facts that Dr. Kupferman was a policymaker; and (7) Plaintiff has not alleged well-settled "custom or usage" to imply the acquiescence of policy-making officials at FHMC because she has not alleged that anyone other than Dr. Kupferman at FHMC engaged in allegedly unconstitutional actions. (*See* Dkt. 56 at 12–15.) The Court explicitly addresses some of these arguments, but has considered FHMC's other arguments and deemed them meritless or irrelevant at this stage.

[63] Although Plaintiff argues that Dr. Kupferman was a policymaker with final authority because she was a Child Abuse Specialist and "was the Director of Continuity Clinics" at FHMC with "responsibility to overview patient care and training of residents" (Dkt. 66 at 26), none of this is alleged in the Complaint. It is thus improper for the Court to consider such factual allegations in deciding the motion to dismiss. *See Green v. City of Mount Vernon*, 96 F. Supp. 3d 263 (S.D.N.Y. 2015) (collecting cases in which the court declines to consider additional facts set forth in plaintiff's opposition papers that are not in the complaint).

[64] FHMC asserts that because Plaintiff only alleges facts as to Dr. Kupferman's unconstitutional actions pertaining to this particular case, there could be no policy or custom inferred on the part of FHMC. (Dkt. 56 at 13.) However, at this stage, given Plaintiff's allegation that Dr. Kupferman, on multiple occasions, overzealously diagnosed SBS and ignored contradictory evidence, the Court finds that the claim survives the Medical Center Defendants' 12(b)(6) motion.

against FHMC across the line from merely "conceivable to plausible." *See Iqbal*, 556 U.S. at 680.

Accordingly, FHMC's motion to dismiss Plaintiff's *Monell* claim against it is denied.

**C.    Liability Based on *Respondeat Superior***

Plaintiff also argues that FHMC should be held liable under the doctrine of *respondeat superior* and therefore Plaintiff need not show that a violation of Plaintiff's constitutional rights by FHMC's employees was due to a policy or custom. (Dkt. 66 at 21–22.) However, the doctrine of *respondeat superior* is not available to render a supervisor liable under Section 1983 for the unconstitutional conduct of his subordinates. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.' . . . They are not vicariously liable under § 1983 for their employee's actions."). In *Connick*, the Supreme Court unequivocally stated that *respondeat superior* cannot be applied either to superiors or to local government entities. *See id.*; *Monell*, 436 U.S. 658 (holding that Section 1983's language demands a causal relationship between the conduct of the defendant and the plaintiff's constitutional deprivation, and that this relationship is absent when liability is imposed solely on the basis of *respondeat superior*). In *Rojas*, the Second Circuit extended *Monell* to Section 1983 suits against private entities. 924 F.2d 406. And just as a municipal entity cannot be held liable under *respondeat superior*, a private corporation cannot be held liable under *respondeat superior* for the allegedly unconstitutional conduct of its employee. *Green v. City of New* York, 465 F.3d 65 (2d Cir. 2006) (citing *Rojas.*, 924 F.2d at 408); *see also Feder v. Sposato*, No. 11–CV–193, 2014 WL 1801137, at *10 (E.D.N.Y. May 7, 2014) (noting that under

*Rojas* a plaintiff must prove an official policy that caused a constitutional tort rather than relying on *respondeat superior* theory).[65]

Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's claim against FHMC based on the doctrine of *respondeat superior* is granted.

## XII.   STATE CONSTITUTIONAL CLAIM

Plaintiff's tenth claim against all Defendants alleges violation of Plaintiff's rights under the New York State Constitution to be free of unreasonable and unlawful searches and seizures under Article I, Section 12 and to be free of deprivation of liberty and property without due process of law under Article I, Section 6.  (Am. Compl. ¶¶ 270–275.)

Plaintiff's State constitution claims must be dismissed because "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983." *Campbell v. City of N.Y.*, No. 09–CV–3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011) (citation and quotation marks omitted); *see also Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (dismissing plaintiff's State constitutional tort claims of unlawful seizures and arrest because the plaintiff had a remedy at common law for false arrest/false imprisonment and a § 1983 claim based on the same grounds and stating that "the state constitutional tort is usually available only in cases in which a plaintiff . . . has no alternative remedy."); *see also Wahad v. F.B.I.*, 994 F. Supp. 237, 240 n.4 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy").

---

[65] Notably, Plaintiff does not even acknowledge *Rojas* and instead "respectfully requests this Court to line with the 7th Circuit [ ] and find FHC liable under the theory of *respondeat superior*."  (Dkt. 66 at 22.)

Here, Plaintiff has a remedy based on Section 1983. Furthermore, Plaintiff has asserted the same due process claim under Section 1983, making Plaintiff's State constitutional claim duplicative. Accordingly, Defendants' motion to dismiss Plaintiff's State constitutional claim is granted.

## XIII. IMMUNITY

### A. Absolute Immunity of ADA Bishop

District courts "are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage." *Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 229 (E.D.N.Y. 2014) (citation and quotation marks omitted), *reconsidered on other grounds*, 47 F. Supp. 3d 152 (E.D.N.Y. 2014). ADA Bishop claims absolute immunity from liability for her prosecutorial actions (Dkt. 59 at 15). *See Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (defendant claiming absolute immunity bears burden of showing that immunity doctrine applies).

Prosecutors performing core prosecutorial functions are entitled to absolute immunity. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 120 (2d Cir. 2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)). They are entitled to absolute immunity "because their prosecutorial activities are 'intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force.'" *Cornejo*, 592 F.3d at 127 (quoting *Imbler*, 424 U.S. at 430) (modification in the original). Prosecutorial functions protected by absolute immunity include conduct "preliminary to the initiation of a prosecution," such as "whether to present a case to a grand jury . . . whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." *Giraldo*, 694 F.3d at 165. The Supreme Court has "made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v.*

*Goldstein*, 555 U.S. 335, 342 (2009) (citing *Imbler*, 424 U.S. at 431 n.33).  A prosecutor who engages in such activities is protected only by qualified immunity.  *Scalafani v. Spitzer*, 734 F. Supp. 2d 288, 296 (E.D.N.Y. 2010) (citing *Van de Kamp*, 555 U.S. 335).

Plaintiff argues that ADA Bishop's conduct was administrative and investigatory in nature.  (*See* Dkt. 61 at 15–17.)  In support of this argument, Plaintiff notes that ADA Bishop "was an initial point of contact for the hospital, and had been in communications with its staff [and] had investigators . . . from the DA's Office involved . . . ."  (*Id.* at 16.)  However, none of this is alleged in the Complaint, and Plaintiff does not direct the Court to any relevant portion of the Complaint in support of these assertions.  Moreover, because information from FHMC staff was crucial to the prosecution of the Lis, ADA Bishop's communications with them are considered part of the prosecutorial process.  *See, e.g., Schnitter v. City of Rochester*, 556 F. App'x 5, (2d Cir. 2014) (summary order) (finding ADA's interview of crucial witness to be a core part of the prosecutorial process).

Plaintiff's other allegations regarding ADA Bishop also relate to prosecutorial functions. Plaintiff alleges that ADA Bishop "failed to examine the medical reports and ask relevant questions as to [Annie's medical] history" (Am. Compl. ¶ 169), and also "ignored evidence . . . and [the] absence of witnesses" (Am. Compl. ¶ 174).  However, these allegations "amount[] to the claim that [ADA Bishop] sought an indictment based on insufficient or unpersuasive evidence[,] . . . [thus challenging] an essential prosecutorial decision."  *Schnitter*, 556 F. App'x. at 7.  Moreover, a prosecutor is entitled to absolute immunity even in the face of allegations of "deliberate withholding of exculpatory information" or "his knowing use of perjured testimony." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler*, 424 U.S. at 431 n.34); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009) ("[I]f the prosecutors

had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated *Brady v. Maryland*, 373 U.S. 83 (1963); but they would be absolutely immune from personal liability"). Thus, absolute immunity applies even though Plaintiff alleges that ADA Bishop "concealed evidence" (Am. Compl. ¶ 175) and "misrepresented facts" (Am. Compl. ¶ 208).[66]

To the extent that Plaintiff's claims are asserted against ADA Bishop in her official capacity, they are barred because Bishop acted on behalf of New York State, which is immune under the Eleventh Amendment. *See Caldwell v. James*, 14–CV–5384, 2015 WL 427980, at *3 (E.D.N.Y. Jan. 30, 2015) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989))); *see, also Caldwell*, 2015 WL 427980 at *3 (collecting cases where courts dismissed claims against State officials on Eleventh Amendment grounds); *Reid v. Schuman*, 83 F. App'x 376, 377 (2d Cir. 2003) (summary order) ("We have held that when a District Attorney is prosecuting a criminal matter, she represents the State, not the municipality.") (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993)).

Accordingly, Plaintiff's claims against ADA Bishop are dismissed with prejudice.

---

[66] Furthermore, the Court does not find that Plaintiff's allegation that ADA Bishop "encouraged and, in effect, deputized Drs. LANDI and KUPFERMAN to forensically and factually investigate the case against the [Lis]" (Am. Compl. ¶ 170) creates a plausible inference that ADA Bishop acted in an investigative or administrative capacity. Plaintiff provides no factual or legal support for her "deputization" theory. This allegation is simply too conclusory to pierce the grant of absolute immunity here.

### B.     City Defendants

The City Defendants also contend that the Officer Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims of false arrest and malicious prosecution.[67] However, for the reasons explained below, the Court cannot find qualified immunity at this stage of the litigation.

 "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Barboza v. D'Agata*, ---F. App'x---, 2017 WL 214563, at *2 (summary order) (2d Cir. 2017) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)).   It is an affirmative defense as to which the defendant officers or officials bear the burden of proof.  *Harlow*, 457 U.S. at 815.

In analyzing the applicability of qualified immunity, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?"  *Barboza*, 2017 WL 214563, at *2 (citation omitted); *Pearson v. Callahan*, 555 U.S. 223 (2009).  In short, "[e]ven if the right at issue was clearly established in certain respects, . . . an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue *in its particular factual context.*" *Barboza*, 2017 WL 214563, at *2 (emphasis in original) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)).   Moreover, courts are "permitted to exercise their sound discretion in

---

[67] Although the City Defendants do not specify which claims they direct their qualified immunity defense against, to the extent they assert the defense based on the existence of probable cause, the defense goes to Plaintiff's claims of false arrest and malicious prosecution. (*See* Dkt. 59 at 12–27.)

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

At this juncture, the Court cannot find that the Officer Defendants are entitled to qualified immunity, especially where Plaintiff's theory of liability is based on the alleged fabrication of evidence and suppression of exculpatory evidence. (*See, e.g.,* Am. Compl. ¶ 145 (with respect to malicious prosecution claim, stating that a criminal complaint containing false information was signed with knowledge that there was no legal basis to prosecute Plaintiff); Am. Compl. ¶ 222 (with respect to Section 1983 conspiracy claim, noting that Defendants conspired to accuse Plaintiff of a crime she did not commit); Am. Compl. ¶ 225 (with respect to unreasonably prolonged detention claim, noting that Defendants mishandled exculpatory evidence); Am. Compl. ¶ 234 (noting that Plaintiff was in pretrial detention because of Defendants' collateral motive).)

Based on these allegations, Plaintiff has sufficiently demonstrated potential violations of her constitutional right to be free from prosecution based on fabricated or suppressed exculpatory evidence. Those rights were clearly established at the time of her prosecution and pretrial detention, such that no reasonable officer could believe that fabricating evidence or suppressing exculpatory evidence is constitutional. *See Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 245, n.8 (E.D.N.Y. 2013) ("It is beyond cavil that [ ] conspiring to and actually falsifying police records, evidence, and testimony violates clearly established rights . . . . and [ ] no public official would think it was objectively reasonable to violate those rights."); *see also Coggins*, 776 F.3d 108 (affirming the district court's conclusion that qualified immunity was inappropriate); *Blake v. Race*, 487 F. Supp. 2d 187, 214 (E.D.N.Y. 2007) ("The [Second Circuit] found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false

confession 'violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise.'" (quoting *Ricciuti*, 124 F.3d at 130); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.").

The City Defendants assert that the Officer Defendants are entitled to qualified immunity because a police officer who signs a supporting deposition under penalty of perjury may be entitled to qualified immunity from a malicious prosecution claim if he reasonably relied on the statement of a witness. *See, e.g., Jean-Laurent v. Bowman*, 2014 WL 4664662221, at *4 (citing *Loria v. Gorman*, 306 F.3d 1271, 1289-90 (2d Cir. 2002)). However, because Plaintiff contends that Dr. Kupferman's and Dr. Landi's diagnoses of Annie's condition and the cause of her death were "entirely unsupported and unsupportable by any medical science or clinical or forensic evidence" (*see* Am. Compl. ¶¶ 150, 160), the Court cannot determine at this point whether it was reasonable for the officers—some of whom are members of the NYPD Child Abuse Squad—to rely on the statements of witnesses, such as Dr. Kupferman or Dr. Landi. Moreover, Plaintiff alleges that the Officer Defendants (and Dr. Kupferman) ignored her claims of innocence out of "unconcealed and unrestrained racism" (Am. Compl. ¶ 114), and that this led to her arrest and prosecution. No reasonable officer would believe seeking arrest and prosecution based on such improper motives was constitutional.

Additionally, in support of their argument, the City Defendants cite to *V.S. v. Muhammad*, 595 F.3d 426 (2d Cir. 2010). Although *V.S.* may seem similar to the instant case, the two are distinguishable in that the "reasonably objective" decision made by the defendants in *V.S.* was in a very different circumstance from the challenged conduct of the Officer Defendants here. In *V.S.*, the Second Circuit held that a caseworker at the New York City Administration of

Child Services was entitled to qualified immunity because she sought a court order permitting the removal of a child from the parent. *Id.* at 431. On summary judgment, the district court found that qualified immunity could not be granted given the plaintiff's allegation that the caseworker had relied on a diagnosis by a doctor who was known to have repeatedly misdiagnosed children's injuries as evidence of child abuse. *Id.* at 431 (district court reasoned that "reliability of [the doctor's] diagnosis . . . is an issue of material fact that goes directly to the objective reasonableness of the caseworker in seizing and removing the child from his mother"). The Second Circuit reversed the district court's decision on qualified immunity, holding that "to impose on [a] caseworker the obligation in such circumstances of assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to remove." *Id.* However, in *V.S.*, the caseworker was making a time-sensitive decision to remove a child from a potentially dangerous and abusive environment. *See V.S. ex rel. T.S. v. Muhammad*, 581 F. Supp. 2d 365, 388 (E.D.N.Y. 2008) (noting defendants' argument that "in light of [the doctor's diagnosis of injury caused by child abuse], the caseworker's belief in the imminent danger to the child was reasonable and their removal of [the child] into protective custody was justified"); *see also Cornejo*, 592 F.3d at 128–29 (recognizing that the caseworker defendants were forced to "choose between difficult alternatives" and were reasonable to believe that "immediate temporary removal" of the children from a potentially abusive environment was justified).

Here, in determining whether the officers reasonably believed that there was probable cause to prosecute Plaintiff, the Court notes that the decision to prosecute was not made under the same threat of imminent harm or time-sensitivity; there was no child to be protected from a potentially abusive parent, as the Lis' only child had already died. Nor was the decision to

prosecute a temporary one.  Moreover, in *V.S.*, the Second Circuit found that the caseworker's actions were reasonable because the doctor had diagnosed the child with SBS "*in the absence of any plausible alternative.*"  *V.S.*, 595 F.3d at 431 (emphasis added).  By contrast, Plaintiff alleges that there were several plausible alternative explanations to SBS as the cause of death, including a genetic disorder and the child's prior medical history, that the Officer Defendants chose to ignore.  (Am. Compl. ¶ 173.)  Plaintiff also alleges that at some point, the Officer Defendants became aware of information that cast doubt on the medical opinions, including the SBS diagnosis, upon which the investigation was premised, but the officers failed to disclose that information to the prosecution or consider it before deciding to prosecute Plaintiff or continue that prosecution.  (*See, e.g.,* Am. Compl. ¶ 178.)  At this stage, the Court must accept these allegations as true, and thus *V.S.* does not dictate that the Officers are entitled to qualified immunity.

Accordingly, the Court does not find that the Officer Defendants are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims.

### C.    Dr. Landi

The City Defendants contend that Dr. Landi is entitled to absolute and qualified immunity.  (Dkt. 59 at 17.)  Again, at this stage of the litigation, the Court finds it inappropriate to dismiss claims against Dr. Landi based on immunity.

#### 1.    Absolute Immunity

In determining whether Dr. Landi's acitivity was investigative or prosecutorial, the Court applies a "functional approach" and looks to the function being performed rather than to the office or identity of the defendant.  *See Cornejo*, 592 F.3d at 127 (citing *Briscoe v. LaHue*, 460 U.S. 325, 342 (1983)); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 121 (2d Cir. 2009) (identifying prosecutorial immunity "not by the identity of the actor but by reference to the

'function' performed"); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 530 (2d Cir. 1993) (noting that immunity attaches to the "function performed, not [ ] the office itself").

In arguing that Dr. Landi is entitled to absolute immunity, the City Defendants rely heavily on *Newton v. City of New York*, 738 F. Supp. 2d 397 (S.D.N.Y. 2010). However, the Court does not find *Newton* to be applicable here. In *Newton*, the plaintiff, who had been convicted of rape, brought a civil rights action against a forensic scientist, employed by the Office of the Chief Medical Examiner of the City of New York, for allegedly failing to conduct proper DNA testing that would have exonerated the plaintiff. *Id.* at 400–03. The forensic scientist had conducted a DNA test three years after the plaintiff was convicted for a court-ordered adversarial post-conviction proceeding. The district court held that the scientist was entitled to absolute and qualified immunity. *Id.* at 411, 416. However, in granting absolute immunity, the court stated that "the protection of absolute immunity may not be appropriate in a pre-conviction context where the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is primarily an investigative one." *Id.* at 411. That distinction is critical here, given that Dr. Landi, unlike the forensic scientist in *Newton*, was involved in Plaintiff's criminal case in a *pre*-conviction context and is alleged to have provided false statements and analyses in support of the criminal complaint and the NYPD's investigation.

Based on the allegations in the Complaint, the Court cannot find, as a matter of law, that Dr. Landi was acting in a prosecutorial role rather than an investigatory one. *See Hill v. City of New York*, 45 F.3d 653 (2d Cir. 1995) ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed . . . in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."); *see also Wilkins v. Herky*, No. 11–cv–6104, 2013 WL

2385065, at *7 (W.D.N.Y. May 29, 2013) ("[I]t is appropriate to address absolute immunity in a 12(b)(6) context *if the complaint clearly indicates the nature of the function for which the defendant is being sued . . . .*" (emphasis added)); *also compare Newton*, 738 F. Supp. 2d at 408, 412 (noting that the defendant-scientist was entitled to absolute immunity because the scientists' role in the plaintiff's criminal case was in an advocacy capacity and *not* for the purpose of identifying potential suspects) *with Cornejo*, 592 F.3d at 128 (finding that the district court was incorrect to find that a caseworker was entitled to absolute immunity because the caseworker's initiation of the child's removal from his mother's custody was functionally equivalent to police officers making arrests in criminal cases).

### 2.    Qualified Immunity

The City Defendants also argue that Dr. Landi is entitled to qualified immunity because she did not violate Plaintiff's Fourth Amendment rights.  (Dkt. 59 at 19.)  The City Defendants contend that Dr. Landi could not have falsely arrested or maliciously prosecuted Plaintiff and thus there was no violation of Plaintiff's clearly established constitutional right.  (*Id.*)  However, the Court has ruled that Plaintiff's malicious prosecution claim will, in fact, proceed against Dr. Landi and several Officer Defendants.  Furthermore, Plaintiff's claims against Dr. Landi are not limited to false arrest and malicious prosecution.  For example, as previously discussed, Plaintiff also asserts fair trial claims, based on alleged fabrication of evidence and concealment of exculpatory evidence, against Dr. Landi.   Accordingly, the Court cannot find, at this time, that Dr. Landi is entitled to qualified immunity

### D.    Dr. Kupferman Is Not Entitled to Statutory Immunity

The Medical Center Defendants assert that Dr. Kupferman is entitled to statutory immunity under the New York Child Protective Services Act.  (Dkt. 55 at 2–3.)

Section 413 of the Child Protective Services Act requires physicians, such as Dr. Kupferman and FHMC's staff, to report suspected child abuse if they have "reasonable cause" to believe that a child has been abused. *See* N.Y. Soc. Serv. Law § 413(1)(a) (McKinney). Failure to report a case of suspected child abuse is a class A misdemeanor. N.Y. Soc. Serv. Law § 420 (McKinney). Section 419 of the Child Protective Services Act provides good faith immunity from any liability to individuals who report suspected cases of child abuse. That section states in pertinent part:

> Any person, official or institution participating in good faith in . . . the making of a report [of suspected child abuse] . . . pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official or institution required to report cases of child abuse or maltreatment . . . shall be presumed. . . .

Contrary to the Medical Center Defendants' assertion, the Court does not find *Thomas v. Beth Israel Hospital Inc.*, 710 F. Supp. 935 (S.D.N.Y. 1989) to be particularly relevant. In *Thomas*, the court held that the defendant-physician who examined an infant and reported suspected child abuse had immunity under Section 419 of the Child Protective Services Act because the physician had "reasonable cause" to suspect abuse when the examination revealed multiple abrasions and black and blue marks. *Id.* at 941–42. In contrast to *Thomas*, however, Plaintiff alleges that Dr. Kupferman's role went beyond simply reporting suspected child abuse. Plaintiff alleges that Dr. Kupferman took on an active role in investigating the Lis. (*See* Am. Compl. ¶ 115 (Kupferman "repeatedly screamed at [the Lis] that they killed their daughter . . . ."); Am. Compl. ¶ 120 ("Kupferman conducted a 'forensic interview' of plaintiff.")).

Similarly, the Court is not convinced by the Medical Center Defendants' reliance on *Storck v. Suffolk County Dep't of Social Servs.*, 62 F. Supp. 2d 927, 946 (E.D.N.Y. 1999) because, there, the court "clearly" found that the defendant doctors were acting "in the discharge

of their duties and within the scope of their employment." Here, Plaintiff's allegations, accepted as true, suggest that Dr. Kupferman's conduct may have exceeded the scope of her employment with FHMC. (*See, e.g.,* Am. Compl. ¶ 157 (Kupferman "acted as a deputy of the *NYPD* and the *Queens County D.A.'s Office*" (emphasis in original)); Am. Compl. ¶ 161 (Kupferman "played an active role in the prosecution of Ying Li . . . that went well beyond her role, and into ancillary and forensic aspects of determining motive, culpability, and the veracity of Ying Li.").) Moreover, Plaintiff alleges that Dr. Kupferman's determination that Annie died of SBS was "such a substantial departure from accepted professional judgment, practice, or standards" (Am. Compl. ¶ 235), and that Dr. Kupferman failed to consider other pertinent information that might have suggested alternative causes for Annie's death (*see, e.g.,* Am. Compl. ¶ 122). Taking these allegations as true, such alleged acts "go beyond mere error and amount to willful misconduct," and thus Dr. Kupferman would not be entitled to statutory immunity based on the lack of "good faith". *See* Section 419 of the Child Protective Services Act; *see also Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 347 (E.D.N.Y. 2008) (allowing plaintiffs to proceed with discovery to prove their allegations of bad faith on the part of the Medical Center Defendants and denying statutory immunity, given that plaintiff alleged that the defendant-doctor's "diagnosis of child abuse was not supported by *any* medical evidence . . . [and] that she disregarded the medical assessment of a colleague.").

Accordingly, because the Court cannot determine at this time whether Dr. Kupferman enjoys immunity under the Child Protective Services Act, the Court denies the Medical Center Defendants' motion to dismiss the claims against Dr. Kupferman on the ground that she is statutorily immune.

## XIV. LEAVE TO AMEND

Plaintiff has requested leave to amend her complaint in the event any of her claims are dismissed. For the reasons discussed below, the Court denies that request in its entirety.

Federal Rules of Civil Procedure 15(a) provides that a court "should freely give leave [to amend] when justice so requires." "Although 'it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile.'" *B. v. City of New York*, No. 14–CV–1021, 2016 WL 4530455, at *18 (E.D.N.Y. Aug. 29, 2016) (citation and quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. *See, e.g., Kwon v. Santander Consumer U.S.A.*, No. 15–CV–3352, 2016 WL 6518578, at *6 (E.D.N.Y. Oct. 6, 2016) (dismissing with prejudice claims that are time-barred while allowing the plaintiff to replead his other claims); *Johnson v. New York City Police Dept.*, 651 F. App'x. 58 (2d Cir. 2016) (summary order) (affirming district court's dismissal of the plaintiff's Section 1983 claims "without granting him an opportunity to amend or discussing whether leave to amend would be appropriate" because the three-year statute of limitations expired).

First, the Court denies, as futile, leave to amend any time-barred claims and all claims against ADA Bishop, whom the Court has found is entitled to absolute immunity. *See, e.g., Harrison v. Cnty. of Nassau*, No. 15–cv–2712, 2016 WL 4083381, at *6 (E.D.N.Y. Aug. 1, 2016) (denying leave to replead claims against ADAs "because it is clear that all of plaintiff's allegations relate to their involvement in [plaintiff's] prosecution and are therefore protected by absolute immunity"); *Johnson*, 651 F. App'x at 61 (finding leave to amend would be futile where the district court found the prosecutor was entitled to absolute immunity); *Contreras v. Perimenis*, 562 F. App'x 50 (Summary Order) (2d Cir. 2014) (same).

Second, the Court exercises its discretion to deny Plaintiff leave to amend as to the other claims that the Court has dismissed. *Avent v. Doe*, No. 2008 WL 877176, at *14 (N.D.N.Y. Mar. 31, 2008) ("Plaintiff has already filed one amended complaint in this action, and this court has found that the complaint does not state a claim[.]"). The Court already permitted Plaintiff the opportunity to amend the complaint, and, in fact, at the pre-motion conference held in connection with Defendants' motions to dismiss, urged Plaintiff to correct the deficiencies identified in Defendants' pre-motion conference requests and at the conference, and to pare down her claims to only viable ones. However, as noted throughout this decision, Plaintiff did not heed the Court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint, which is currently 275 paragraphs. To allow Plaintiff to attempt to amend her complaint again would be an act of futility and a waste of resources. The Court therefore denies Plaintiff leave to amend her complaint a second time.

In summary, the following claims are dismissed:

- Count 1 (False Arrest and Imprisonment) – as to all Defendants;

- Count 2 (Malicious Prosecution) – as to all Defendants, except Defendants Degnan and Landi, and the Medical Center Defendants;

- Count 3 (Malicious Abuse of Process) – as to all Defendants, except Defendants Degnan and Landi;

- Count 4 (Failure to Intervene) – as to all Defendants;

- Count 5 (Section 1983 Conspiracy) – as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

- Count 6 (Unreasonably Prolonged Detention) – as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- Count 7 (Due Process) – as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, Landi, and Medical Center Defendants.  However, the speedy trial aspects of Plaintiff's due process claim is dismissed as to the Medical Center Defendants.  Moreover, Plaintiff's due process claim of failure to investigate and conditions of confinement are dismissed as to all Defendants.

- Count 10 (State Constitution) – as to all Defendants.

## CONCLUSION

For the reasons stated above, the City Defendants' motion to dismiss is GRANTED in part and DENIED in part.  The Medical Center Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff shall proceed on the following claims:

- Malicious Prosecution against Defendants Degnan, Landi, and the Medical Center Defendants;

- Malicious Abuse of Process against Defendants Degnan and Landi;

- Section 1983 Conspiracy against Defendants Degnan, Moser, Phelan, Heffernan, Landi, and the Medical Center Defendants;

- Unreasonably Prolonged Detention against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- Due Process (*Brady* violation and fabrication of evidence) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

- Due Process (speedy trial) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- *Monell* claims against the City and FHMC.

Given that several Defendants as to whom claims are proceeding are not yet represented (*see supra* footnote 1), Plaintiff shall by April 14, 2017 advise the Court in writing how she intends to proceed with respect to these Defendants.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
        Brooklyn, New York